UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -*v*.- | 26 Cr. 04 (VEC) |
| ANTHONY HERBERT | |
| Defendant. | |

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA**
**IN OPPOSITION TO THE DEFENDANT'S PRETRIAL MOTIONS**

JAMES M. McDONALD
United States Attorney

Benjamin M. Burkett
Catherine Ghosh
Justin Horton
Assistant United States Attorneys

- Of Counsel -

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 1

A. The Indictment ..... 1

B. The Search Warrants ..... 7

1. The July 2024 Email Warrant ..... 7
2. The September 2024 Phone Warrant ..... 11
3. The August 2025 Warrant ..... 14
4. The October 2025 Warrant ..... 24
5. The February 2026 Warrant ..... 27

ARGUMENT ..... 30

I. SEVERANCE OF COUNT SIX IS UNWARRANTED ..... 30

A. Applicable Law ..... 30

1. Rule 8(a) ..... 30
2. Rule 14(a) ..... 34

B. Discussion ..... 35

1. Count Six Is Properly Joined Because All of the Charged Offenses Are Connected by Overlapping Evidence ..... 36
2. Count Six Is Properly Joined Because the Charged Offenses Are of the Same or Similar Character ..... 43
3. The Defendant's Conclusory Claims Are Insufficient to Demonstrate Substantial Prejudice ..... 54

II. DISMISSAL OF COUNT FIVE IS UNWARRANTED ..... 58

A. Applicable Law ..... 59

B. Discussion ..... 60

1. Count Five is Not Duplicitous ..... 60
2. Count Five Does Not Risk Unfairness ..... 65

III. THE DEFENDANT'S SUPPRESSION MOTION IS MERITLESS ..... 68

A. Applicable Law ..... 69

1. Standing ..... 69
2. Probable Cause ..... 70
3. Particularity and Overbreadth ..... 71
4. Manner of Search ..... 78
5. The Suppression Remedy and Good Faith ..... 79
6. Franks Hearings ..... 82

B. Discussion ..... 85

1. The Defendant Lacks Standing ..... 85
2. The July 2024 Email Warrant and the September 2024 Phone Warrant Were Properly Issued and Executed ..... 87
3. Even if Law Enforcement's Execution of the 2024 Warrants Was Deficient, Blanket Suppression is Unwarranted ..... 104
4. The August 2025 Warrant Was Properly Issued and Relied Upon in Good Faith ..... 109
5. The Remaining Warrants Were Properly Issued and Relied Upon in Good Faith ..... 115
6. No Hearing is Required ..... 119

CONCLUSION ..... 120

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bins v. United States*,
331 F.2d 390 (5th Cir. 1964) .................... 62
*Blunt v. United States*,
404 F.2d 1283 (D.C. Cir. 1968) .................... 57
*Bradley v. United States*,
433 F.2d 1113 (D.C. Cir. 1969) .................... 57
*Carpenter v. United States*,
138 S. Ct. 2206 (2018) .................... 72
*Coolidge v. New Hampshire*,
403 U.S. 443 (1971) .................... 72, 102
*Dalia v. United States*,
441 U.S. 238 (1979) .................... 78
*Demaree v. Pederson*,
887 F.3d 870 (9th Cir. 2018) .................... 74
*Drew v. United States*,
331 F.2d 85 (D.C. Cir. 1964) .................... 32
*Franks v. Delaware*,
438 U.S. 154 (1978) .................... 82
*Gerstein v. Pugh*,
420 U.S. 103 (1975) .................... 70
*Golino v. City of New Haven*,
950 F.2d 864 (2d Cir. 1991) .................... 82
*Groh v. Ramirez*,
540 U.S. 551 (2004) .................... 75
*Herring v. United State*,
555 U.S. 135 (2009) .................... 81
*Hill v. United States*,
418 F.2d 449 (D.C. Cir. 1968) .................... 55
*Horton v. California*,
496 U.S. 128 (1990) .................... 77
*Illinois v. Gates*,
462 U.S. 213 (1983) .................... 70, 82
*In the Matter of a Warrant for All Content & Other Info. Associated with the Email Acct. xxxxxxx gmail.com Maintained at Premises Controlled By Google, Inc.*
33 F. Supp. 3d 386 (S.D.N.Y. 2014), *as amended* (Aug. 7, 2014) .................... 75, 78
*Jones v. United States*,
362 U.S. 257 (1960) .................... 71

*Kelly v. United States*,
590 U.S. 391 (2020) ... 61
*Kousisis v. United States*,
605 U.S. 114 (2025) ... 43, 58, 61
*Minnesota v. Dickerson*,
508 U.S. 366 (1993) ... 77
*Rakas v. Illinois*,
439 U.S. 128 (1978) ... 69
*Rawlings v. Kentucky*,
448 U.S. 98 (1980) ... 69
*Richardson v. United States*,
526 U.S. 813 (1999) ... 67
*Teledyne Instruments, Inc. v. Cairns*,
No. 12 Cv. 854 (ORL), 2013 WL 5781274 (M.D. Fla. Oct. 25, 2013) ... 86
*Texas v. Brown*,
460 U.S. 730 (1983) ... 70
*Thiel v. Korte*,
954 F.3d 1125 (8th Cir. 2020) ... 80
*United States v. Agrawal*,
726 F.3d 235 (2d Cir. 2013) ... 60
*United States v. Amato,*
15 F.3d 230 (2d Cir. 1994) ... *passim*
*United States v. Amrep Corp.*,
560 F.2d 539 (2d Cir. 1978) ... 58, 63, 64
*United States v. An*,
733 F. Supp. 3d 77 (E.D.N.Y. 2024) ... 86
*United States v. Aracri*,
968 F.2d 1512 (2d Cir. 1992) ... 59, 61, 62, 65
*United States v. Arias-Casilla*,
No. 21 Cr. 218 (AT), 2022 WL 2467781 (S.D.N.Y. July 6, 2022) ... 75, 76, 88, 103
*United States* v. *Armstrong*,
No. 23 Cr. 324, 2024 WL 2894273 (D. Minn. Mar. 12, 2024) ... *passim*
*United States* v. *Attanasio*,
870 F.2d 809 (2d Cir. 1989) ... 45
*United States v. Awadallah*,
349 F.3d 42 (2d Cir. 2003) ... 82, 84, 85
*United States v. Babilonia*,
854 F.3d 163 (2d Cir. 2017) ... 77, 106
*United States v. Barrett,*
No. 23 Cr. 623 (JLR), 2025 WL 371084 (S.D.N.Y. Feb. 3, 2025) ... *passim*
*United States v. Bastanipour*,
41 F.3d 1178 (7th Cir. 1994) ... 51
*United States v. Bezmalinovic*,
No. S3 96 Cr. (MGC), 1996 WL 737037 (S.D.N.Y. Dec. 26, 1996) ... 47
*United States v. Biaou*,

No. 24 Cr. 323 (CRC), 2026 WL 221768 (D.D.C. Jan. 28, 2026) .......................................... 57
*United States v. Blakney,*
941 F.2d 114 (2d Cir. 1991)........................................................................................ 31, 54
*United States v. Bonventre,*
646 F. App'x 73 (2d Cir. 2016) ........................................................................................ 36
*United States v. Bowen*,
689 F. Supp. 2d 675 (S.D.N.Y. 2010)................................................................................ 78
*United States v. Bicher,*
No. 22 Cr. 589 (LGS), 2023 WL 2401374 (S.D.N.Y. Mar. 7, 2023) ............................... *passim*
*United States v. Brown,*
744 F. Supp. 558 (S.D.N.Y. 1990)................................................................................ *passim*
*United States v. Canfield*,
212 F.3d 713 (2d Cir. 2000)........................................................................ 82, 84, 85, 120
*United States v. Cartagena*,
No. 24 Cr. 516 (PGG), 2025 WL 1456097 (S.D.N.Y. May 21, 2025).................................... 62
*United States v. Carter*,
448 F. App'x 112 (2d Cir. 2011) ............................................................................... 31, 46
*United States v. Carter*,
448 F. App'x 112 (2d Cir. 2011) ............................................................................... 31, 46
*United States v. Casamento*,
887 F.2d 1141 (2d Cir. 1989)........................................................................................ 35
*United States v. Clark*,
638 F.3d 89 (2d Cir. 2011)............................................................................................ 82
*United States v. Cohan*,
628 F. Supp. 2d 355 (E.D.N.Y. 2009) ............................................................................ 72
*United States v. Comprehensive Drug Testing, Inc.*,
621 F.3d 1162 (9th Cir. 2010) ...................................................................................... 74
*United States v. Delima*,
No. 22 Cr. 0111, 2023 WL 7404054 (D. Vt. Nov. 9, 2023) ........................................... *passim*
*United States v. Falso*,
544 F.3d 110 (2d Cir. 2008)................................................................................ 83, 85, 120
*United States v. Fama*,
758 F.2d 834 (2d Cir. 1985).......................................................................................... 71
*United States v. Figueroa*,
618 F.2d 934 (2d Cir. 1980).......................................................................................... 51
*United States v. Frazier*,
No. 21 Cr. 371, 2022 WL 3574300 (N.D. Ala. May 26, 2022)............................................... 40
*United States v. Free,*
841 F.2d 321 n.1 (9th Cir. 1988) .................................................................................. 30
*United States v. Friedman,*
854 F.2d 535, 563 (2d Cir. 1988)................................................................................... 35
*United States v. Filippi*,
No. 12 Cr. 604 (RA) 2013 WL 208919 (S.D.N.Y. Jan. 16, 2013) ........................................... 86
*United States v. Fishbein*,
No. S1 21 Cr. 296 (PAC), 2023 WL 2734428 (S.D.N.Y. Mar. 31, 2023)................... 30, 32, 52

*United States v. Gabriel*,
920 F. Supp. 498 (S.D.N.Y. 1996) .......... 64
*United States v. Galpin*,
720 F.3d 436 (2d Cir. 2013) .......... *passim*
*United States v. Gamble*,
388 F.3d 74, 76 (2d Cir. 2004) .......... 106
*United States v. Ganias*,
824 F.3d 199 (2d Cir. 2016) .......... 79, 88, 110
*United States v. Garlick*,
No. 22 Cr. 540 (VEC), 2023 WL 2575664 (S.D.N.Y. Mar. 20, 2023) .......... *passim*
*United States v. Gatto*,
313 F. Supp. 3d 551 (S.D.N.Y. 2018) .......... 75, 88, 94
*United States v. Germosen*,
139 F.3d 120 (2d Cir. 1998) .......... 52
*United States v. Gilmore*,
No. 24 Cr. 127 (LJL), 2024 WL 3990604 (S.D.N.Y. Aug. 29, 2024) .......... 62, 63
*United States v. Gosy*,
No. 16 Cr. 46, 2019 WL 948178 (W.D.N.Y. Feb. 27, 2019) .......... 50
*United States v. Goyal*,
No. 19 Cr. 844 (CS) ECF No. 89 (S.D.N.Y. Aug. 11, 2021) .......... *passim*
*United States v. Graziano*,
558 F. Supp. 2d 304 (E.D.N.Y. 2008) .......... 80, 95
*United States v. Guttenberg*,
No. 07 Cr. 141 (DAB), 2007 WL 4115810 (S.D.N.Y. Nov. 14, 2007) .......... 55
*United States v. Haqq*,
278 F.3d 44 (2d Cir. 2002) .......... 69
*United States v. Halper*,
590 F.2d 422 (2d Cir. 1978) .......... 32, 33, 44, 50
*United States v. Harris*,
805 F. Supp. 166 (S.D.N.Y. 1992) .......... 43, 44, 47
*United States v. Haynes*,
16 F.3d 29 (2d Cir. 1994) .......... 55
*United States v. Hernandez*,
No. 09 Cr. 625 (HB), 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010) .......... 76
*United States v. Hester*,
No. 19 Cr. 324), 2020 WL 3483702 (S.D.N.Y. June 26, 2020) .......... 54
*United States v. Hills*,
No. 16 Cr. 329, 2018 WL 1621088 (N.D. Ohio Apr. 4, 2018) .......... 107
*United States v. Hinton*,
127 F. Supp. 2d 548 (D.N.J. 2000) .......... 64
*United States v. Jacobson*,
4 F. Supp. 3d 515 (E.D.N.Y. 2014) .......... 73
*United States v. Josephberg*,
418 F. Supp. 2d 297 (S.D.N.Y. 2005) .......... 48
*United States v. Josephberg,*

459 F.3d 350 (2d Cir. 2006)....................................................................................... 48
*United States v. Kandic*,
134 F.4th 92 (2d Cir. 2025) ................................................................................. 59, 65
*United States v. Kaplan*,
895 F.2d 618 (9th Cir. 1990) ........................................................................... 35, 50, 56
*United States v. Kearney*,
444 F. Supp. 1290 (S.D.N.Y. 1978)........................................................................ 62, 63
*United States v. Kerik*,
615 F. Supp. 2d 256 (S.D.N.Y. 2009)......................................................................... 47
*United States v. Khan*,
726 F. App'x 73 (2d Cir. 2018) ................................................................................ 60
*United States v. Khandakar*,
955 F. Supp. 2d 268 (S.D.N.Y. 2013)......................................................................... 40
*United States v. Kimble*,
855 F.3d 604 (4th Cir. 2017) ............................................................................. 80, 81
*United States v. Klump*,
536 F.3d 113 (2d Cir. 2008)...................................................................................... 82
*United States* v. *Lahey*,
967 F. Supp. 2d 698 (S.D.N.Y. 2013)......................................................................... 85
*United States* v. *Lanza*,
790 F.2d 1015 (2d Cir. 1986)............................................................................. 34, 58
*United States v. Leeper*,
--- F.4th ----, 2026 WL 2339544 (2d Cir. Aug. 13, 2026)............................................. 71
*United States v. Leon*,
468 U.S. 897, 922 (1984).................................................................................. 71, 81
*United States v. Loera,*
59 F. Supp. 3d 1089 (D.N.M. 2014) .......................................................................... 95
*United States v. Litwok,*
678 F.3d 208 (2d Cir. 2012)...................................................................................... 43
*United States v. Lumiere*,
No. 16 Cr. 483 (JSR), 2016 WL 7188149 (S.D.N.Y. Nov. 29, 2016).................................. 79
*United States v. Mandell*,
710 F. Supp. 2d 368 (S.D.N.Y. 2010)......................................................................... 84
*United States v. Margiotta*,
646 F.2d 729 (2d Cir. 1981)................................................................................ *passim*
*United States v. Matias*,
836 F.2d 744 (2d Cir. 1988)...................................................................................... 79
*United States v. McGrath*,
558 F.2d 1102 (2d Cir. 1977)............................................................................. 30, 47
*United States v. Melendez,*
No. 16 Cr. 33 (LTS), 2016 WL 4098556 (S.D.N.Y. July 28, 2016) ................................... 83
*United States v. Mendlowitz,*
17 CR. 248 (VSB), 2019 WL 1017533.......................................................................... 107
*United States v. Montoya-Eschevarria*,,
892 F. Supp. 104 (S.D.N.Y. 1995)............................................................................. 86

*United States v. Moore,*
968 F.2d 216 (2d Cir. 1992) ........ 82
*United States v. Meszaros*,
No. 06 Cr. 290, 2008 WL 5113425 (E.D.N.Y. Nov. 25, 2008) ........ 53
*United States v. Murray*,
618 F.2d 892 (2d Cir. 1980) ........ 59
*United States v. Nejad*,
436 F. Supp. 3d 707 (S.D.N.Y. 2020) ........ 72, 75, 88
*United States v. Osorio*,
949 F.2d 38 (2d Cir. 1991) ........ 69
*United States v. Otero*,
563 F.3d 1127 (10th Cir. 2009) ........ 96
*United States v. Padilla*,
508 U.S. 77 (1993) ........ 69
*United States v. Page*,
657 F.3d 126 (2d Cir. 2011) ........ *passim*
*United States v. Parker*,
165 F. Supp. 2d 431 (W.D.N.Y. 2001) ........ 66
*United States v. Patel*,
No. 25 Cr. 173 (VM), 2026 WL 849850 (S.D.N.Y. Mar. 27, 2026) ........ 75, 88
*United States v. Paulino*,
850 F.2d 93 (2d Cir. 1988) ........ 69
*United States v. Pena*,
932 F. Supp. 2d 464 (S.D.N.Y. 2013) ........ 56
*United States v. Peeples*,
962 F.3d 677 (2d Cir. 2020) ........ 85, 112
*United States v. Peoples*,
748 F.2d 934 (2d Cir. 1984) ........ 55
*United States v. Percoco*,
No. 16 Cr. 776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ........ 37
*United States v. Perez*,
247 F. Supp. 2d 459 (S.D.N.Y. 2003) ........ 54
*United States v. Pizarro*,
No. 17 Cr. 151 (AJN), 2018 WL 1737236 (S.D.N.Y. Apr. 10, 2018) ........ 54
*United States v. Pizarro,*
No. 19-2391, 2023 WL 3332539 (2d Cir. May 10, 2023) ........ 31, 55
*United States v. Rahme*,
813 F.2d 31 (2d Cir. 1987) ........ 69
*United States v. Rajaratnam*,
719 F.3d 139 (2d Cir. 2013) ........ 84, 85
*United States v. Ramirez*,
894 F.2d 565 (2d Cir. 1990) ........ 52
*United States v. Raniere*,
No. 18 Cr. 204 (NGG), 2019 WL 1984026 (E.D.N.Y. May 3, 2019) ........ *passim*
*United States v. Ray*,

541 F. Supp. 3d 355 (S.D.N.Y. 2021)............................................................... 75, 76, 120
*United States v. Raymonda*,
780 F.3d 105 (2d Cir. 2015)......................................................................................... 81
*United States v. Reese*,
933 F. Supp. 2d 579 (S.D.N.Y. 2013)........................................................................... 52
*United States v. Reichberg*,
5 F.4th 233 (2d Cir. 2021) ........................................................................................ 115
*United States v. Reilly*,
76 F.3d 1271 (2d Cir. 1996)......................................................................................... 84
*United States v. Rice*,
699 F.3d 1043 (8th Cir. 2012) ..................................................................................... 67
*United States v. Rigas*,
281 F. Supp. 2d 660 (S.D.N.Y. 2003)........................................................................... 64
*United States v. Riley*,
906 F.2d 841 (2d Cir. 1990)................................................................................... 72, 79
*United States v. Rivera,*
546 F.3d 245 (2d Cir. 2008)...................................................................... 31, 43, 56, 58
*United States v. Robinson*,
294 F. App'x 630 (2d Cir. 2008) ....................................................................... 61, 62, 64
*United States v. Romain*,
No. 13 Cr. 924 (RWS), 2014 WL 6765831 (S.D.N.Y. Dec. 1, 2014) .................................... 78
*United States v. Rosa*,
11 F.3d 315 (2d Cir. 1993)..................................................................... 35, 71, 112
*United States v. Rosa*,
626 F.3d 56 (2d Cir. 2010)..................................................................................... 75, 81
*United States v. Rosario*,
No. 19 Cr. 807 (LAP), 2021 WL 5647879 (S.D.N.Y. Dec. 1, 2021) .............................. *passim*
*United States v. Ruggiero*,
824 F. Supp. 379 (S.D.N.Y. 1993)................................................................................ 69
*United States v. Ruiz*,
894 F.2d 501 (2d Cir. 1990)................................................................................ *passim*
*United States v. Rutkoske*,
No. 03 Cr. 1452 (RCC), 2005 WL 3358596 (S.D.N.Y. Dec. 8, 2005).................................... 52
*United States v. Salemo*,
499 F. App'x 110 (2d Cir. 2012) ....................................................................... 32, 33, 54
*United States v. Salerno*,
66 F.3d 544 (2d Cir. 1995)........................................................................................... 51
*United States v. Sandalo,*
70 F.4th 77 (2d Cir. 2023) ................................................................................... 83, 120
*United States v. Sarshar*
No. 21 Cr. 202 (GHW) .................................................................................................. 67
*United States v. Scali*,
No. 16 Cr. 466 (NSR), 2018 WL 369195 (S.D.N.Y. Jan. 9, 2018)......................................... 48
*United States v. Scarfo*,
180 F. Supp. 2d 572 (D.N.J. 2001) ............................................................................... 80

*United States v. Shellef*,
507 F.3d 82 (2d Cir. 2007)........................................................................................ 43
*United States v. Shi Yan Liu*,
239 F.3d 138 (2d Cir. 2000)................................................................................ 79, 107
*United States v. Singh*,
390 F.3d 168 (2d Cir. 2004).................................................................................. 70, 81
*United States v. Singleton*,
987 F.2d 1444 (9th Cir. 1993) ..................................................................................... 86
*United States v. Skyfield,*
No. 23 Cr. 569 (LJL), 2023 WL 8879291 (S.D.N.Y. Dec. 22, 2023) ..................................... 83
*United States v. Small*,
No. 24 Cr. 208 (VEC) ........................................................................................ 62, 66, 67
*United States v. Stirling*,
571 F.2d 708 (2d Cir. 1978)........................................................................................ 64
*United States v. Stokes*,
33 F.3d 438 (2d Cir. 2013)........................................................................................... 81
*United States v. Sturdivant,*
244 F.3d 71 (2d Cir. 2001).................................................................................... 64, 67
*United States v. Swinton*,
251 F. Supp. 3d 544 (W.D.N.Y. 2017) .......................................................................... 80
*United States v. Tompkins*,
118 F.4th 280 (2d Cir. 2024) ................................................................................ 73, 74
*United States v. Triumph Capital Grp., Inc.*,
211 F.R.D. 31 (D. Conn. 2022).................................................................................. 107
*United States v. Turoff,*
853 F.2d 1037 (2d Cir. 1988)....................................................................................... 30
*United States v. Tutino*,
883 F.2d 1125 (2d Cir. 1989)................................................................................. 51, 62
*United States v. Ulbricht*,
No. 14 Cr. 68 (KBF), 2014 WL 5090039 (S.D.N.Y. Oct. 10, 2014).......................................... 76
*United States v. Ulbricht*,
858 F.3d 71 (2d Cir. 2017).................................................................................. *passim*
*United States v. Ventresca*,
380 U.S. 102 (1965)................................................................................................... 71
*United States v. Vilar*,
No. 05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007).......................... 79, 83, 92
*United States v. Villanueva Madrid*,
302 F. Supp. 2d 187 (S.D.N.Y. 2003)........................................................................... 40
*United States v. Walker*,
142 F.3d 103 (2d Cir. 1998)........................................................................................ 55
*United States v. Wallace*,
No. 22 Cr. 211, 2023 WL 6160695 (D. Colo. Sept. 21, 2023) ................................................ 53
*United States v. Watson*,
404 F.3d 163 (2d Cir. 2005).................................................................................. 70, 86
*United States v. Werner*,

620 F.2d 926 ........ *passim*
*United States v. Wey*,
No. 15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017)........ 63, 67
*United States v. Williams*,
705 F.2d 603 (2d Cir. 1983)........ 66
*United States v. Woods*,
No. 17 Cr. 103, 2019 WL 7630758 (W.D.N.Y. Aug. 30, 2019) ........ 67. 92, 94
*United States v. Young*,
745 F.2d 733 (2d Cir. 1984)........ 72
*United States v. Young*,
916 F.3d 368 (4th Cir. 2019) ........ 80
*United States v. Zemlyansky*,
945 F. Supp. 2d 438 (S.D.N.Y. 2013)........ 71, 72, 73
*Zafiro v. United States*,
506 U.S 534 (1993);........ 34, 35, 56

**Statutes**

18 U.S.C. § 1702........ 63
18 U.S.C. § 2511........ 63
18 U.S.C. §§ 666(a)(1)(A) ........ 6, 7, 58, 61
18 U.S.C. §§ 1343........ 7
18 U.S.C. §§ 1346........ 7
18 U.S.C. §§ 1951........ 7
18 U.S.C. §§ 1956........ 11
18 U.S.C. §§ 1957........ 11
21 U.S.C. §§ 331........ 44
21 U.S.C. §§ 333(a)(2)........ 44
21 U.S.C. §§ 2402........ 44
21 U.S.C. §§ 2403........ 44

**Rules**

Federal Rule of Criminal Procedure 7(c)(1) ........ 59, 61
Federal Rule of Criminal Procedure 8(a)........ *passim*
Federal Rule of Criminal Procedure 14(a)........ 32, 34, 54
Federal Rule of Evidence 404(b) ........ *passim*

**Other Authorities**

Orin Kerr, THE DIGITAL FOURTH AMENDMENT 90 (2024) ........ 77, 95, 101

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the defendant's pretrial motions. (Dkt. 41-43).[1]

## BACKGROUND

### A. The Indictment

On or about January 7, 2026, a grand jury sitting in the Southern District of New York returned a six-count Indictment charging defendant Anthony Herbert with various fraud, bribery, and extortion offenses. (Dkt. 2 ("Ind.")). Those charges stem from three alleged schemes, each of which the Indictment describes in detailed allegations covering conduct from in or about 2020 through 2025, by which time the defendant was working for the Office of the New York City Mayor's Community Affairs Unit. (*See generally* Ind.).

The Indictment proceeds largely in reverse chronological order. The first scheme described in the Indictment took place from at least in or about March 2024 through in or about September 2024, while the defendant was working for New York City (the "City") as the Citywide Public Housing Liaison. (*See* Ind. ¶¶ 2, 6). As alleged, while in that role, the defendant solicited and received thousands of dollars in cash payments from an individual identified in the Indictment as the Security Company Executive, in exchange for the defendant's advice and pressure of other City government officials to award the Security Company Executive's security guard company (the "Security Company") contracts with the City, including for providing services at New York City Housing Authority ("NYCHA") developments. (*See* Ind. ¶¶ 2, 10-34).

[1] Citations to "Dkt." refer to docket entries in this case. All page citations are to the pagination generated by the Court's Electronic Case Files ("ECF") system. Unless otherwise noted, record and case text quotations omit all internal quotation marks, citations, and alterations.

As part of that scheme, on or about May 9, 2024, the defendant requested the Security Company Executive send the defendant a letter on behalf of the Security Company to the City requesting "access to bid[] on contracts." (Ind. ¶ 12).[2] In the same exchange, the defendant asked the Security Company Executive for a "loan" of up to $15,000, which the defendant claimed he would pay back on a monthly basis (though the defendant never repaid any money received or referenced repayment in future communications). (*Id.*).

Consistent with that conversation, over the course of the following months, the defendant accepted at least three bribe payments from the Security Company Executive, totaling at least $11,000—all while the defendant continued to advise and pressure City officials to award work to the Security Company. (*See* Ind. ¶¶ 10, 17-34). For instance, the defendant promised to "put[] pressure on" the then-Mayor of New York City (the "Mayor") to increase security at NYCHA developments, which the defendant claimed would create more contract opportunities for the Security Company. (*See* Ind. ¶ 19; *see also* Ind. ¶ 24 (describing defendant's text messages to the Mayor regarding a need for the City to retain private security at NYCHA properties)). The defendant later coached the Security Company Executive through a meeting at City Hall with two senior City officials. (*See* Ind. ¶¶ 26-29; *see also* Ind. ¶ 27 (describing recorded conversation in which the defendant told the Security Company Executive that he (*i.e.*, the defendant) had "told him [*i.e.*, the Mayor] he had to put the security back in NYCHA so that more, so like, you could, you could, uh, fuckin submit for that")).

[2] As noted in the Indictment, on May 9, 2024, and at all subsequent times relevant to the Indictment, the Security Company Executive was communicating with the defendant at the direction and under the supervision of law enforcement.

The defendant also ghostwrote at least two letters for the Security Company. For example, on or about May 16, 2024, the defendant emailed the Security Company Executive a ghostwritten letter to two senior City Hall officials so that the Security Company Executive could "peruse [it] for corrections," put it on the letterhead of the Security Company, and send it to City Hall officials. (Ind. ¶ 13). The letter introduced the Security Company as a "licensed and certified security company" and requested information on how to submit the company as an "MWBE for a Security Contract"—a reference to the process for obtaining City contracts through programs for Minority- or Women-owned Business Enterprises (*i.e.*, "MWBEs"). (Ind. ¶¶ 13-15). Later that same day, the Security Company emailed one of those senior City Hall officials, copying the defendant, attaching a letter on the Security Company's letterhead with text that was nearly identical to the letter that the defendant had circulated earlier that day. (Ind. ¶ 14). Following the letter's submission, the defendant contacted the senior City Hall officials about the Security Company, while continuing to press the Security Company Executive for a $15,000 payment. (*See* Ind. ¶¶ 15-16). Later, in or about August 2024, the defendant ghostwrote a second letter for the Security Company which, like the one before it, eventually was emailed to a senior City Hall official. (Ind. ¶ 33).

The second scheme charged in the Indictment, which is alleged to have spanned from at least in or about October 2022 through in or about February 2023, occurred while the defendant functioned as the Brooklyn Borough Director for Community Affairs while a member of the Office of the New York City Mayor's Community Affairs Unit. (Ind. ¶ 6). The defendant is alleged to have used that role to advise, pressure, and fraudulently induce other City officials to approve payments to the director (the "Funeral Home Director") of a particular funeral home

(the "Funeral Home") under a City-run financial assistance program for burial services for low-income families, in exchange for thousands of dollars in kickbacks from the proceeds of those reimbursement payments from the Funeral Home Director. (Ind. ¶¶ 3, 35-44).

As part of that scheme, the defendant encouraged the Funeral Home Director to submit funeral reimbursement applications (including invoices) requesting City funding in connection with two particular funerals (specifically, the funerals of two individuals referred to in the Indictment as Victim-1 and Victim-2). (*See* Ind. ¶¶ 36-39). The defendant then advised and pressured City officials to award that funding to the Funeral Home (without disclosing his own financial incentive for doing so), including by advising a City official to "[p]lease process payment request to support expenses for [Victim-1]" and by "vouch[ing]" for the Funeral Home Director in an email forwarding City officials an invoice for Victim-2's funeral. (Ind. ¶ 39).

In helping secure those payments to the Funeral Home, the defendant worked to address City personnel's concerns that the Funeral Home invoices "may be over-charging the City." (Ind. ¶ 42). For instance, on or about December 12, 2023, a senior City official asked if the family of Victim-1 had received funds from GoFundMe, because "[m]y understanding is that they received $6k in the GoFundMe." (*Id.*).[3] The defendant falsely stated in response, "as per the Funeral home[], I am told there is no knowledge of a gofundme." (*Id.*). The defendant, however, was well aware that Victim-1's family had a GoFundMe page for Victim-1: On or about September 15, 2022, the defendant acknowledged in a text message to a family member of Victim-1 that "[t]here is over $6000 in the gofundme me." (*Id.*).

---

[3] GoFundMe is a fundraising website that allows individuals to raise money from others, and is sometimes used to raise funds to cover funeral expenses. (Ind. ¶ 36).

After the defendant falsely told City personnel that there was no GoFundMe page for Victim-1, City officials approved the invoices for Victim-1 and Victim-2. (*Id.* ¶ 43). The Funeral Home Director ultimately received two checks from the City agency administering the burial assistance program (both dated December 16, 2022): one check for $16,500 related to Victim-1, and one check for $7,845 related to Victim-2. (Ind. ¶ 41). By the end of the month, and after the defendant and the Funeral Home Director had exchanged messages about the funds and the defendant "counting on that hookup," the Funeral Home Director wrote the defendant a check for $5,000 described in the check's memo line as a payment for "referrals." (Ind. ¶ 44).

As to the third and last scheme described in the Indictment, the Indictment alleges that, on or about April 10, 2021—less than a year before the defendant assumed his first role in City Hall—the defendant submitted a fraudulent loan application to induce a bank to issue the defendant a loan pursuant to the Paycheck Protection Program ("PPP"). (Ind. ¶¶ 5, 48-53).[4] As alleged, the defendant's fraudulent PPP loan application specifically concerned a purported company called "Anthony Herbert." (Ind. ¶ 49). The application listed the "Anthony Herbert" business's gross income in 2020 as $98,010, which qualified the company for a loan of $20,418. (*Id.*). The application indicated that the purpose of this loan was "Payroll Costs (including proprietor expenses, equal to business expenses plus owner compensation)," and listed the defendant as the 100% owner and sole employee of the "Anthony Herbert" business, which was purportedly established on or about October 1, 2017. (*Id.*). To substantiate his business's purported revenue

[4] As explained in the Indictment, the PPP was a loan program administered by the United States Small Business Administration ("SBA") intended to help businesses keep their workforce employed during the COVID-19 pandemic. (Ind. ¶ 48). Applications for PPP loans were submitted directly to banks that participated in the program. (*Id.*).

of $98,010 in 2020, the defendant's PPP loan application included a fraudulent invoice indicating that the "Anthony Herbert" business sold baked goods. (*See* Ind. ¶¶ 49-50). The application also attached a falsified Internal Revenue Service ("IRS") Form 1040 Schedule C for the year 2020, for the purported "Anthony Herbert" business. (Ind. ¶ 51). As explained in the Indictment, however, 2020 tax returns prepared for the defendant by a tax preparer and signed by the defendant did not include any Schedule C, and the IRS has no record of the defendant having submitted the Schedule C that he submitted in support of his PPP loan application. (Ind. ¶ 51). Based on his fraudulent PPP loan application, the defendant received $20,418 via electronic deposit into one of his checking accounts. (Ind. ¶ 53).

In addition to the foregoing, the Indictment alleges that the defendant filed a series of false financial disclosures in 2023 and 2024, in which he falsely answered "no" to the following questions, among others:

- During [the relevant year], did you receive any gift or gifts valued at $50 or more from the same person or entity or affiliated entities that had business dealings with the City?

- During [the relevant year], did you receive any gift or gifts valued at $1,000 or more from the same person or entity or affiliated entities that did not have business dealings with the City?

- Did you owe any entity or person (other than a relative) $5,000 or more for 90 consecutive days during [the relevant year] or on the date you file this report?

- During [the relevant year], did you . . . receive gifts in the aggregate amount or value of $50.00 from any single source where the source is a person or firm doing business with, or intending to do business with, the City of New York.

(Ind. ¶¶ 45-47).

Based on his participation in the Security Company scheme, the Indictment charges the defendant with, from at least in or about March 2024 through in or about September 2024, committing bribery, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2 (Count One), honest services

wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2 (Count Two), and extortion under color of official right, in violation of 18 U.S.C. § 1951 (Count Three). (Ind. ¶¶ 54-59). Based on his participation in the Funeral Home scheme, the Indictment charges the defendant with an additional count of bribery from at least in or about October 2022 through in or about February 2023, again in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2 (Count Four), and one count of federal program fraud during the same time period, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2 (Count 5). (Ind. ¶¶ 60-63). Finally, based on his participation in the PPP loan fraud scheme, the Indictment charges the defendant with an additional count of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Count Six). (Ind. ¶¶ 64-65).

**B. The Search Warrants**

1. *The July 2024 Email Warrant*

The Indictment's charges arise from an investigation originating in or about March 2024, during which the Government obtained numerous judicially authorized warrants sanctioning its various investigative steps.

The first of those warrants relevant to the instant motions was issued on July 2, 2024, by the Honorable Katharine H. Parker, United States Magistrate Judge for the Southern District of New York (the "July 2024 Email Warrant"), and authorized the Government to search a particular Gmail account used by the defendant (the "Subject Account"). (*See generally* Dkt. 51-1). The July 2024 Email Warrant was supported by a 27-page affidavit signed by a special agent of the U.S. Attorney's Office for the Southern District of New York ("Affiant-1"). (Dkt. 51-1 at 2-28). Among other things, that affidavit specified the crimes under investigation at that point in time: wire fraud, bribery, theft of government funds and conspiracy to commit the same, Travel Act promotion of bribery, and money laundering and conspiracy to commit money laundering

(the "Original Subject Offenses"). The affidavit then set forth more than 11 pages of alleged facts establishing probable cause, all of which principally pertained to the Security Company scheme charged in Counts One through Three of the Indictment. (Dkt. 51-1 at 3-4, 12-25).

The July 2024 Email Warrant itself directed Google LLC, as the service provider for the Subject Account, to provide the Government with, among other data, *the entirety* of the Subject Account's contents—without date limitation. (Dkt. 51-1 at 29-33). The July 2024 Email Warrant then authorized law enforcement to review that data for "any evidence, fruits, and instrumentalities" of the Original Subject Offenses, "related to a contract bribery and fraud scheme to obtain lucrative security contracts with the City based, at least in part, on misrepresentations and in exchange for cash and/or payments-in-kind to at least one public official, *for the time period of January 1, 2023 to the date of this Order* [*i.e.*, July 2, 2024]." (Dkt. 51-1 at 33-34 (emphasis added)). The July 2024 Email Warrant further specified discrete categories of evidence that the Government was authorized to seize, namely:

a. Evidence sufficient to identify the user(s) of the Subject Account at times relevant to the Subject Offenses, including photographs, contact information, payment information, and other personally identifiable information.

b. Evidence concerning the relationship between Anthony Herbert [described in the July 2024 Email Warrant as "HERBERT"], [a particular senior City official], and other co-conspirators, including but not limited to all communications between and amongst these individuals.

c. Evidence related to bribes and/or kickbacks to HERBERT in exchange for steering contracts for the City of New York . . . to a particular company or individual.

d. Evidence relating to the disbursement or laundering of proceeds of the Subject Offenses.

e. Evidence regarding HERBERT's communication(s) with any City representative regarding the award of contracts, including security contracts.

f. Evidence concerning HERBERT's City employment history, including his title, position, responsibilities, disciplinary violations, and/or promotion/demotion.

g. Evidence concerning the concealment of the Subject Offenses.

h. Evidence of the geographic location of the user(s) of the Subject Accounts.

i. Evidence of passwords or other information needed to access the Subject Account or other accounts of the users of the Subject Account.

j. Evidence relating to other accounts, devices, or physical premises in which evidence of the commission of the Subject Offenses may be found.

(*Id.*).

The July Email 2024 Warrant provided that law enforcement would "make reasonable efforts" to search only for files, documents, or other electronically stored information ("ESI") within those discrete categories but, ultimately, authorized law enforcement "to conduct a complete review of all the electronically stored information from the Subject Account if necessary to evaluate its contents and to locate all data responsive to the warrant." (Dkt. 51-1 at 35). In that regard, the warrant specifically delineated examples of various techniques that law enforcement agents were authorized to use in reviewing the data provided by Google for information responsive to the warrant, including:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);
- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;
- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;
- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the Subject Account was used.

(*Id.*).

That authorization was supported by facts that Affiant-1 set forth in his affidavit, which noted that law enforcement intended to "use various methods" to locate evidence responsive to the warrant, "including but not limited to undertaking a cursory inspection of all emails within the Subject Account"—a technique "analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure." (Dkt. 51-1 at 26-27). The affidavit explained that such an approach was appropriate, in part, because other investigative techniques, including "keyword searches," for instance, "are typically inadequate to detect all information subject to seizure." (*Id.*; *see also id.* (explaining that keyword searches "work only for text data," whereas "many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos do not store data as searchable text" and that "keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications")).

In compliance with the July 2024 Email Warrant, Google produced various data from the Subject Account to law enforcement. (*See* Dkt. 51-4 at 4-5). Specifically, law enforcement obtained a total of 658,186 documents from Google in response to the July 2024 Email Warrant, 8,792 of which have been identified as responsive to date.[5]

---

[5] This figure accounts both for documents identified as responsive to the July 2024 Email Warrant as well as documents identified as responsive to other warrants later obtained with respect to the Subject Account (discussed below).

2. *The September 2024 Phone Warrant*

On September 3, 2024, the Honorable Peggy Kuo, United States Magistrate Judge for the Eastern District of New York, authorized a series of warrants including, as relevant here: (i) a warrant for the search of the defendant's residence; and (ii) a warrant authorizing the Government to search the defendant's person for, among other things, cellphones and other electronic storage devices and to then search any seized electronic devices for certain evidence (the "September 2024 Phone Warrant"). (Dkt. 51-2 at 191-204). Like the July 2024 Email Warrant application, the affidavit submitted in support of those warrants was signed by Affiant-1, and it specified the crimes under investigation and alleged facts establishing probable cause—all of which, at that point, remained largely focused on the Security Company scheme. (Dkt. 51-2 at 24-25, 77-85).

The September 2024 Phone Warrant specifically authorized law enforcement to seize "any and all cellphones," including a particular cellphone known to be used by the defendant (the "Subject Device"), that "may contain evidence, fruits, and instrumentalities" of the crimes specified in the warrant, and then to search any seized devices in order to seize particular categories of evidence. (Dkt. 51-2 at 201-03).[6] Specifically, the warrant defined those categories of evidence—some of which included particular date ranges and others of which did not—as follows:

[6] The September 2024 Phone Warrant authorized law enforcement to search for and seize evidence of the same crimes specified in the July 2024 Email Warrant (*i.e.*, the Original Subject Offenses), except for money laundering and conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956 and 1957. (Dkt. 51-2 at 201). The Government's application in support of the September 2024 Phone Warrant did not seek authorization to search for or seize evidence of the money laundering offenses. (*See* Dkt. 51-2 at 24-25).

1. Evidence concerning the occupancy or ownership of [Herbert's residence] *for the time period between January 1, 2018, and the present, inclusive*.

2. Electronic communications between ANTHONY HERBERT and other law enforcement officers, public officials, or individuals regarding public security contracts or the awarding of such contracts in furtherance of the Subject Offenses, *for the time period between January 1, 2023, and the present, inclusive*.

3. Evidence concerning documents and/or records regarding public security contract-related activities or information, including, but not limited to, the contracts, contract bidding process, bidding entities or individuals, requirements, necessary licenses or certifications, qualifications, experiences, references, and the rules surrounding public security contracts, in relation to the Subject Offenses.

4. Evidence, including communications, photographs, videos, images, cash in excess of $1,000, and other content and information, that depict preparation for, participation in, or concealment of, the Subject Offenses, *for the time period between January 1, 2023, and the present, inclusive*, including but not limited to:

    a. Payments, gifts, services, money or things of value provided to HERBERT from any individual or the individual's associates, including associated entities, that were seeking or had obtained a public contract;

    b. The duties and responsibilities of HERBERT in his capacity working for the City of New York;

    c. Knowledge and understanding by HERBERT and individuals he communicated with in furtherance of the Subject Offenses, concerning the rules and regulations governing payments to HERBERT in exchange for taking actions in an official capacity; and

    d. Knowledge of any acts taken by HERBERT or other public officials in exchange for any payments, gifts, services, money or things of value to HERBERT or another public official and their associates.

5. Communications, photographs, or other documents or records concerning the filing of any and all financial disclosure forms, including but not limited to draft financial disclosures, filed financial disclosures, documents used in the preparation of financial disclosures, and correspondence with any person regarding the preparation of financial disclosures.

6. Information, including geolocation information, concerning the timing or location of communications or actions in furtherance of one or more of the Subject Offenses (*e.g.*, information that places HERBERT and/or others in particular locations or communicating at particular times and locations in connection with the Subject Offenses).

7. Communications, photographs, or other documents or records concerning the use of alternative methods of communications believed to be less easily accessed or intercepted by law enforcement.

8. Evidence of, or evidence tending to identify, the deletion of data that is or was contained in the devices subject to this warrant, or the withholding of data that is or was contained in the devices subject to this warrant from production pursuant to subpoena or other lawful process, during the course of, in furtherance of, or in an attempt to conceal any fact regarding, the Subject Offenses.

9. Other evidence of the consciousness of guilt of HERBERT, or any potential coconspirator, or any persons acting on his behalf with respect to the Subject Offenses, such as evidence that their conduct with respect to the Subject Offenses deviated from their conduct in other relevant circumstances in ways intended to conceal the nature of, or their involvement in, the Subject Offenses.

10. Evidence of any pecuniary, penal, or other motive HERBERT, or any potential coconspirator, or any persons acting on his behalf had in participating in the Subject Offenses, such as evidence establishing their financial circumstances or actual, potential, or believed criminal exposure, at any time relevant to the Subject Offenses.

11. Information concerning the identities and locations of co-conspirators (including, for example, communications with co-conspirators, photos or other attachments, and address book information).

12. Information concerning passwords or other information needed to access a user's computer, electronic devices or other online accounts used in furtherance of one or more of the Subject Offenses.

13. Evidence concerning the geographic location of HERBERT and potential coconspirators, in connection with commission of the Subject Offenses, *for the time period between January 1, 2023, and the present, inclusive*.

14. Evidence concerning the location of other evidence, including financial accounts, electronic communications services, mobile applications, phone numbers, and electronic devices, used in furtherance of the Subject Offenses.

15. For each of the devices, the phone number(s), email addresses, or other accounts associated with the electronic devices; address books and contact lists; log information of phone numbers of incoming and outgoing calls; other caller-identification information, including names, phone numbers, and addresses; and evidence of user attribution showing who used or owned the electronic devices at the time the records and items described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords.

(Dkt. 51-2 at 201-03 (emphasis added)). To effectuate the Government's review, the September 2024 Phone Warrant authorized law enforcement to copy any devices seized pursuant to the warrant for later review. (Dkt. 51-2 at 203).

Although the September 2024 Phone Warrant limited the *seizure* of some categories of evidence to evidence for the time period of January 1, 2023, to the present, the September 2024 Phone Warrant—like the July 2024 Email Warrant before it—contemplated law enforcement conducting a broader review in its efforts to identify that evidence. (*See* Dkt. 51-2 at 203). And—again mirroring the January 2024 Email Warrant—the September 2024 Phone Warrant listed examples of various techniques that law enforcement agents were authorized to use in identifying responsive material, among them "opening or cursorily reading the first few 'pages' of . . . files in order to determine their precise contents" and "performing key word searches through all electronic storage areas." (*See* Dkt. 51-2 at 203-04). As with the January 2024 Email Warrant, the September 2024 Phone Warrant indicated that law enforcement would "make reasonable efforts" to search only for responsive material but ultimately authorized "a complete review of all the ESI from seized devices if necessary to evaluate its contents and to locate all data responsive to the warrant." (Dkt. 51-2 at 204). That language was, again, supported by facts alleged in the warrant application, which expressly described challenges in reviewing ESI. (*See* Dkt. 51-2 at 107-108).

3. *The August 2025 Warrant*

The Government seized the Subject Device and proceeded with searching its contents pursuant to the September 2024 Phone Warrant, while continuing its review of the Subject Account for materials responsive to the July 2024 Email Warrant. (*See* Dkt. 51-3 at 25). While executing those searches, law enforcement agents observed evidence of additional criminal

activity, some of which fell outside of the time period applicable to the evidence that law enforcement agents were authorized to seize pursuant to the July 2024 Email Warrant (and outside of the time period included in *certain* of the categories of evidence that law enforcement was authorized to seize pursuant to the September 2024 Phone Warrant), and some of which concerned crimes other than the Original Subject Offenses. (*See* Dkt. 51-3 at 25-26). Based on these observations, law enforcement agents sought further authorization from a United States Magistrate Judge permitting them to continue looking for evidence of additional criminal activity beyond that described in the initial warrants. (*See generally* Dkt. 51-3).

To that end, the Government submitted an application to the Honorable Henry J. Ricardo, United States Magistrate Judge for the Southern District of New York, seeking, among other things, a warrant broadening the categories of evidence that the Government was authorized to seize from the Subject Account and the Subject Device, which Judge Ricardo authorized on August 14, 2025 (the "August 2025 Warrant"). That application included an affidavit signed by a special agent of the Internal Revenue Service-Criminal Investigations ("IRS-CI") ("Affiant-2"), which—notably—appended as its Exhibit A, and incorporated by reference, the application submitted in support of the July 2024 Email Warrant, which, in turn, included a copy of the July 2024 Email Warrant itself. (*See* Dkt. 51-3 at 5).

In his affidavit, Affiant-2 acknowledged the date limitations applicable to certain of the categories of evidence that law enforcement was authorized to seize pursuant to the July 2024 Email Warrant and the September 2024 Phone Warrant. (*See* Dkt. 51-3 at 15-16 & n.7).[7]

---

[7] Though Affiant-2's affidavit correctly identified the time period that the July 2024 Email Warrant provided in describing the categories of evidence that the Government was authorized to seize

The affidavit then explained that law enforcement was now seeking a warrant expanding the time period applicable to the materials that law enforcement was authorized to seize from the Subject Account and the Subject Device (which the application collectively referred to as the "Subject Media") as evidence of the Original Subject Offenses, as well as authorizing law enforcement to review the Subject Media for evidence of additional crimes. (*See* Dkt. 51-3 at 16).

In support of that request, Affiant-2's affidavit began by restating many of the facts as to the Original Subject Offenses included in the Government's application for the July 2024 Email Warrant—which, as noted above, largely concerned the defendant's participation in the Security Company scheme. (*See* Dkt. 51-3 at 16-19).[8]

The affidavit then described additional evidence establishing the defendant's commission of the Original Subject Offenses, including "in particular, [the defendant's] motive for committing the Original Subject Offenses." (Dkt. 51-3 at 19-25). For instance, and as to motive evidence in particular, the affidavit noted that law enforcement had learned, based on communications seized from the Subject Account (pursuant to the July 2024 Email Warrant) that, on or about November 13, 2023, the defendant had asked multiple people if he could borrow money, including

---

pursuant to that warrant (specifically, January 1, 2023, to July 2, 2024), the affidavit mistakenly characterized that time period as limiting the scope of the records that *Google was required to produce* pursuant to the July 2024 Email Warrant. (*See* Dkt. 51-3 at 15). The affidavit correctly noted that the September 2024 Phone Warrant limited "some of the categories of evidence to be seized from the [Subject Device]" to evidence for the time period from January 1, 2023 to September 3, 2024. (Dkt. 51-3 at 16 n.7).

[8] The affidavit supplemented even those facts with additional evidence. (*See, e.g.*, Dkt. 51-3 at 17 & n.10 (describing additional portion of a May 29, 2024 meeting between the Security Company Executive—who was generally described in the Government's search warrant applications as "CS-1"—and the defendant, in which the defendant told the Security Company Executive that he (*i.e.*, the defendant) was "putting pressure on" the Mayor to authorize NYCHA developments to renew contracting with private security companies and that, "once he does that, there's gotta be a contract in place . . . that's why I'm rushing you to get your shit")).

two particular individuals ("Individual-1" and "Individual-2") whom he asked for $1,000. (Dkt. 51-3 at 24). The affidavit further explained, also with respect to the defendant's motive, that law enforcement had seized records from the Subject Account showing the defendant's efforts, "[b]eginning in fall 2023," to organize an awards event and that the defendant had obtained a $10,000 loan from Indvidual-2 to pay for a deposit with the event's anticipated venue. (*Id.*). The event was ultimately canceled, which resulted in the defendant borrowing money from [redacted] in order to repay a portion of the money the defendant owed to Individual-1. (*Id.*). Affiant-2's affidavit went on to explain that law enforcement had also gathered financial records indicating that the defendant was borrowing funds from private parties, which Affiant-2 noted "support[ed] that HERBERT was financially struggling at the time and had a motive to accept bribes from [the Security Company Executive]." (*Id.*). Those financial records showed, for instance, a March 19, 2025 payment in the amount of $1,500 to the defendant from a purported consulting company (the "Consulting Company") characterized as an alleged "consultant fee," although the defendant was a City employee at the time. (Dkt. 51-3 at 24-25).[9]

The communications described above—*i.e.*, the communications pertaining to the defendant's borrowing money and the awards event—were seized from the Subject Account, and all of them post-dated January 1, 2023, therefore falling within the date range specified in the

[9] As noted in Affiant-2's affidavit, records submitted to law enforcement by the Consulting Company indicated that the Consulting Company reportedly had done business with the City in the past, including with NYCHA, although, at the time of the affidavit's submission, it was unknown when that business with the City had occurred in relation to the defendant's City employment. (Dkt. 51-3 at 25 n.12).

As explained in a later warrant application (discussed below), law enforcement later developed additional evidence concerning [redacted]. (*See* Dkt. 51-5 at 7).

July 2024 Email Warrant. And, as noted in the affidavit, the March 19, 2025 $1,500 payment from the Consulting Company (and certain of the defendant's borrowing activity) were supported by financial records, not records from the Subject Account. Affiant-2's affidavit explained, though, that—in addition to that payment—law enforcement had reviewed financial records *and*, "in the course of reviewing the contents of the Subject Account," observed "in plain view" additional communications indicating that the Consulting Company sent money to the defendant on prior occasions as well. Specifically, the affidavit noted that those records indicated that, "on or about September 11, 2021, September 23, 2021, December 17, 2021, and October 31, 2023, HERBERT received $500, $1,000, $2,500, and $500, respectively, from [the Consulting Company] as purported consultant fees (the last of which was while HERBERT was employed as a City employee),[10] and on April 14, 2024, [the Consulting Company] donated $500 to HERBERT's campaign [for New York State Assembly]." (Dkt. 51-3 at 25 n.12; *see also* Dkt. 51-3 at 16-17).

Affiant-2's affidavit then described evidence indicating that the defendant had engaged in crimes other than the Original Subject Offenses, which the affidavit divided into groups termed the "Additional Fraud Subject Offenses," the "[redacted]," the "Additional Bribery Subject Offenses," and the "[redacted]." (*See* Dkt. 51-3 at 25-36).[11] Although some of the conduct described as evidence of those schemes occurred as early as 2017, the application sought authorization to seize evidence largely limited to the time period from January 1, 2022 to the then-present. (*See* Dkt. 51-3 at 67-68 (*e.g.*, "Evidence

---

[10] The October 31, 2023 payment was also within the scope of the date range specified in the July 2024 Email Warrant.

[11] The defendant does not dispute that the Government's application for the August 2025 Warrant established probable cause with respect to the [redacted] and the [redacted]. (*See* Dkt. 43 at 12 n.3).

that depicts preparation for, participation in, or concealment of, the Subject Offenses, for the time period between January 1, 2022, and the present, inclusive . . . ," and "Communications, photographs, or other documents or records concerning the filing of any and all financial disclosure forms . . ."—which would have applied to the defendant only after he became a City employee in or about February 2022)).

As described in the Government's application for the August 2025 Warrant, the Additional Fraud Subject Offenses principally concerned efforts by the defendant, the Security Company Executive, and others to enrich themselves through sham charity dinners hosted by the defendant's purported nonprofit, the New York State Multi-Cultural Restaurant & Nightlife Chamber of Commerce (the "Nightlife Chamber")—the same entity involved in the spring 2024 awards event which resulted in the defendant's $10,000 debt described above. (*See* Dkt. 51-3 at 6, 24-28). In setting forth probable cause establishing the defendant's involvement in that scheme, Affiant-2's affidavit described both records that law enforcement obtained from the Security Company Executive's cellphone, as well as records that law enforcement had observed "in plain view" while reviewing the Subject Account pursuant to the July 2024 Email Warrant. (Dkt. 51-3 at 25-28). Affiant-2's affidavit explained how law enforcement had come to observe those materials, elaborating: "After issuance of the Prior Search Warrants [defined to include the July 2024 Email Warrant and the September 2024 Phone Warrant], my law enforcement colleagues and I initiated a review of the data produced for the Subject Account and the data extracted from the [Subject Device]." (Dkt. 51-3 at 25). That review "included communications sent and received by HERBERT," among them certain "emails and text messages members of law enforcement observed in plain view" that Affiant-2 submitted helped establish probable cause to

believe that the defendant had engaged in the Additional Fraud Subject Offenses and, additionally, "shed light on the prior relationship between HERBERT and [the Security Company Executive]," as well as the defendant's "motive for committing the Original Subject Offenses." (*Id.*).

Affiant-2's affidavit then described those emails and text messages, which included, among other communications, an email that the defendant sent to the Security Company Executive and another recipient on March 20, 2018, in which the defendant referenced an awards ceremony that the Nightlife Chamber planned to host on September 6, 2018, and in which the defendant wrote that he, the Security Company Executive, and a third party would be splitting a portion of any "profit" generated from the awards ceremony. (Dkt. 51-3 at 26). The emails and text messages that law enforcement observed during their review included other communications about the defendant's involvement with the Nightlife Chamber and his relationship with the Security Company Executive, spanning from April 2017 through December 2022—including, for example, a December 28, 2022 email that the defendant sent himself in which the defendant identified the Security Company Executive as a potential member of the "fundraising committee" for a political campaign the defendant was organizing on his own behalf. (*See* Dkt. 51-3 at 26-28).

As noted above, beyond these communications that law enforcement observed in the course of their review of the Subject Account, the portion of Affiant-2's affidavit concerning the Additional Fraud Subject Offenses also described, in four of its paragraphs, several text messages between the defendant and the Security Company Executive. (*See* Dkt. 51-3 at 27-28, ¶¶ (e)-(h)). These text messages were obtained from the Security Company Executive's cellphone, not the Subject Account (and, thus, were not encountered in the course of law enforcement's review of

the Subject Account pursuant to the July 2024 Email Warrant). (*See* Dkt. 51-3 at 27 n.13).[12] These text messages, which ranged from August 17, 2021, through November 9, 2022, shed light on the relationship between the defendant and the Security Company Executive. (*See* Dkt. 51-3 at 27-28). In one of the messages, for instance, the defendant told the Security Company Executive that the "Chamber" (*i.e.*, the Nightlife Chamber) would be "fruitful for us all"; in another, the defendant requested a campaign donation from the Security Company Executive; and, in another, the Security Company Executive told the defendant, "you my business partner." (*Id.*).

With respect to the Additional Bribery Subject Offenses, Affiant-2's affidavit set forth evidence concerning the defendant's participation in an apparent bribery scheme in which he [redacted]

[12] Although a footnote in Affiant-2's affidavit explained that the messages in paragraphs 20(f), (g), and (h) of the affidavit were obtained from the Security Company Executive's cellphone (without reference to the text messages described in paragraph (e) of the affidavit), the text messages described in the prior subparagraph, 20(e), also were from the Security Company Executive's cellphone (*i.e.*, not the Subject Account or the Subject Device).

[redacted][13]

As Affiant-2 explained in his affidavit, the Security Company Executive did not have a specific recollection of paying a "bribe" to the defendant in exchange for the defendant [redacted]. (Dkt. 51-3 at 33). However, the Security Company Executive did recall that, during the relevant time period, the Security Company Executive had made "several payments" to the defendant with the "understanding that, should [the Security Company Executive] request HERBERT's assistance with matters relating to HERBERT's government employment, HERBERT would provide such assistance." (*Id.*).[14]

Based on the Government's application—which, among other things, (i) attached the application for the July 2024 Warrant (and a copy of the warrant itself); (ii) described the steps that law enforcement had taken in reviewing the Subject Account pursuant to that warrant; and (iii) disclosed the manner in which law enforcement, while conducting that review, had observed

---

[13] [redacted]

[14] As the defendant acknowledges, insofar as Affiant-2's affidavit described evidence of the defendant's participation in the bribery scheme involving [redacted], the affidavit did not rely on records from the Subject Account or the Subject Device, including any records that law enforcement observed in plain view while reviewing that media. (*See* Dk. 43 at 13).

in "plain view" certain materials that, although outside the temporal bounds of what the July 2024 Warrant authorized law enforcement to *seize*, showed the defendant's involvement in additional criminal conduct—Judge Ricardo authorized the August 2025 Warrant. (*See generally* Dkt. 51-3).

The August 2025 Warrant itself specifically described the Subject Account and the Subject Device (which, like the application in support of the warrant, it referred to as the Subject Media) and authorized law enforcement to review the Subject Media's ESI in order to seize particular categories of evidence pertaining to the crimes identified in the warrant (which, as explained above, included both the Original Subject Offenses and additional crimes). (Dkt. 51-3 at 66-69). The August 2025 Warrant delineated those specific categories of evidence, some of which were limited to evidence from a particular time period and others of which were not. (*See* Dkt. 51-3 at 67-69). For instance, the warrant limited seizure of evidence of communications between the defendant and other public officials and individuals "regarding contracts or the awarding of such contracts" to the time period of January 1, 2022, to the present. (Dkt. 51-3 at 67; *see also id.* (similarly limiting the seizure of evidence depicting "preparation for, participation in, or concealment of" the crimes specified in the warrant). The warrant did not impose similar date limitations with respect to other categories of evidence that law enforcement was authorized to seize pursuant to the warrant, including, for example:

- Evidence concerning the background and nature of the relationship between HERBERT and individuals on whose behalf HERBERT served as a reference or made statements to law enforcement.

- Other evidence of the consciousness of guilt of HERBERT, or any potential co-conspirator, or any persons acting on his behalf with respect to the Subject Offenses, such as evidence that their conduct with respect to the Subject Offenses deviated from their conduct in other relevant circumstances in ways intended to conceal the nature of, or their involvement in, the Subject Offenses.

- Evidence of any pecuniary, penal, or other motive HERBERT, or any potential coconspirator, or any persons acting on his behalf had in participating in the Subject Offenses, such as evidence establishing their financial circumstances or actual, potential, or believed criminal exposure, at any time relevant to the Subject Offenses.

- Evidence concerning the location of other evidence, including financial accounts, electronic communications services, mobile applications, phone numbers, and electronic devices, used in furtherance of the Subject Offenses.

(Dkt. 51-3 at 68-69).

Like the other warrants the Government had previously obtained in its investigation, the August 2025 Warrant authorized law enforcement to use "various techniques to locate data responsive to the warrant," among them "conducting a file-by-file review by 'opening' or reading the first few 'pages' of . . . files in order to determine their precise contents." (*See* Dkt. 51-3 at 66).

4. *The October 2025 Warrant*

The Government's investigation continued, and, by October 2025, law enforcement had uncovered evidence indicating that the defendant had engaged in additional crimes. In particular, the Government's investigation indicated that, in addition to the crimes described in its prior warrant application, the defendant had participated in: (i) the PPP loan fraud scheme that was ultimately charged in Count Six of the Indictment; and (ii) a scheme, spanning from at least in or about January 2020 through at least in or about March 2025, through which the defendant improperly receive referral fee payments, including the payments from the Funeral Home Director supporting Counts Four and Five of the Indictment. (*See* Dkt. 51-4 at 6-7).

Accordingly, the Government, once again, went to a United States Magistrate Judge to obtain yet another warrant authorizing the Government to further review and seize additional data from the Subject Account and the Subject Device (the "October 2025 Warrant"). (*See generally*

Dkt. 51-4).[15] Of note, the Government elected to seek the October 2025 Warrant even though it considered some of the evidence related to the referral scheme to be covered by the warrants it had already obtained. (Dkt. 51-4 at 7 n.3). Rather than make that determination absent court approval, the Government, "in an abundance of caution," sought authority to search the data from the Subject Account and the Subject Device for evidence of the referral scheme, as well as authority to search for and seize evidence of that scheme outside the date ranges included with respect to some of the categories of evidence described in the prior warrants. (*Id.*).

The Government's application for the October 2025 Warrant included another affidavit from Affiant-2 which explained the Government's rationale for seeking another warrant and described some of the evidence that the Government had gathered as to the defendant's involvement in the PPP loan fraud scheme and the referral scheme. (*See generally* Dkt. 51-4 at 3-38). Much of that evidence—and especially the evidence as to the PPP loan scheme—consisted of records other than data from the Subject Account and the Subject Device. (*See, e.g.*, Dkt. 51-4 at 7-10 (describing, with respect to the PPP loan fraud scheme, the April 10, 2021 PPP loan application for the "Anthony Herbert" business and the documentation submitted in support thereof, including the fraudulent invoice and Schedule C (all of which were obtained from the bank administering the PPP loan program); bank records showing that the resulting PPP loan was deposited into the defendant's bank account; tax documents; and email subscription records);[16]

[15] As noted in the Government's warrant application, by this point, the data collected from the Subject Account had been loaded onto a pair of drives, which the application referred to, collectively with the Subject Device, as the "Subject Media." (Dkt. 51-4 at 4-6).

[16] In addition to this evidence, Affiant-2's affidavit noted, in setting forth evidence of the defendant's involvement in the PPP loan fraud scheme, several emails "which members of law enforcement saw in plain view in the course of reviewing the contents of the [Subject Account]."

Dkt 51-4 at 13-14 (describing, with respect to the referral scheme, financial records showing payments from the Funeral Home Director to the defendant); Dkt. 51-4 at 19-21 (describing, also with respect to the referral scheme, [redacted]). Additional evidence pertaining to the defendant's involvement in the referral scheme included records from the Subject Account and the Subject Device—for instance, texts and emails between the defendant and the Funeral Home Director. (*See, e.g.*, Dkt. 51-4 at 14-18). As the defendant acknowledges, all of those communications post-dated January 1, 2022, and were thus within the date limitation that the August 2025 Warrant imposed with respect to certain of the categories of evidence that it authorized law enforcement to seize. (*See* Dkt. 43 at 31).[17]

Based on the affidavit—including Affiant-2's recounting of the Government's review thus far and law enforcement's observation of certain evidence in "plain view" during the course of that review—the Honorable Ona T. Wang, United States Magistrate Judge for the Southern District

---

(Dkt. 51-4 at 12-13). None of these emails concerned the April 10, 2021 PPP loan application for the "Anthony Herbert" baked good business but, rather, pertained to an additional PPP loan application that [redacted]. (*See* Dkt. 51-4 at 11-13). The emails that law enforcement saw in plain view while reviewing data from the Subject Account, indicated that, [redacted]. (Dkt. 51-4 at 12-13). Affiant-2's affidavit noted that law enforcement was [redacted] (Dkt. 51-4 at 12 n.5).

[17] As described in the affidavit submitted in connection with the October 2025 Warrant, some of the referral messages also were within the categories previously authorized for seizure, such as "HERBERT's use or attempted use of, or promise to use, his City position . . . for personal profit or attempted personal profit," and the affidavit therefore noted that the defendant's communications regarding the referral scheme were "within the scope of the Prior Search Warrants [defined to include the August 2025 Warrant]" and "in the alternative . . . observed in plain view." (Dkt. 51-4 at 7 n.3, 28).

of New York, authorized the October 2025 Warrant. (Dkt. 51-4 at 39-42). Like the others before it, the October 2025 Warrant authorized law enforcement to review the data from the Subject Account and the Subject Device for particular categories of evidence pertaining to certain crimes (now defined to include crimes capturing the defendant's participation in the PPP loan fraud scheme and the referral scheme). (*Id.*). And, once more, the warrant authorized "a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant." (Dkt. 51-4 at 41). As to what law enforcement agents were now authorized to seize, the October 2025 Warrant—like the August 2025 Warrant—set forth categories of evidence, some of which included date limitations and others of which did not (including, again, evidence as to the defendant's consciousness of guilt and motive). (Dkt. 51-4 at 42). As to the date-limited categories of evidence, the warrant authorized seizure of evidence dating back to January 1, 2020. (Dkt. 51-4 at 41-42).

5. *The February 2026 Warrant*

As noted above, the Indictment was returned on January 7, 2026. Nevertheless, the Government continued investigating and, by February 2026, had developed evidence that [redacted]. (*See* Dkt. 51-5 at 7).

The Government thus sought another warrant authorizing continued review of the data from the Subject Account and the Subject Device, and permitting law enforcement to seize additional evidence of criminal activity connected to [redacted] [redacted] [redacted] [redacted] (the "February 2026 Warrant"). (*See generally* Dkt. 51-5). [redacted]

[redacted]

(*See* Dkt. 51-5 at 19-20).

In support of its request, the Government submitted another affidavit from Affiant-2. (Dkt. 51-5 at 2-26). That affidavit described the prior search warrants that the Government had obtained with respect to the Subject Account and the Subject Device. (*See* Dkt. 51-5 at 4-7 & n.3). The affidavit then laid out evidence of the defendant's participation in [redacted], some of which derived from public records and grand jury subpoena returns (*see* Dkt. 51-5 at 7-11 & n.4), as well as financial records (*see* Dkt. 51-5 at 12-14). The financial records, for example, showed that [redacted].

(*See* Dkt. 51-5 at 12).

Other evidence described in the affidavit consisted of emails and text messages obtained in the course of the Government's investigation, "including pursuant to judicially-authorized search warrants *and grand jury subpoenas*." (Dkt. 51-5 at 9 (emphasis added)).[18] Of note, most

[18] The defendant repeatedly mischaracterizes this aspect of Affiant-2's affidavit by selectively quoting one paragraph of the affidavit addressing evidence of the defendant's *use* of the Subject Account and the Subject Device (*i.e.*, a paragraph stating that certain emails obtained pursuant to the prior warrants "are sometimes signed 'Tony Herbert,'" and that the phone "contains emails sent from the [Subject Account]") to imply that all of the emails discussed previously in the affidavit were from those sources. (Dkt. 43 at 12, 31 (referencing paragraph 21 of the affidavit

of the communications described in Affiant-2's affidavit—including all of the communications from [redacted] which the defendant complains "[fall] outside the communications categories of every warrant the Government has ever held" (Dkt. 43 at 32)—derived not from the Subject Account or the Subject Device but, rather, were obtained from third parties, such as [redacted], pursuant to grand jury subpoenas.[19]

The Honorable Sarah Netburn, United States Magistrate Judge for the Southern District of New York, authorized the February 2026 Warrant, which authorized the Government to further review the data from the Subject Account and the Subject Device for evidence of additional criminal activity, including evidence of [redacted], and to seize that evidence. (Dkt. 51-5 at 27-30). The February 2026 Warrant included categories of evidence, some of which included date ranges authorizing the seizure of evidence as far back as [redacted], and others of which contained no date limitations. (Dkt. 51-5 at 29-30).

---

(Dkt. 53-5 at 15)). As the affidavit states, the evidence referenced in paragraph 21 supported Affiant-2's belief that "the HERBERT Email Account and HERBERT Personal Phone were used by HERBERT at all relevant times," and said nothing about the source of the various emails and text messages previously discussed in the affidavit—many of which, as described below, were not from either the Subject Account or the Subject Device.

[19] Although the affidavit itself did not specify the source of each email described in the affidavit (beyond explaining that they were "documents obtained in the course of this investigation, including pursuant to judicially-authorized search warrants and grand jury subpoenas"), the Government produced these communications to the defendant together with an index clearly denoting the sources of these materials, and the versions of these communications produced to the defendant generally bear Bates stamping indicating their source (such that it is readily apparent from the versions of these documents produced to the defendant that they were not obtained from the Subject Account or the Subject Device). Furthermore, most of the emails did not include the Subject Account at all but were sent to and from the [redacted] email address (while a few included the Subject Account on parts of the email chains, but were also sent to or from the [redacted] email address).

## ARGUMENT

### I. SEVERANCE OF COUNT SIX IS UNWARRANTED

Count Six is properly joined with the other fraud and bribery offenses charged in Counts One through Five: They are logically connected through overlapping proof and, as crimes involving substantial alleged dishonesty, are of the same or similar character under controlling Second Circuit precedent. To sever Count Six would require convening a second jury to hold a second trial at which multiple common witnesses will be required to testify a second time. The defendant bears a heavy burden in justifying such an extraordinary waste of resources, and he has not carried it here. His severance motion should be denied.

#### A. Applicable Law

##### 1. *Rule 8(a)*

Rule 8(a) of the Federal Rules of Criminal Procedure provides that an indictment may charge a defendant in separate counts if the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."

The Second Circuit has interpreted Rule 8(a) as providing a "liberal standard for joinder," *United States v. Fishbein*, No. 24-2441, 2026 WL 200773, at *3 (2d Cir. Jan. 27, 2026) (quoting *United States v. McGrath*, 558 F.2d 1102, 1106 (2d Cir. 1977)). That broad interpretation "reflects a policy determination that gains in trial efficiency outweigh the recognized prejudice that accrues to the accused" when offenses are tried together. *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988); *see also United States v. Free*, 841 F.2d 321, 324 n.1 (9th Cir. 1988) (explaining that joinder "is the rule, severance the exception"). In particular, "[j]oinder is proper where the same evidence may be used to prove each count," *United States v. Page*, 657 F.3d 126,

129 (2d Cir. 2011) (quoting *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991)), or if "the counts have a 'sufficient logical connection,'" *Page*, 657 F.3d at 129 (quoting *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990)). Joinder of offenses also is appropriate where the evidence proving the counts is "interconnected and overlapping," *United States v. Amato*, 15 F.3d 230, 236 (2d Cir. 1994), such as through "some substantial identity of facts or participants" or because they "arise out of a common plan or scheme," *United States v. Pizarro*, No. 19-2391, 2023 WL 3332539, at *2 (2d Cir. May 10, 2023).

Offenses "of the same or similar character" are also properly joined. Fed. R. Crim. P. 8(a). "'Similar' charges include those that are 'somewhat alike,' or those 'having a general likeness' to each other." *United States v. Rivera*, 546 F.3d 245, 253 (2d Cir. 2008) (quoting *United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980) (Friendly, J.)); *see also United States v. Carter*, 448 F. App'x 112, 114 (2d Cir. 2011). The Second Circuit has cautioned against "requiring too precise an identity between the character of the offenses" in assessing whether they are "of the same or similar character" for purposes of Rule 8(a), in part because doing so "would fail to give effect to the word 'similar' succeeding the word 'same' and thus violate an elementary rule of statutory construction." *Werner*, 620 F.2d at 926. The Second Circuit has accordingly held that a set of offenses involving "substantial alleged dishonesty" is "surely" enough to render them "of the same or similar character." *Ruiz*, 894 F.2d at 505.

Additionally, joinder of offenses on the basis of their "same or similar character" has been upheld "where evidence of the one offense would be admissible in a separate trial on the other offense as evidence of 'other crimes, wrongs, or acts'" and where evidence of the charged offenses is "sufficiently 'simple and distinct' to mitigate the dangers otherwise created by such a joinder."

*United States v. Halper*, 590 F.2d 422, 431 (2d Cir. 1978); *see also* Fed. R. Evid. 404(b).[20] Those pragmatic decisions reflect the "reality" that the "element of prejudice is largely absent in

[20] In *Halper*, the Government charged the defendant in two separate indictments, one of which contained over 100 counts principally charging the defendant with Medicaid fraud and the other of which charged the defendant with income tax evasion. *Halper*, 590 F.2d at 424. The Second Circuit found that the district court had erred in granting a motion to try both indictments' charges in a single trial, pursuant to Federal Rule of Criminal Procedure 13 (not Rule 8). *Id.* at 428-33. In reaching that decision, the *Halper* court rejected the Government's argument that the charged offenses were "of the same or similar character," in part because, according to the *Halper* court, evidence of the defendant's tax evasion would not have been admissible in a separate trial on the Medicaid fraud charges (and vice versa) and because the evidentiary record was not "simple and distinct." *See id.* at 431-32 (citing *Drew v. United States*, 331 F.2d 85, 88 (D.C. Cir. 1964)).

The *Halper* decision has "been criticized," Transcript of Proceedings at 44, *United States v. Goyal*, No. 19 Cr. 844 (CS), ECF No. 40 (S.D.N.Y. Oct. 8, 2020), in part because the joinder inquiry in *Halper* involved "somewhat different considerations [than those relevant to a Rule 8 inquiry] because *Halper* arose under Fed. R. Cr. P. 13, rather than Fed. R. Cr. P. 8(a)," *Werner*, 620 F.2d at 927-28 (concluding that joinder was proper in part because, among other reasons, if the district court had granted severance, "the testimony at the trial for each offense would very likely have included evidence of the other"). As Judge Friendly suggested in *Werner*, the *Halper* decision appears to take an overly narrow view of what it means for offenses to be of the "same or similar character," suggesting that joinder of offenses "of the same or similar character" is appropriate *only* where evidence of those offenses would be cross-admissible in separate trials or where the evidence is sufficiently "simple and distinct." *See Werner*, 620 F.2d at 927-28 (discussing *Halper*'s interpretation of *Drew*). Decisions post-dating *Halper* have not imposed any such limitation on the meaning of the phrase "same or similar character" and, to the contrary, have invoked the principles that *Halper* imported from *Drew* in *upholding* joinder of offenses as proper under Rule 8(a)'s "same or similar character" language, *including* where "evidence of the joined offenses would be mutually admissible in separate trials," *Halper*, 590 F.2d at 431, and where "the evidence is sufficiently 'simple and distinct,'" *id. See, e.g.*, *Werner*, 620 F.2d at 927-28 (evidence "mutually admissible in separate trials"); *United States v. Chang*, 131 F.3d 132 (2d Cir. 1997) (evidence "simple and distinct").

What remains somewhat unclear, though, is whether those factors—*i.e.*, cross-admissibility of evidence and "simple and distinct" categories of evidence—are properly considered as factors counseling in favor of determining that offenses are "of the same or similar character," *see, e.g.*, Transcript of Proceedings at 3-5, *United States v. Goyal*, No. 19 Cr. 844 (CS), ECF No. 89 (S.D.N.Y. Aug. 11, 2021), or factors suggesting that joinder will not result in the sort of substantial prejudice required to justify severance under Federal Rule of Criminal Procedure 14(a) (an inquiry discussed below), *see, e.g.*, *United States v. Salemo*, 499 F. App'x 110, 114 (2d Cir. 2012) (invoking *Halper* in concluding that defendant could not "demonstrate prejudice from the

situations where evidence of the separate crimes would be admissible anyway." *Halper*, 590 F.2d at 431 (citing *Drew*, 331 F.2d at 90); *see also Salemo*, 499 F. App'x at 113-14 (citing *Halper* and concluding that joinder of two fraud counts—one of which involved a scheme to "secure financing for a sea cucumber farming project in the Marshall Islands" in 2009 and the other of which involved a scheme to "acquire six parcels of distressed commercial real estate in the Bronx" in 2010—resulted in no prejudice where evidence as to one scheme "would have been admissible in any event on the disputed question of [the defendant's] fraudulent intent [with respect to the other charged scheme]").

For instance, in *United States v. Goyal*, the court, relying on *Halper*, denied a motion to sever a set of PPP loan fraud charges from a group of healthcare fraud charges after determining that the evidence of those offenses would be cross-admissible if the court were to order separate trials. *See* Transcript of Proceedings at 3-5, *United States v. Goyal*, No. 19 Cr. 844 (CS), ECF No. 89 (S.D.N.Y. Aug. 11, 2021).[21] There, the court reasoned, evidence of the defendant's PPP loan fraud would have been admissible in any separate trial on the healthcare fraud charges to demonstrate "whether the defendant's actions in connection with the health care fraud counts was intentional or mistaken" and evidence of the healthcare fraud would have been admissible in any separate trial on the PPP loan fraud charge to "cast[] light on the intent with which defendant made the contested statements on his PPP loan applications." *Goyal* Tr. at 5.

---

joinder"). The Government respectfully suggests that this mixed approach suggests the significance of these factors is, like the joinder inquiry more broadly, case-specific.

[21] The transcript of the August 11, 2021 proceeding in *Goyal* at which the Court orally announced its decision denying the defendant's severance motion is attached as Exhibit A and hereinafter referred to as "*Goyal* Tr."

2. *Rule 14(a)*

Pursuant to Rule 14(a) of the Federal Rules of Criminal Procedure, even where joinder of offenses is otherwise proper, the court "may order separate trials of counts . . . or provide any other relief that justice requires" if the joinder "appears to prejudice a defendant or the government." A defendant who "seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice." *Amato*, 15 F.3d at 237. The defendant must show prejudice that is "unfair," and "not merely that [the defendant] might have had a better chance for acquittal at a separate trial." *Page*, 657 F.3d at 129.

The issue under Rule 14 accordingly is not whether a defendant would prefer to be tried separately for each alleged offense, or might suffer some prejudice from having all charged offenses tried together, but whether any prejudice to him from a joint trial "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." *United States* v. *Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986). Such sufficiently severe prejudice exists only where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *accord United States v. Cacace*, 796 F.3d 176, 192 (2d Cir. 2015).

Importantly, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538-39. "This is because 'Rules 8(b) and 14 are designed to promote economy and efficiency and to avoid a multiplicity of trials, so long as these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial.'" *Page*, 657 F.3d at 129 (quoting *Zafiro*, 506 U.S. at 540). Thus, "even in the rare circumstances where 'the risk

of prejudice is high,'" *United States v. Kaplan*, No. 23 Cr. 293 (JMA), 2025 WL 2200539, at *9 (E.D.N.Y. Aug. 1, 2025) (quoting *Zafiro*, 506 U.S. at 539), "less drastic measures than severance, such as limiting instructions, often will suffice to cure any risk of prejudice and permit joinder," *Page*, 657 F.3d at 129. In light of the district court's broad discretion in this realm, a decision to grant or deny severance is "virtually unreviewable" on appeal. *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988).

In sum, a defendant seeking severance under Rule 14 has the "extremely difficult burden" of showing that he would be so prejudiced by joinder that he would be denied a fair trial. *United States v. Casamento*, 887 F.2d 1141, 1149-50 (2d Cir. 1989) ("If the denial of the motion [to sever] causes some prejudice, but less than substantial prejudice, we are not apt to reverse, since, by and large, joinder promotes judicial efficiency."). Consequently, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Bicher*, No. 22 Cr. 589 (LGS), 2023 WL 2401374, at *1 (S.D.N.Y. Mar. 7, 2023) (quoting *United States* v. *Rosa*, 11 F.3d 315, 341 (2d Cir. 1993)).

**B. Discussion**

The defendant's motion to sever Count Six should be denied. Count Six is properly joined under Rule 8 and its "liberal standard for joinder," *Fishbein*, 2026 WL 200773, at *3, both because that count is tied to the Indictment's other charges with overlapping evidence, *Amato*, 15 F.3d at 236, and because all six of the Indictment's fraud and bribery charges involve "substantial alleged dishonesty" and are therefore "of the same or similar character," *Ruiz*, 894 F.2d at 505. Applying similar reasoning, every court in this District to have considered whether a PPP loan fraud charge was properly joined with other fraud charges has concluded that joinder was proper. This Court should not break from those decisions here. More pragmatically, trying all six of the

Indictment's related counts in a single trial will promote judicial economy, and the defendant has not come close to carrying the "heavy burden" of showing that he will suffer prejudice so unfair as to warrant dicing up the charges into two separate trials. *See Amato*, 15 F.3d at 237.

1. *Count Six Is Properly Joined Because All of the Charged Offenses Are Connected by Overlapping Evidence*

The defendant's PPP loan fraud scheme and the other charged offenses are tied together by overlapping evidence such that they are sufficiently connected with one another to justify joinder. *Page*, 657 F.3d at 129; *Amato*, 15 F.3d at 236.

In particular, the Government anticipates that its proof at trial as to all six of the Indictment's counts will include evidence of the defendant's employment and financial state from 2019 through 2025, including evidence regarding the defendant's corporate entities, income streams, bank account ownership and use, and tax documents across that period—as well as evidence regarding misrepresentations that the defendant made to conceal the profits of all three schemes charged in the Indictment. *See Bicher*, 2023 WL 2401374, at *2 (concluding that counts concerning PPP loan fraud were properly joined with wire fraud count concerning a scheme to defraud New York City landlords by entering into lease agreements under false pretenses, in part because there was "some overlap in the companies involved across the two schemes, as well as the bank accounts where the proceeds were sent"); *see also United States v. Bonventre*, 646 F. App'x 73, 80 (2d Cir. 2016) (holding that severance motion was properly denied where defendant was charged with securities fraud and tax fraud crimes that "hinged on" the same activities—there,

"backdated trades and fictitious records").[22] Dividing the charges into two separate trials—with whichever trial came second necessitating a rehashing of this evidence and the testimony required to authenticate and explain it—would result in precisely the sort of judicial inefficiency that Rule 8 guards against. *See Page*, 657 F.3d at 129 (explaining that Rule 8 is "designed to promote economy and efficiency and to avoid a multiplicity of trials"); *cf. United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *14 (S.D.N.Y. Dec. 11, 2017) (denying severance motion concerning joinder of defendants where "division would require the Court to preside over an additional trial with redundant facts and would force one [defendant] to stand trial twice").

For instance, the Government's anticipated proof includes the defendant's tax documents from at least the years 2019 through 2024, which the Government expects collectively will establish facts surrounding the defendant's financial state during that time period (going to, among other issues, his motive in committing all of the charged crimes). Those tax records show, among other things, that the defendant did not report in his tax filings: (i) income from his purported baked good business in 2019 or 2020 (or any other year); (ii) payments that he received from the Funeral Home Director in 2023; or (iii) payments that he received from the Security Company Executive in 2024. (*See also* Ind. ¶ 51 (alleging that the defendant's 2020 tax returns omitted the falsified Schedule C submitted in connection with his PPP loan application)). That is, these records contain evidence of all six offenses charged in the Indictment, including the count that the defendant seeks to sever.

---

[22] The anticipated proof described herein does not constitute a complete proffer of all of the Government's expected trial evidence. The Government reserves the right not to call as a witness at trial any of the possible witnesses referenced herein.

Of note, the Government's proof relating to the defendant's tax records will likely necessitate testimony from at least two common witnesses. First, the Government anticipates calling as a witness the tax preparer referenced in the Indictment, who the Government understands prepared the defendant's tax documents for years 2020 through 2024—*i.e.*, across the time period during which the defendant allegedly committed *all* of the conduct charged in the Indictment, including the PPP loan fraud scheme charged in Count Six. (*See* Ind. ¶ 51). And, second, the Government anticipates calling as a witness an IRS employee to authenticate the defendant's tax filings and explain, among other things, the meaning of certain disclosures in those filings, as well as the significance of certain omissions in those filings—again, evidence relevant to all six counts.

As to the tax preparer, in particular, the Government expects the tax preparer's testimony to cover, among other topics, the defendant's financial circumstances from at least 2019 through 2024; the defendant's businesses (including, for instance, the defendant's ownership of or involvement with numerous companies purportedly engaged in political and consulting work, and his lack of involvement with any baked goods company); and documents that the defendant submitted to his tax preparer, as well as the circumstances surrounding certain representations and omissions in the defendant's tax filings—all testimony that, like the defendant's tax records themselves, goes to all six of the charged crimes.[23]

[23] The Government expects to offer additional documentary evidence beyond the defendant's tax records as to the defendant's financial circumstances and businesses—evidence that also bears on all six of the Indictment's charges. For instance, the defendant's résumé and other application materials for his City employment (which include a list of his prior employment from 2007 through 2023) do not list any baking- or catering-related employment (*see* Dkt. 51-4 at 11), and these documents also provide evidence of, among other things, the defendant's official City role and awareness of certain conflict of interest policies.

Additionally, the tax preparer is expected to testify about emails between the defendant and the tax preparer concerning PPP loans, including communications in which the defendant suggested that he and the tax preparer split PPP loan proceeds. This suggestion to split proceeds tellingly mirrors the defendant's conduct with respect to the Funeral Home scheme, in which he and the Funeral Home Director appear to have split the funds that the Funeral Home received through the City's burial assistance program. (Ind. ¶ 44).

Beyond the defendant's tax records (and associated testimony), as the Indictment makes clear, all of the charged crimes involved the defendant making similar misrepresentations—sometimes in the *same* disclosures—about the proceeds of all three charged schemes. For instance, the Indictment alleges, with respect to the conduct charged in Counts 1 through 5, that the defendant "filed false financial disclosure forms that omitted his receipt of thousands of dollars from both the Security Company Executive and the Funeral Home Director." (Ind. ¶ 4; *see also id.* ¶¶ 45-47). Specifically, the defendant electronically filed required financial disclosures for the years 2023 and 2024 on or about May 20, 2024, and May 6, 2025, in which he attested, among other things, that during the relevant year he had not received any gifts from a person or entity that had business dealings with the City—an assertion that was false given the payments that the defendant received from the Security Company Executive and the Funeral Home Director. (Ind. ¶ 46-47). The defendant also attested, in the same financial disclosures, that he did not owe any entity or person (other than a relative) $5,000 or more for 90 consecutive days during the relevant year or on the date of the disclosure's filing. (Ind. ¶ 46). This representation was also false, in part because of the outstanding approximately $20,000 PPP loan that the defendant obtained though the crime charged in Count Six, which had not been forgiven. The defendant's

failure to report the fraudulently obtained PPP loan just as he failed to report the kickbacks he received from the Security Company Executive (even as a purported "loan") or Funeral Home Director are all evidence of his consciousness of guilt. *See United States v. Khandakar*, 955 F. Supp. 2d 268, 270 71 (S.D.N.Y. 2013) (concluding that joinder was proper, in part, because "the Government ha[d] proffered several false exculpatory statements that would be admissible on all counts"). These financial disclosures—which, like the defendant's tax filings, necessitate another witness whose testimony bears on all six counts charged in the Indictment, both to explain these disclosures' meaning and authenticate them if needed—therefore form yet another category of "overlapping evidence" binding Count Six to the other crimes charged in the Indictment.

Furthermore, the Government expects to prove that the proceeds of all three schemes charged in the Indictment, including the PPP loan fraud scheme charged in Count Six, flowed to the same set of consolidated bank accounts. *See United States v. Villanueva Madrid*, 302 F. Supp. 2d 187, 190 (S.D.N.Y. 2003) (joinder proper in part "because defendant allegedly used some of the same accounts to carry out both offenses"); *see also United States v. Frazier*, No. 21 Cr. 371, 2022 WL 3574300, at *5 (N.D. Ala. May 26, 2022), *report and recommendation adopted*, 2022 WL 2902390 (N.D. Ala. July 22, 2022) (denying motion to sever PPP loan fraud counts where there was "commingling of funds" and separate trials would have entailed testimony of "same financial analysts and case agents" as to the financial accounts and records at issue), *aff'd*, No. 24-12897, 2025 WL 3484987 (11th Cir. Dec. 4, 2025). Specifically, the Government expects to prove that, as a result of the PPP loan fraud scheme charged in Count Six, the defendant received $20,418 via electronic deposit into a particular checking account. The Government further expects to introduce bank records showing that the defendant deposited the funds from the other crimes

charged in the Indictment into another checking account at the same bank that was linked to the checking account that received the PPP loan funds.[24] (*See* Ind. ¶ 20 (alleging that the defendant "deposited $4,500 in cash into his bank account" the day after being given $5,000 in cash by the Security Company Executive); Ind. ¶ 30 (alleging that the defendant "deposited $3,000 cash into his bank account" after being given $3,500 by the Security Company Executive); Ind. ¶ 44 (alleging that the defendant deposited a $5,000 check from the Funeral Home Director); Ind. ¶ 53 (describing the $20,418 electronic deposit into the defendant's checking account as a result of the PPP loan fraud scheme). The defendant's control over these linked checking accounts (established in part by the combined banks statements and frequent transfers of funds between the two accounts) will need to be proven for all counts, including through a potential bank custodian witness as well as through various indicia of the defendant's use of the accounts (to foreclose, for example, any suggestion that the defendant was not aware of the relevant banking activity).

Finally, the searches undertaken of the defendant's cellphone and online accounts yielded proof relevant to all six charged counts, including, for example, evidence of the defendant's ownership of and control over his bank accounts—meaning that at least a fifth anticipated witness (if not more witnesses given that this digital evidence spans both an electronic device and multiple digital accounts) would be testifying to evidence bearing on all six counts, including Count Six.

Accordingly, if severance were granted and the PPP loan fraud scheme were tried in a separate, second trial, multiple witnesses would be required to testify at *both* of the defendant's trials, and much of the evidence introduced at the defendant's first trial (the tax filings, bank

[24] Because these checking accounts were linked, their transaction history appears on the same consolidated bank statements. Underscoring the overlapping nature of this evidence, those consolidated bank statements show frequent transfers between the two checking accounts.

records, financial disclosures, and more) would need to be re-authenticated, re-introduced, and explained a second time to another twelve jurors (and alternates), all after yet more motions practice, pretrial filings, and the other drains on judicial resources that criminal trials entail. Rule 8(a) discourages such an inefficient approach, especially where, as here, interconnected evidence binds all six charges.

The defendant ignores all that interconnectedness by promising "the evidence will be different" and predicting that the Government will prove the PPP loan fraud scheme solely through "a discrete documentary record" while proving the other charged conduct through "recorded conversations, text messages, City contracting records, reimbursement files, and financial disclosures." (Dkt. 41 at 7-9). But, as explained above, the documentary evidence establishing the defendant's participation in the PPP loan fraud scheme—which will, contrary to the defendant's conjecture, necessitate the testimony of multiple witnesses—is not so cabined and, indeed, includes (as just one example) the very "financial disclosures" that the defendant concedes are evidence of the *other* charged crimes. The extent of that overlapping evidence sets this case apart from those cited in the defendant's brief. *Compare, e.g.*, *United States v. Barrett*, No. 23 Cr. 623 (JLR), 2025 WL 371084, at *14 (S.D.N.Y. Feb. 3, 2025) (severing PPP loan fraud count from charges concerning misbranded performance-enhancing drugs where the only overlapping evidence was "vaguely" defined as "evidence of Barrett's employment and financial state in 2020 and 2021, when Barrett committed the charged offenses"), *with Bicher* 2023 WL 2401374, at *2 (denying motion to sever PPP loan fraud count from wire fraud count where there was "overlap in

the companies involved across the two schemes, as well as the bank accounts where the proceeds were sent").[25]

In sum, because "the same evidence may be used to prove each count" charged in the Indictment, *Page*, 657 F.3d at 129, the defendant cannot overcome the strong presumption in favor of a joint trial. Count Six is properly joined with the Indictment's other counts on that basis alone.

2. *Count Six Is Properly Joined Because the Charged Offenses Are of the Same or Similar Character*

As a separate basis for joinder, and as the common evidence connecting all six of the Indictment's charges suggests, Count Six is also properly joined because the charged PPP loan fraud scheme bears a sufficient "general likeness" to the other charged offenses to render them "of the same or similar character" for purposes of Rule 8(a). *Rivera*, 546 F.3d at 253.[26]

---

[25] Many of the other decisions cited in the defendant's brief concern the possible joinder of tax charges with other fraud crimes. (Dkt. 41 at 7-8 (citing, *e.g.*, *United States v. Litwok*, 678 F.3d 208, 216-18 (2d Cir. 2012); *United States v. Shellef*, 507 F.3d 82, 99-100 (2d Cir. 2007), *abrogated on other grounds by Kousisis v. United States*, 605 U.S. 114 (2025))). As a result, those decisions focused largely on whether "funds derived from [the] non-tax violations either [were] or produce[d] the unreported income [that formed the subject of the tax violations]," an inquiry that has developed specifically in the context of tax cases. *See Shellef*, 507 F.3d at 98. Moreover, in those cases, there was minimal or, in *Litwok*, "*no* evidentiary overlap" between the alleged tax violations and the other charged crimes. 678 F.3d at 216-17 (emphasis added); *see also Shellef*, 507 F.3d at 99 ("no . . . link" among the charges other than "the fact that the businesses that produced the . . . unreported income [relevant to the challenged tax charges] were also subsequently used to perpetrate the alleged conspiracy and wire fraud [charged in other counts]"). As explained above, the extent of overlapping evidence in this case is far greater. What's more, in *Shellef*, the Government did not advance—as it does below—an argument that the charged offenses were "of the same or similar character," *see* 507 F.3d at 97 (finding it "critical[]" that the government did not "defend the joinder of offenses under Rule 8(a)'s 'same or similar character' clause," which is less "restrictive" than Rule 8(b), which does not include such a clause); and, in *Litwok*, the court did not address that separate basis for joinder, *see* 678 F.3d at 216-17.

[26] The defendant quotes a sole district court case from over 30 years ago in asserting that joinder based on charges being "of the same or similar character" is the "weakest basis for joinder." (Dkt. 41 at 8 (quoting *United States v. Harris*, 805 F. Supp. 166, 182 (S.D.N.Y. 1992)). But the

The Second Circuit has been clear that crimes involving "substantial alleged dishonesty," are "surely . . . of the same or similar character." *Ruiz*, 894 F.2d at 505. In keeping with that guidance, every court in this District to have considered whether a PPP loan fraud charge was properly joined with other fraud charges has held that joinder was proper. *See Bicher*, 2023 WL 2401374, at *2; *Goyal* Tr. at 2-5. In *Bicher*, for instance, the court held that two counts concerning PPP loan fraud were properly joined with a wire fraud count concerning a scheme to defraud New York City landlords by entering into lease agreements under false pretenses because the charged schemes had a "general likeness sufficient to satisfy the liberal standard of Rule 8(a)." 2023 WL 2401374 at *2. And, in *Goyal*, the court concluded that bank fraud and false statements charges based on a PPP loan fraud scheme were "of the same or similar character" as compared to healthcare fraud, wire fraud, and false statements charges based on a scheme to defraud the Medicare program, private insurance plans, and patients. *See Goyal* Tr. at 2-5.[27]

---

Government has found no decision (other than *Harris*) characterizing Rule 8(a)'s "same or similar character" branch as any weaker than its other bases for joinder. And the *Harris* court seemingly based its observation about Rule 8(a)'s "same or similar character" language on *Halper*. *See Harris*, 805 F. Supp. at 182 (citing *Halper*, 590 F.2d at 430). As explained above, though, Second Circuit decisions post-dating *Halper* have clarified that joinder of offenses based on their "same or similar character" is expressly authorized by Rule 8(a), without regard to criticism of joinder on that ground. *See Werner*, 620 F.2d at 928 (discrediting criticism of Rule 8(a)'s "same or similar character" language and emphasizing "the important policy behind this branch of Rule 8(a)"); *see also id.* ("[I]f commentators do not like [Rule 8(a)'s 'same or similar character' branch], the road for them to seek amendment is open.").

[27] The only other decision in this District to have addressed the possible joinder of a PPP loan count with other offenses was *Barrett*, where the court severed a wire fraud count premised on PPP loan fraud from two other counts charging Barrett with distributing adulterated and misbranded performance-enhancing drugs to influence major international sports competitions, in violation of the Rodchenkov Anti-Doping Act of 2019 ("RADA"), 21 U.S.C. §§ 2402, 2403, and the Food, Drug, and Cosmetics Act of 1938 ("FDCA"), 21 U.S.C. §§ 331, 333(a)(2). *See Barrett*, 2025 WL 371084, at *14-*15. As described more fully below, *Barrett* is inapposite with respect to the defendant's severance motion, in which he seeks to sever a PPP loan fraud charge not from

This Court should reach the same conclusion with respect to the fraud and bribery charges in this case. All three schemes charged in the Indictment involved the defendant making misrepresentations to government agencies (or, in the case of the PPP loan fraud charge, to a bank administering a program *on behalf* of a government agency) in an effort to enrich himself. *See United States* v. *Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989) (concluding that joinder was appropriate where defendant was involved in two separate conspiracies "that shared a common purpose: to conceal and launder" the defendant's income).

The similarities among those schemes are multifold. For one thing, in all three schemes, the defendant sought to take advantage of government-run programs: with respect to the Security Company scheme, the City's programs for Minority- or Women- owned Business Enterprises (*i.e.*, MWBEs) (*see* Ind. ¶¶ 15, 23, 33); with respect to the Funeral Home scheme, the City's burial assistance program for low-income families (*see* Ind. ¶¶ 3, 35); and, with respect to the PPP loan fraud scheme, an SBA-run program intended to help businesses keep their workforce employed during the COVID-19 pandemic (*see* Ind. ¶ 48). And in at least the Funeral Home scheme and the PPP loan fraud scheme, the defendant similarly sought to split funds directly obtained from a government-run financial assistance program with others who assisted in the fraud—in other words, a kickback.[28]

---

performance-enhancing drug charges but, rather, from other fraud and bribery charges involving "substantial alleged dishonesty," *Ruiz*, 894 F.2d at 505.

[28] The defendant also expressed his expectation of sharing in the proceeds if the Security Company Executive was awarded contracts. For example, after the Security Company Executive told the defendant to "help me help you" "stay afloat" financially, the defendant responded, "what do you think I'm doing, doc? But you know, it's a process, that's the whole thing, it's a process." (Ind. ¶ 32.)

Additionally, the defendant took advantage of the programs involved in all three schemes through similar misrepresentations. Count Five, for instance, specifically alleges that the defendant "fraudulently induced" New York City to award funds to a particular funeral home and that the defendant obtained $5,000 of that funding, in part by "falsely telling City officials" that there were no GoFundMe funds raised for a particular funeral (when the defendant knew otherwise), such that the funeral home's invoice should be paid through the government-run burial assistance program. (Ind. ¶¶ 3, 62-63). The core misrepresentation underpinning the PPP loan fraud scheme charged in Count Six is similar—namely, that the defendant mispresented to a bank participating in a government-run program (this time, a program run by the SBA, rather than New York City) that the "Anthony Herbert" baked goods business lacked funds such that it qualified for a different government-run assistance program. (Ind. ¶¶ 45, 64-65). Indeed, as noted above, the defendant made similar misrepresentations, *in the same financial disclosures*, as to all three schemes. (*See* Ind. ¶¶ 4, 45-47). Even beyond his financial disclosures, the defendant used similar sham documentation across all three of his schemes—ghostwritten letters submitted to City officials in connection with the Security Company scheme, which omitted the defendant's association with the Security Company (*see* Ind. ¶¶ 13-14); inflated invoices submitted to City personnel in connection with the Funeral Home scheme, which also omitted the defendant's association with and receipt of payments from the Funeral Home Director (*see* Ind. ¶¶ 36, 42); and a similarly fraudulent invoice submitted to the bank administering the PPP loan program (*see* Ind. ¶ 50). *See Carter*, 448 F. App'x at 114 (holding passport fraud and false statement offense to be of a similar character where "[i]n both the passport fraud charges and the false

statement charge, the defendant and a co-conspirator submitted a fraudulent application to a United States agency").

Viewed collectively, these similarities among the three charged schemes establish, at minimum, the "'general likeness' sufficient to satisfy the 'liberal standard' of Rule 8(a)," *Bicher*, 2023 WL 2401374 at *2 (quoting *McGrath*, 558 F.2d at 1106), and certainly establish that the charged offenses all involved "substantial alleged dishonesty" such that they "surely" are "of the same or similar character" under *Ruiz*, 894 F.2d at 505.

In arguing that the Court must conclude otherwise, the defendant, ignoring *Ruiz* entirely, asserts that courts have "uniformly" rejected joinder based on crimes mutually "involving dishonesty for financial gain." (Dkt. 41 at 10). To prop up that claim, the defendant cites a number of district court cases, some of which themselves ignored *Ruiz*, *see, e.g.*, *Harris*, 805 F. Supp. at 182-84; *Barrett*, 2025 WL 371084, at *14 (citing *Ruiz* without discussion), and others of which unpersuasively distinguished *Ruiz*, *see, e.g.*, *United States v. Bezmalinovic*, No. S3 96 Cr. 97 (MGC), 1996 WL 737037, at *4 (S.D.N.Y. Dec. 26, 1996); *see also, e.g.*, *United States v. Kerik*, 615 F. Supp. 2d 256, 275 n.25 (S.D.N.Y. 2009) (adopting *Bezmalinovic*'s interpretation of *Ruiz*). As to the latter category, *Bezmalinovic* distinguished *Ruiz* in conclusory fashion by pointing out that the charges in that case were "connected because they all related either to [*Ruiz*'s] consulting for or investing in [a particular company] or to his attempt to conceal the fact that those activities might be illegal," 1996 WL 737037, at *4—which, indeed, was one of the bases for the *Ruiz* court's conclusion that joinder was proper, *see Ruiz*, 894 F.2d at 505 (concluding, based on evidentiary overlap, that the charged offenses "were part of a common scheme or plan"). What *Bezmalinovic* ignored, however, was the *Ruiz* court's *alternative* basis for concluding that joinder was proper—

namely, that the charged offenses, regardless of whether they "were part of a common scheme or plan," all involved "substantial alleged dishonesty," such that they were "surely . . . of the same or similar character." *Ruiz*, 894 F.2d at 505. Many other district court decisions have faithfully applied that reasoning. *See, e.g.*, *United States v. Josephberg*, 418 F. Supp. 2d 297, 303 (S.D.N.Y. 2005) (following *Ruiz* and holding that charges of individual income tax fraud, health care fraud, and "nanny tax" fraud were properly joined because they "involve the same actors committing dishonest acts to receive some monetary benefit"), *vacated on other grounds*, 459 F.3d 350 (2d Cir. 2006); *United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 369195, at *6 (S.D.N.Y. Jan. 9, 2018) (following *Ruiz* and finding joinder proper in part based on offenses all involving "substantial dishonesty and deceit"), *aff'd*, 820 F. App'x 23 (2d Cir. 2020); *see also Goyal* Tr. at 3 (describing *Ruiz* as the "best case for the government" in oral decision denying motion to sever PPP loan fraud count).

Moreover, of the defendant's cited decisions, only *Barrett* addressed the possible joinder of a PPP loan fraud count. There, the district court granted a motion to sever a wire fraud count premised on PPP loan fraud from two other counts charging Barrett with distributing adulterated and misbranded performance-enhancing drugs to influence major international sports competitions, in violation of RADA and the FDCA. *See Barrett*, 2025 WL 371084, at *14-*15.

But *Barrett* supports, rather than counsels against, joinder here. As noted above, in *Barrett*, the only evidence connecting the PPP loan fraud count to the other charges was "vaguely" defined as "evidence of Barrett's employment and financial state in 2020 and 2021, when Barrett committed the charged offenses." *Id.* at *14; *see also United States v. Barrett*, No. 23 Cr. 623 (JLR), ECF No. 51 at 30-31 n.12 (S.D.N.Y. Dec. 13, 2024) (government brief identifying as

possible "overlapping witnesses" only that "the same witnesses would likely testify at each separate trial regarding the searches conducted [of the defendant's cellphone and online accounts] in order to authenticate the exhibits drawn from those searches"). By contrast, here the Government has identified, with reference to the Indictment's allegations, multiple potential overlapping witnesses and multiple sources of shared documentary evidence supporting all six of the charged offenses. Without comparable overlapping evidence in *Barrett*, the government was left to justify joinder solely on the ground that the PPP loan fraud count was "of the same or similar character" as the RADA and FDCA charges because all three charged offenses were "economically motivated." 2025 WL 371084, at *14. The court rejected that argument as "too sparse a justification to satisfy even the liberal joinder standard." *Id.* Here, though, it is not solely the defendant's "economic motivation" that demonstrates the charged offenses' similarity. Far from that, the Indictment makes clear that the charged crimes involved similar misrepresentations, in similar documents, to similar entities carrying out similar functions; and that the defendant took similar steps (again, making similar misrepresentations) to conceal the proceeds of all three of the charged schemes. In other words, all of the crimes charged here—including the one that the defendant seeks to sever—are fraud and bribery charges involving similar varieties of "substantial alleged dishonesty," *Ruiz*, 894 F.2d at 505. By contrast, the non-PPP crimes charged in *Barrett*—crimes concerning the distribution of misbranded performance-enhancing drugs—were of a wholly different nature when compared to Barrett's submission of a fraudulent PPP loan application.[29]

---

[29] Even so, and yet further emphasizing the breadth of Rule 8(a)'s "same or similar character" language, other decisions have found joinder of controlled substance and fraud crimes appropriate

Underscoring the propriety of joinder here, if the Court were to split the Indictment's counts into two trials as the defendant suggests, evidence of the defendant's participation in the PPP loan fraud scheme would be admissible in any separate trial on the fraud and bribery charges concerning the Security Company scheme and the Funeral Home scheme (and vice versa). *See Halper*, 590 F.2d at 431 (indicating that joinder of offenses on the basis of their "same or similar character" is proper "where evidence of the one offense would be admissible in a separate trial on the other offense as evidence of 'other crimes, wrongs, or acts'"); *see also id.* (no "element of prejudice" where "evidence of the separate crimes would be admissible anyway"); *see, e.g.*, *Goyal* Tr. at 3-5 (denying severance motion on the same ground).[30]

Relevant to that inquiry, the defendant's correspondence with the Government indicates that he plans to mount an entrapment defense, at least in connection with the Security Company scheme. (*See* Dkt. 51-6 at 5 (requesting, among other things, "all statements by CS-1 or any other witness relevant to an entrapment defense")). If that is the case, evidence relating to the defendant's fraudulent PPP loan application would be admissible at any separate trial as to Counts

---

under the Rule. *See, e.g.*, *United States v. Kaplan*, 895 F.2d 618, 621 (9th Cir. 1990) (upholding joinder of charges against doctor for unlawful distribution of controlled substances and mail fraud in connection with a scheme to defraud insurance companies because they were "of a similar character in that they all revolve[d] around allegations that [the doctor] was acting in a criminal manner outside the usual course of his medical practice" and admissible to show intent and common scheme under Rule 404(b)); *United States v. Gosy*, No. 16 Cr. 46, 2019 WL 948178, at *2 (W.D.N.Y. Feb. 27, 2019) (upholding joinder of unlawful distribution and healthcare fraud charges against doctor that involved the defendant's "position as a doctor, his medical practice, and falsifying documentation").

[30] Because evidence of the PPP loan fraud scheme charged in Count Six would be admissible at any separate trial on the Indictment's remaining counts, joinder is proper here even if the Court construes *Halper* as limiting joinder of offenses based on their "same or similar character" to circumstances where evidence of the offenses would be cross-admissible in separate trials or where the evidence is sufficiently "simple and distinct." *Halper*, 590 F.2d at 431; *see also Werner*, 620 F.2d at 927-28 (discussing *Halper*).

One through Three to prove that the defendant was "predisposed" to commit the crimes charged in those counts. *United States v. Salerno*, 66 F.3d 544, 547 (2d Cir. 1995); *see also United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989) ("[T]he Supreme Court long ago established the rule permitting the use of bad acts to show predisposition."); *United States v. Bastanipour*, 41 F.3d 1178, 1183 (7th Cir. 1994) (explaining that, where defendant advances an entrapment defense, "the defendant's predisposition to commit the charged crime is legitimately at issue").

Moreover, and whether the defendant ultimately advances an entrapment defense or not, evidence of the defendant's participation in the PPP loan fraud scheme charged in Count Six would be admissible in a trial on his other fraud and bribery crimes (and vice versa) because, as in *Goyal*, the defendant has not "unequivocally taken intent, knowledge and absence of mistake off the table" with respect to any of those crimes. *Goyal* Tr. at 5 (citing *United States v. Figueroa*, 618 F.2d 934, 942 (2d Cir. 1980)). Far from it: the defendant has specifically referenced an apparent defense theory that the defendant "did not intentionally omit or knowingly conceal reportable gifts, loans, debts, income, or payments on his financial disclosures." (Dkt. 51-6 at 5). As a result, it appears that a key disputed issue at any trial on the charged offenses is likely to be the defendant's willfulness, knowledge, and intent.

With those issues in dispute, if the Court held a separate trial as to Counts One through Five, the Government would be entitled to introduce evidence of the defendant's PPP loan fraud conduct at any such trial under Rule 404(b) for the purposes of showing, among other things, the defendant's knowledge, intent, and lack of mistake in carrying out the Security Company scheme and the Funeral Home scheme. For example, evidence that the defendant intentionally concealed a reportable loan that he obtained through a fraudulent scheme to obtain SBA funds (*i.e.*, the PPP

loan fraud conduct) would be admissible as another act "sufficiently similar" to the charged conduct of intentionally concealing reportable payments from the Security Company Executive and the Funeral Home Director, so as "to bear on the issues of knowledge and intent." *United States v. Reese*, 933 F. Supp. 2d 579, 582 (S.D.N.Y. 2013). That PPP loan fraud evidence would similarly be admissible for the additional purpose of showing that the defendant's failure to report two streams of criminal proceeds in his financial disclosures (*i.e.*, those flowing from the Security Company scheme and the Funeral Home scheme) was contemporaneous with his failing to disclose a third (*i.e.*, that flowing from the PPP loan fraud scheme)—and was therefore not a mistake. *See United States v. Rutkoske*, No. 03 Cr. 1452 (RCC), 2005 WL 3358596, at *2 (S.D.N.Y. Dec. 8, 2005) (admitting evidence of a subsequent securities fraud scheme four years after the charged fraud scheme to be admitted under Rule 404(b) to challenge defendant's possible claim that he was an "innocent participant"); *see also United States v. Fishbein*, No. S1 21 Cr. 296 (PAC), 2023 WL 2734428, at *2 (S.D.N.Y. Mar. 31, 2023) (denying motion to sever rental scheme charge from Medicaid scheme charges after concluding that "evidence from the Rental Scheme would—at the very least—add 'context and dimension' to the Government's case on the Medicaid Scheme" and because defendant had "fail[ed] to demonstrate why the Rental Scheme evidence would [have been] inadmissible in a separate trial on the Medicaid Scheme"), *aff'd*, 2026 WL 200773.[31]

[31] The defendant unpersuasively claims that, because his other fraud and bribery crimes occurred nearly a year after the PPP loan fraud scheme, evidence of the defendant's participation in the PPP loan fraud scheme would "shed no light" on those crimes. (*See* Dkt. 41 at 12). But that argument lack support in the law. The Second Circuit has been clear that "[t]he fact that the evidence involved a subsequent rather than prior act is of no moment. 'Subsequent act' evidence may be admitted under Rule 404(b)." *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998); *see also United States v. Ramirez*, 894 F.2d 565, 569 (2d Cir. 1990) ("[W]hether the similar act evidence occurred prior or subsequent to the crime in question is not necessarily determinative to its admissibility.").

Similar Rule 404(b) grounds would permit the Government to introduce evidence of the fraud and bribery offenses charged in Counts One through Five in any separate trial on the defendant's PPP loan fraud conduct. Here, *Goyal* is particularly instructive. In that case, as explained above, the court denied a motion to sever a group of charges premised on PPP loan fraud conduct from a group of healthcare fraud charges. *See Goyal* Tr. at 2-5. The court based its decision, in large part, on its reasoning that evidence of the defendant's PPP loan fraud conduct would have been admissible at any separate trial on the healthcare fraud charges (and vice versa), under Rule 404(b). *Id.* *Goyal*'s Rule 404(b) analysis applies with equal force here. For example, in any separate trial on the PPP loan fraud charged in Count Six, Rule 404(b) would permit the Government to admit the misrepresentations that the defendant made in the course of the Security Company scheme and the Funeral Home scheme as evidence rebutting the notion that the defendant lacked knowledge that the PPP loan application submitted for the "Anthony Herbert" business contained fraudulent misrepresentations—or, as the *Goyal* court put it, to "cast[] light on the intent with which defendant made the contested statements on his PPP loan applications." *Goyal* Tr. at 5.[32]

[32] Of note, the PPP loan fraud conduct in *Goyal* occurred in April 2020, and the conduct supporting the healthcare fraud charges in *Goyal* occurred from January 2010 and about March 2017. That gap in time did not alter the *Goyal* court's conclusion that evidence of those different schemes was cross-admissible. Similarly here, it is not dispositive that the alleged PPP loan fraud scheme charged in Count Six took place nearly a year before the defendant assumed his first role in City government—contrary to the defendant's arguments (Dkt. 41 at 9). *See also United States v. Meszaros*, No. 06 Cr. 290, 2008 WL 5113425, at *6 (E.D.N.Y. Nov. 25, 2008) (Bianco, J.) (concluding that joinder was proper where "the time frame separating the two schemes based upon the dates in the Superseding Indictment [was] less than one year"); *United States v. Wallace*, No. 22 Cr. 211, 2023 WL 6160695, at *3 (D. Colo. Sept. 21, 2023) ("[T]he fact that the offenses in Counts 1-40 and Counts 41-44 are temporally separated by a year does not affect their similarity under Rule 8(a).").

That evidence of the charged schemes would be mutually admissible in separate trials if the Court were to grant severance in this matter is enough on its own to warrant denial of the defendant's severance motion. *See United States v. Hester*, No. 19 Cr. 324 (NSR), 2020 WL 3483702, at *21 (S.D.N.Y. June 26, 2020) ("Notably, the fact that evidence of the crime charged in one count may be admissible in the Government's direct case in the trial of the other will typically defeat the need to sever the counts."); *see also Salemo*, 499 F. App'x at 114.[33]

In sum, and as the cross-admissibility of the evidence pertaining to the charged offenses shows, all six of the Indictment's counts, including Count Six, are properly joined as charges "of the same or similar character."

3. *The Defendant's Conclusory Claims Are Insufficient to Demonstrate Substantial Prejudice*

The defendant has failed to carry the "heavy burden" of showing substantial prejudice under Rule 14(a). *See Amato*, 15 F.3d at 237. At the outset, courts routinely hold that there is no substantial prejudice where evidence supporting the charged offenses is "interconnected"—as it is here. *Blakney*, 941 F.2d at 116; *United States v. Pizarro*, No. 17 Cr. 151 (AJN), 2018 WL

[33] The Government notes that it has not yet provided notice of what, if any, evidence it intends to offer pursuant to Federal Rule of Evidence 404(b); nor has the defendant given notice of any affirmative defenses, including a potential entrapment defense. Accordingly, if the Court is unpersuaded that joinder is proper on the record as it stands (which the Government maintains is sufficient to deny the defendant's severance motion), the Government respectfully suggests that the Court withhold judgment on the severance motion at least until the defendant's anticipated trial defenses have become clearer. Such an approach would be consistent with the approach that the court took in *Goyal*. *See* Transcript of Proceedings at 47-50, *United States v. Goyal*, No. 19 Cr. 844 (CS), Dkt. 40 (S.D.N.Y. Oct. 8, 2020) (reserving judgment on motion to sever PPP loan fraud count until the court had "a fuller understanding of what the defense might be" because, in the court's view, the question of severance "[came] down to whether . . . evidence of one set of frauds would be admissible . . . at the trial of the other"); *Goyal* Tr. at 4 (denying motion to sever after motions *in limine* once the court "ha[d] some indication of what the defense will be, and it seems clear that knowledge and intent and absence of mistake are not off the table.").

1737236, at *6-*7 (S.D.N.Y. Apr. 10, 2018), *aff'd*, 2023 WL 3332539. The same is true where evidence of the charge that the defendant seeks to sever would be admissible in any trial on other offense(s) under Rule 404(b), as evidence of the defendant's PPP loan fraud scheme would be at any trial on the other fraud and bribery charges (and vice versa). *See United States v. Haynes*, 16 F.3d 29, 32 (2d Cir. 1994) (severance improper where claims of prejudice were rooted in evidence that would be admissible in a separate trial); *United States v. Peoples*, 748 F.2d 934, 936 (2d Cir. 1984) ("Unfair prejudice does not result if evidence admissible to prove each charge is also admissible to prove the other charge."). In any event, none of the supposed manifestations of prejudice identified by the defendant is "sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." *United States v. Guttenberg*, No. 07 Cr. 141 (DAB), 2007 WL 4115810, at *8 (S.D.N.Y. Nov. 14, 2007) (quoting *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998)).

First, the defendant expresses concern that joinder will invite the jury to improperly consider evidence of the defendant's PPP loan fraud scheme as "propensity evidence" in considering the other fraud and bribery charges. (Dkt. 41 at 11-12). But, as the defendant all but concedes in insisting that the PPP loan fraud charge is "discrete" (Dkt. 41 at 9, 14), the likelihood of jury confusion here is minimal. *See Hill v. United States*, 418 F.2d 449, 450–51 (D.C. Cir. 1968) (concluding that joinder "did not erupt in prejudice to defendant over and above that inherent in all joinder of offenses of common character" because the offenses "were responsibly separated from each other by counsel and by the trial judge"). And the Court can address even that minimal risk with the "less drastic" measure of a limiting instruction. *Page*, 657 F.3d at 129; *see Werner*, 620 F.2d at 929 ("The jury could readily examine Werner's conduct on the two different

occasions separately and Judge Costantino clearly and repeatedly ordered it to do so in language fully measuring up to that approved by the cases."); *accord Bicher*, 2023 WL 2401374, at *2 (concluding that defendant had failed to show substantial prejudice resulting from joinder of PPP loan fraud offense, in part because of the availability of "less drastic measure such as a limiting instruction"); *Goyal* Tr. at 6 (finding no unfair prejudice from joinder of PPP loan fraud charges, in part because court intended to "give the jury a limiting instruction that they must consider each count separately . . . .").[34] Despite many decisions in which courts have taken that course, the defendant asserts in conclusory fashion that, "[o]nce the jury hears a self-contained loan-fraud case, an instruction not to treat that evidence as proof of Mr. Herbert's character cannot realistically erase it." (Dkt. 41 at 13). But that is not how courts treat juries. Rather, "juries are presumed to follow their instructions," *Zafiro*, 506 U.S. at 540, and courts have routinely relied on limiting instructions in cases presenting jurors with far more inflammatory evidence than the evidence at issue in this case, *see, e.g.*, *Rivera*, 546 F.3d at 254 (using a limiting instruction to prevent spillover prejudice for counts involving the sexual exploitation of different children, especially in light of admissibility across counts); *United States v. Pena*, 932 F. Supp. 2d 464, 467 (S.D.N.Y. 2013) (using a limiting instruction to address spillover prejudice from two murder-for-hire conspiracies). Thus, even if this case presented the "rare circumstances" where the risk of prejudice were unfairly high (which it does not), *Kaplan*, 2025 WL 2200539, at *9, the Court should exercise its

[34] Notably, *Bicher* and *Goyal*—both decisions in which joinder of a PPP loan fraud charge was found to be proper and not unfairly prejudicial—expressly considered the availability of a limiting instruction as mitigating against any prejudice. By contrast, *Barrett*, on which the defendant hangs his hat, did not even address the possibility of such an instruction—despite the Supreme Court's express endorsement of such instructions as a mechanism for curing any potential prejudice raised by a joint trial. *See Zafiro*, 506 U.S. at 538-39.

considerable discretion in fashioning a remedy to cure any possibility of prejudice by issuing a limiting instruction to the jury, thereby avoiding the "drastic" measure of severance, *Page*, 657 F.3d at 129.

Second, the defendant vaguely asserts that joinder may cause him prejudice because it would impair his right to testify—should he even elect to testify, which he expressly does not commit to doing. (Dkt. 12-13 (claiming that joinder would require the defendant to choose between testifying "about all of the charged counts or none of them," even though his defenses to the charged offenses "*may* call for different defenses and strategies" (emphasis added)). That conclusory claim is not enough. A defendant's "election to testify on some but not all of the charges on trial does not automatically require a severance." *Bradley v. United States*, 433 F.2d 1113, 1122 (D.C. Cir. 1969) (noting that "[s]uch a rule . . . would divest the court of all control over the matter of severance and entrust it to the defendant"); *accord United States v. Biaou*, No. 24 Cr. 323 (CRC), 2026 WL 221768, at *7 (D.D.C. Jan. 28, 2026). Rather, to establish prejudice on this ground, a defendant typically must "provide the Court with enough information 'regarding the nature of the testimony he wishes to give on one count and his reason for not wishing to testify on the other' so that the Court can (1) assess whether 'the claim of prejudice is genuine,' and (2) 'intelligently weigh the considerations of economy and expedition in judicial administration against the defendant's interest in having a free choice with respect to testifying.'" *Biaou*, 2026 WL 221768, at *7 (quoting *Blunt v. United States*, 404 F.2d 1283, 1289 (D.C. Cir. 1968)); *see also Werner*, 620 F.2d at 930 ("It is settled that a mere unexplicated assertion [of the desire to testify on only one count] is not enough.").

Finally, and most outlandishly, the defendant asserts that severing Count Six, thereby necessitating two trials and the commensurate drains on resources, would somehow promote judicial efficiency. (Dkt. 41 at 18). The opposite is true. For all the reasons stated above, joinder of Count Six would promote conservation of judicial resources. With only his "generalized claim[s] of prejudice," *Rivera*, 546 F.3d at 254, the defendant has fallen far short of showing that he will face prejudice "sufficiently severe" to outweigh those gains in judicial economy, *Lanza*, 790 F.2d at 1019. His motion to sever Count Six should be denied.

## II. DISMISSAL OF COUNT FIVE IS UNWARRANTED

Count Five of the Indictment charges the defendant with a scheme to commit federal-program fraud, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2. In essence, that count alleges that the defendant fraudulently induced the City to award money to the Funeral Home Director who, in turn, used some of those public funds to pay kickbacks to the defendant. The count's illustrative to-wit clause identifies two of the "material misstatement[s]" the defendant used "to trick [his] victim into a contract that requires handing over money or property." *Kousisis v. United States*, 605 U.S. 114, 118 (2025) (defining "the fraudulent-inducement theory" of "federal fraud"). Seizing on the to-wit clause, the defendant asserts that Count Five charges "two distinct alleged schemes" and is therefore improperly duplicitous. (Dkt. 42 at 5). But this argument "confuse[s] the scheme to defraud . . . with the means adopted to effectuate that scheme." *United States v. Amrep Corp.*, 560 F.2d 539, 546-57 (2d Cir. 1978). For this reason, and the others described below, Count Five is appropriately pleaded and the defendant's motion to dismiss it as improperly duplicitous should be denied.

### A. Applicable Law

An indictment's count is duplicitous when it alleges "two or more distinct crimes." *United States v. Kandic*, 134 F.4th 92, 99 (2d Cir. 2025) (quoting *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980)). But a duplicitous count "must be distinguished from the allegation in a single count of the commission of a crime by several means," *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992), as expressly permitted by Federal Rule of Criminal Procedure 7(c)(1).

Duplicity alone is not a flaw, because "not all duplicitous indictments are *impermissibly* duplicitous." *Kandic*, 134 F.4th at 99. Duplicity is impermissible only where it "risks unfairness to the defendant" in at least one of three ways: unanimity, double jeopardy, and adequate notice. *See id.* (quoting *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981)); *see also id.* at 99 n.2 (consolidating prior case law's "five underlying policy concerns" into these "three broader categories" of prejudice that may cause impermissible duplicity).

These three forms of prejudice are variations on the theme that a duplicitous count must be clear about what exactly it alleges. That clarity is necessary to confirm that jurors voted unanimously to convict, *see, e.g.*, *Murray*, 618 F.2d at 896 (impermissible duplicity where guilty verdict would "not reveal whether the jury found [a] defendant guilty of only one crime and not the other, or guilty of both"); to determine the scope of the defendant's protection against double jeopardy, *see, e.g.*, *Kandic*, 134 F.4th at 100 (impermissible duplicity where count "create[s] uncertainty about possible subsequent prosecutions as to the same conduct"); and to enable the defendant to prepare his defense, *see id.* (impermissible duplicity where count fails to "assure the defendant adequate notice" for this purpose).

And, because it is not inherently unfair for a count to "contain[] several allegations that could have been stated as separate offenses," that feature alone cannot make a count impermissibly

duplicitous. *Margiotta*, 646 F.2d at 733. Indeed, duplicitous counts often "benefit" the defendant by "limiting the maximum penalties [he] may face if convicted" and by "also avoid[ing] . . . the unfairness of portraying the defendant to the jury as the perpetrator of [multiple] crimes" that could have been charged as just one. *See id.*

**B. Discussion**

1. *Count Five is Not Duplicitous*

Count Five alleges that the defendant "obtained by fraud" at least $5,000 in City funds by "fraudulently induc[ing]" City officials to award payments to the Funeral Home Director who, in turn, used some of those public monies to pay kickbacks to the defendant. (*See, e.g.*, Ind. ¶ 63). It incorporates twenty-two paragraphs of prior allegations that describe how, over a period of several months in late 2022 and early 2023, in exchange for kickbacks from the Funeral Home Director, the defendant used his public authority to cause other City officials to approve reimbursements to the Funeral Home Director under a burial assistance program administered by a City agency. (*See id.* ¶¶ 35-47, 63).

The count's to-wit clause—a notice device that "is properly understood to be illustrative rather than definitional of the core of criminality charged," *United States v. Agrawal*, 726 F.3d 235, 261 (2d Cir. 2013)—describes two "manner[s] in which [the defendant] allegedly violated the relevant statute," *United States v. Khan*, 726 F. App'x 73, 75 (2d Cir. 2018). One such "manner" was lying to City officials about other funds that were available for the same purpose as the money requested from the City. (*See* Ind. ¶ 63). Another was by concealing the defendant's role in referring victims' families to the Funeral Home Director (and, accordingly, obscuring his role in generating the payment requests he purported merely to facilitate). (*See id.*). These are the "two different statements" on which the defendant's duplicity motion is premised (Dkt. 42 at 1),

but they are not *themselves* "two distinct alleged schemes" (*id.* at 5). Rather, the exemplar misrepresentations in the illustrative to-wit clause are simply "one or more specified means," Fed. R. Crim. P. 7(c)(1), by which the defendant committed "a single continuing scheme." *Aracri*, 968 F.2d at 1518 (affirming, in relevant part, conviction on count that "listed various means" of an alleged "scheme" including using "different companies" and multiple "fictious invoices" to execute "a series of transfers" but "all for [a] single purpose"); *see also, e.g.*, *Kousisis*, 605 U.S. at 123 (describing defendants' "making a number of false or fraudulent . . . representations" as the "how" of "a scheme . . . premised on a fraudulent inducement").[35]

Indeed, courts before and after *Aracri*'s statement that related culpable acts may be charged in a single scheme count have applied this principle across a range of allegations and offenses. *Aracri* itself analogized its single count for a multiyear tax fraud scheme involving numerous entities and "a system of fictitious invoices," 968 F.2d at 1514-15, to *Margiotta*'s "single scheme to defraud" based on "numerous mailings" and a narcotics case's "aggregation of two heroin sales in one count" because they were part of an "ongoing and continuous" drug crime. *See Aracri*, 968

[35] The "obtained by fraud" provision of Section 666(a)(1)(A)'s federal-program fraud offense that is charged in Count Five is materially indistinguishable from other federal fraud statutes, *see, e.g.*, *Kelly v. United States*, 590 U.S. 391, 398 (2020) (describing Section 666 federal-program fraud as working "[s]imilarly" to the wire fraud statute by proscribing obtaining property by deception), and so the Court may rely on the mail- and wire-fraud case law's principles regarding the aggregation of discrete acts into a "single continuing scheme" for purposes of duplicity analysis. *See, e.g.*, *United States v. Robinson*, 294 F. App'x 630 (2d Cir. 2008) (rejecting duplicity challenge to mail, bank, and wire-fraud counts alleging single scheme involving numerous transactions in stolen checks with various counterparties over many years). The defendant appears to agree (*see* Def. Br. 6 n.2 ("[C]ourts analyze the fraud element of 18 U.S.C. § 666(a)(1)(A) using the language of and cases interpreting other federal fraud statutes, including the wire fraud and mail fraud statutes.")), and does not argue that his duplicity motion is premised on any unique feature of the federal-program fraud statute under which he is charged in Count Five.

F.2d at 1519 (citing *Margiotta*, 646 F.2d at 733, and *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989)). More recently, the Second Circuit relied on *Aracri* and *Margiotta* to reject an argument that "three fraud counts" (for mail, bank, and wire fraud) were improperly duplicitous because each single count arose out of the defendant obtaining checks stolen from diverse sources and distributing them to five different co-conspirators or informants over a period of nearly six years. *Robinson*, 294 F. App'x 630, 632 (2d Cir. 2008). More recently still, courts in this District relied on *Aracri*, *Margiotta*, and *Robinson* to deny duplicity-based motions to dismiss counts that charged NYCHA officials with taking bribes over many years from multiple payors at different locations. *See United States v. Gilmore*, No. 24 Cr. 127 (LJL), 2024 WL 3990604, at *2 (S.D.N.Y. Aug. 29, 2024); *United States v. Cartagena*, No. 24 Cr. 516 (PGG), 2025 WL 1456097, at *5-6 (S.D.N.Y. May 21, 2025); *see also United States v. Small*, No. 24 Cr. 208 (VEC), ECF No. 61 at 45-47 (S.D.N.Y. Sept. 24, 2025) (denying similar motion and citing *Gilmore* and *Cartagena*).

The defendant relies on *United States v. Kearney*, 444 F. Supp. 1290 (S.D.N.Y. 1978) (also reported at 451 F. Supp. 33), to assert that Count Five "is impermissibly duplicitous *because* the government must prove different facts to establish the purported frauds [*sic*] involving Victim-1 and Victim-2." (Dkt. 42 at 5 (emphasis added)). But that is not the law in the Second Circuit: *Kearney* not only predates the Second Circuit's foundational duplicity cases, but it also relied on a Fifth Circuit decision whose reasoning *Margiotta* expressly rejected. *Compare Kearney*, 444 F. Supp. at 1294-95 (in 1978, relying on "the *Bins* test" and "the *Bins* formulation," citing *Bins v. United States*, 331 F.2d 390 (5th Cir. 1964)) *with Margiotta*, 646 F.2d at 733 (in 1981, noting that "[w]e do not agree" with *Bins* "that whatever acts the Constitution permits to be punished separately are required to be stated in separate counts, a result that would require exposure to

cumulative punishments"); *see also, e.g.*, *Gilmore*, 2024 WL 3990604, at *2 (citing defendant's invocation of *Kearney* but noting that "the Second Circuit, however, has expressly rejected" the Fifth Circuit law on which it relied).

The defendant's reliance on *Kearney* has a second and independent fatal flaw, too: that case's finding of improper duplicity "relied in large measure on the text of the statutes under which the defendant was charged"—an obscure obstruction-of-correspondence law, 18 U.S.C. § 1702, and the unlawful-wiretapping statute at 18 U.S.C. § 2511—neither of which "contemplate[d] that several separate transactions may form a single, continuing scheme" and both of which instead "targeted singular instances of prohibited conduct." *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *4 (S.D.N.Y. Jan. 18, 2017) (rejecting *Kearney*'s application to fraud and money laundering counts that "each charge conduct that may be considered part of one integrated fraudulent scheme, notwithstanding the involvement of three different issuers"). Not surprisingly, *Gilmore*'s and *Wey*'s various rejections of *Kearney* appear to be that latter case's only two citations in criminal cases in this District in the last 25 years.

None of the defendant's other arguments holds water. The defendant summarizes his attack on Count Five as: "Different proofs. Different statements. Different payments. Different crimes." (Dkt. 42 at 6). As to "statements" and "payments," it is an exceedingly rare federal fraud offense that is committed with a single misrepresentation or a single transaction—and the defendant cites no rule for these purported limits. As to "different proofs," the argument gestures to the long-rejected notion that "in proving a scheme to defraud by means of several misrepresentations, every misrepresentation charged in the indictment must be proved and the failure to prove one must result in a retrial." *Amrep Corp.*, 560 F.2d at 546 (emphasizing that this

is not the law). Because "the alleged false statements [are] merely the means for carrying the [scheme to defraud] into effect," *id.* at 546-57, "[t]he real question . . . is not so much whether there was sufficient evidence regarding each and every specification"—that is, "different proofs," each adequately proven—"but, rather, whether there was sufficient overall proof of the alleged scheme to defraud." *United States v. Stirling*, 571 F.2d 708, 725 (2d Cir. 1978). In other words, not only does the law *permit* "different proofs" for the various means by which a defendant may have committed a singular scheme to defraud, but the Government need only prove *one* such means in order to secure a conviction.

The defendant's other authorities for Count Five's purported duplicity miss their mark in various ways. The duplicity finding in *United States v. Sturdivant* came only after trial evidence persuaded the district court "that there was not a sufficient link" between two street-level drug sales. *See* 244 F.3d 71, 78 (2d Cir. 2001). The District of New Jersey ruling in *United States v. Hinton*, 127 F. Supp. 2d 548, 554 (D.N.J. 2000), that the bank-fraud statute's reference to the singular "financial institution" precludes charging a scheme to defraud multiple banks is not only inapplicable to the differently worded federal-program fraud offense charged in this case, but was expressly rejected on its own terms by Judge Sand in this District in *United States v. Rigas*, 281 F. Supp. 2d 660, 670-71 (S.D.N.Y. 2003). And in *United States v. Gabriel*, 920 F. Supp. 498, 503 (S.D.N.Y. 1996), Judge Rakoff *declined* to dismiss a count for improper duplicity and deferred consideration of the issue until after trial.

Twelve years after his opinion in *Gabriel*, Judge Rakoff sat with Judge Sack and Judge Katzmann on the panel that decided the *Robinson* case. Uncited by the defendant, *Robinson* affirmed convictions on fraud counts covering various transactions with different and otherwise

unrelated co-conspirators over several years because each alleged a "single continuing scheme." 294 F. App'x at 632. For the same reason, Count Five is not duplicitous and the defendant's motion to dismiss it should be denied.

2. *Count Five Does Not Risk Unfairness*

Count Five is not duplicitous, because it alleges "the commission of a crime by several means." *Aracri*, 968 F.2d at 1518. But even if the Court were to find that Count Five alleges "two . . . distinct crimes," there would be no basis to find that the count is "*impermissibly* duplicitous" because it does not implicate any of the kinds of risks that justify such a finding—much less at this pretrial stage. *Kandic*, 134 F.4th at 99.

*First*, Count Five is clear and detailed. Its twenty-two paragraphs of incorporated allegations describe particular dates of relevant events, quote from particular relevant communications, and provide various dollar amounts of relevant transactions—all over a relatively short period of several months "[f]rom at least in or about October 2022 through in or about February 2023." (*See, e.g.*, Ind. ¶¶ 35-47, 63). What is more, the Government has provided the defendant with extensive and well-organized discovery, and has recently provided additional information about the Indictment in written correspondence with defense counsel. The specificity of Count Five's language—on its own, but even more so as supplemented by discovery productions and the provision of additional information—provides more than adequate notice to the defendant about the nature, participants, dates, and transactions underlying the alleged scheme to defraud, and in so doing, poses no threat to the unanimity of a future verdict or the clarity of the defendant's protection against double jeopardy. *See, e.g.*, *Margiotta*, 646 F.2d at 732-34 (finding that count was not impermissibly duplicitous because its allegations of the "content, sender, addressee, and approximate date of filing" of discrete mailings constituting some of the means of

a mail-fraud scheme "provided sufficient notice" to avoid "risk[ing] unfairness to the defendant"); *United States v. Williams*, 705 F.2d 603, 624 (2d Cir. 1983) (rejecting argument of improper duplicity in view of "[t]he specificity of the conspiracy-to-defraud allegations" in the challenged count); *United States v. Parker*, 165 F. Supp. 2d 431, 452 (W.D.N.Y. 2001) ("[B]ased on the extensive discovery provided to Defendants regarding the expected evidence at trial as well as the details of the background of the investigation as recited in the Indictment, Defendants have been given adequate notice of the basis of the Government's case as to each count" challenged as improperly duplicitous).

*Second*, insofar as Count Five is even potentially (but permissibly) duplicitous, Count Five would *advantage* the defendant rather than unfairly prejudice him. Alleging conduct that *could* be charged as multiple offenses in a single count "achieves the obvious benefit" for the defendant "of limiting the maximum penalties defendant may face if convicted of [federal-program] fraud and also avoids the unfairness of portraying the defendant to the jury as the perpetrator of [two] crimes" rather than the one alleged in Count Five. *Margiotta*, 646 F.2d at 733; *accord, e.g.*, *Small*, ECF No. 61 at 6 (S.D.N.Y. Sept. 24, 2025) (noting, before denying duplicity motion on other grounds, "that there are benefits to [the defendant] for [the Government] charging it this way versus multiple separate bribe counts, multiple separate extortion counts").

*Third*, the defendant is wrong that it is "clear" that "[t]he remedy for a duplicitous count" is "either dismiss the count or require the Government to elect the single offense they will pursue at trial." (Dkt. 42 at 10). As this Court noted in denying a pretrial motion to dismiss an indictment for improper duplicity in *Small*, "there will be no prejudice to [the defendant] from proceeding pursuant to this indictment" because "[a]ny possible prejudice can be cured via an

appropriate jury instruction and verdict form that ensures unanimity." *Small*, ECF No. 61 at 46 (S.D.N.Y. Sept. 24, 2025).[36] So, too, is the defendant wrong that courts should and do dismiss indictments before trial to protect against a duplicitous count's potential impact on sentencing. (*See* Dkt. 42 at 9). Indeed, the case that the defendant cites for the backwards proposition that "there is no reason" not to dismiss the indictment "before a single juror is impaneled" to preempt potential sentencing complications actually held that the remedy was not vacating a conviction or remanding for retrial but "simply . . . resentencing defendant." *Sturdivant*, 244 F.3d at 73.[37]

Because Count Five "do[es] not run afoul of Rule 8(a), the Court need not consider the issue of prejudice" to the defendant. And "to the extent that [the defendant] raises concerns" that later "increase the risk of ambiguity in any eventual jury verdict, the parties will have a full opportunity to ameliorate any such risk through their proposed jury instructions and verdict forms." *Wey*, 2017 WL 237651, at *5. The defendant's motion to dismiss Count Five as improperly duplicitous should be denied.

[36] Even the case that the defendant says is "directly on point" cuts against his request to dismiss Count Five as an anticipatory remedy. In *United States v. Sarshar*—an insider trading case in which the defendant was charged with impermissibly providing material non-public information to multiple tippees—Judge Woods found "the *threat* of improper duplicity" based on his concern of the risk of a non-unanimous verdict as to which tippee the defendant provided information to, but acknowledged that an impermissibly "duplicitous indictment does not necessarily require dismissal." *See* No. 21 Cr. 202 (GHW), ECF No. 70 at 128-29 (S.D.N.Y. Oct. 29, 2021) (quoting *Sturdivant*, 244 F.3d at 79) (emphasis added). In addition to the possibility of dismissal without prejudice and recharging, the court suggested several potential "other remedies" including "a jury instruction." The Government elected to seek leave to dismiss the indictment later that month, and declined to re-indict the defendant after he entered into a civil settlement with the SEC shortly thereafter. *See id.* ECF Nos. 73, 77.

[37] The defendant's authority for his claim of unfair prejudice with respect to jury unanimity is also inapposite. The Supreme Court's discussion of jury unanimity in *Richardson v. United States*, 526 U.S. 813 (1999), was focused on the specific requirements of the continuing criminal enterprise statute for drug traffickers, which "is completely different" from the unanimity considerations of a scheme to defraud. *See United States v. Rice*, 699 F.3d 1043, 1048 (8th Cir. 2012).

## III. THE DEFENDANT'S SUPPRESSION MOTION IS MERITLESS

The defendant's motion to suppress evidence found on his personal email account and cellphone lacks merit and does not entitle him to any sort of hearing.

First, and as a threshold matter, the defendant has not established standing to challenge the warrants at issue in his suppression motion.

Second, every one of those warrants permissibly—and in a manner entirely consistent with the law in this Circuit—authorized a complete review (*i.e.*, search) of the data from the defendant's cellphone and email account, in order to identify (and, then, seize) evidence of his criminal activity. And the warrants permissibly—indeed, prudently—did not limit law enforcement's ability to identify that evidence by imposing any specific protocols or requirements, including date-filtering. As a result, the defendant's suppression motion, which turns entirely on an argument that law enforcement erred when they *observed* data outside the date ranges applicable to what they were able to *seize*, rests on an untenable, mistaken premise.

Third, even if there had been some error, law enforcement acted in good faith when they disclosed what they had done and seen to a neutral magistrate judge who, after having been presented with those facts, authorized a new warrant empowering law enforcement to expand law enforcement's review. Indeed, law enforcement did so not once, not twice, but three separate times—each time incrementally expanding the scope of the evidence that they were authorized to seize. And each of the warrants that those judges issued rested on ample probable cause beyond the supposedly "out-of-date" communications at the heart of the defendant's suppression motion.

Ultimately, and as set forth in detail herein, the Government took a reasonable, measured approach both in obtaining and in executing the warrants issued in the course of its investigation. Multiple different judges blessed that approach, and their determinations should not be cast aside

based on the defendant's meritless suppression arguments. There was no Fourth Amendment violation here.

### A. Applicable Law

#### 1. *Standing*

"Fourth Amendment rights are personal rights . . . [that] may not be vicariously asserted." *United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002) (quoting *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978)). "In order to prevail on a contention that a search violated the Fourth Amendment, an accused must show that he had a legitimate expectation of privacy in a searched place or item." *United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)). In other words, "a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla*, 508 U.S. 77, 81 (1993).

"When considering a claimed violation of Fourth Amendment rights, the burden is on the defendant to establish that his own rights under the Fourth Amendment were violated." *United States v. Paulino*, 850 F.2d 93, 96 (2d Cir. 1988); *see also United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991). To satisfy this burden, a defendant must submit an "affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search." *United States v. Ruggiero*, 824 F. Supp. 379, 391 (S.D.N.Y. 1993), *aff'd*, 44 F.3d 1102 (2d Cir. 1995) (citing *Rawlings*, 448 U.S. at 98); *Rakas*, 439 U.S. at 130 n.1. The fact that the Government connects a defendant to the subject of a search does not suffice to establish standing, absent an affidavit from someone with personal knowledge of the facts therein, which affidavit would establish standing on its own.

*See United States v. Watson*, 404 F.3d 163, 166 (2d Cir. 2005) ("[The] defendant could not challenge the search of a residence merely because he anticipated that the Government will link the objects recovered in that search to defendant at trial.").

2. *Probable Cause*

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

The legal standard for determining whether a particular warrant application is supported by probable cause is well established. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Such determinations must be approached in a practical way, *id.* at 232, because "probable cause is a flexible, common-sense standard," *Texas v. Brown*, 460 U.S. 730, 742 (1983). Additionally, the training and experience of law enforcement agents bear significantly on probable cause determinations. *Gates*, 462 U.S. at 232. Inferences drawn by law enforcement agents based on facts known to them, the totality of the circumstances, and their training and experience can all support a probable cause finding. *Id.* at 231-32. Probable cause "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004). It "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands." *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975). Probable cause requires "only the probability, and not a prima facie showing, of criminal activity." *Gates*,

462 U.S. at 235. Accordingly, "the fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985); *see also, e.g.*, *United States v. Leeper*, --- F.4th ----, 2026 WL 2339544, at *5 (2d Cir. Aug. 13, 2026) (affirming warrant for DNA collection, reasoning, "The supporting affidavit does not establish with certainty that there would be a sample against which to compare [the individual's] DNA, but that is not what the Fourth Amendment requires.").

Once a "neutral and detached" magistrate has made finding that probable cause exists, that finding is "entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant." *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993). "[S]o long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 232 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). This deferential standard reflects two important considerations. First, as the Supreme Court has observed, "[r]easonable minds frequently may differ on the question whether a particular affidavit established probable cause." *United States v. Leon*, 468 U.S. 897, 914 (1984). Second, "[a] grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). For these reasons, the Supreme Court has directed that "courts should not invalidate [a] warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *Id.* at 109.

3. *Particularity and Overbreadth*

With respect to warrants, the Fourth Amendment "both requires particularity and forbids overbreadth." *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 450 (S.D.N.Y. 2013). "Although somewhat similar in focus, these are two distinct legal issues: (1) whether the items listed as 'to be

seized' in the warrant were overbroad because they lacked probable cause and (2) whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." *Id.*; *accord United States v. Nejad*, 436 F. Supp. 3d 707, 724 (S.D.N.Y. 2020) (quoting *United States v. Cohan*, 628 F. Supp. 2d 355, 359 (E.D.N.Y. 2009)) ("A warrant, therefore, can be unconstitutionally infirm in two conceptually distinct but related ways: either by seeking specific material as to which no probable cause exists, or by giving so vague a description of the material sought as to impose no meaningful boundaries.").

The Fourth Amendment's particularity requirement is addressed to the "specific evil [of] the 'general warrant' abhorred by the colonists," and is meant to prevent the "general, exploratory rummaging in a person's belongings" that such a warrant permitted. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). To satisfy that requirement, a warrant must: (1) "identify the specific offense for which the police have established probable cause"; (2) "describe the place to be searched"; and (3) "specify the items to be seized by their relation to designated crimes." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017), *abrogated in part on other grounds Carpenter v. United States*, 138 S. Ct. 2206, 2220-21 (2018).

A warrant that calls for seizure of "all evidence" of a given crime or crimes is sufficiently particular if it offers a list of illustrative items. *See United States v. Riley*, 906 F.2d 841, 843-45 (2d Cir. 1990) (warrant containing list of illustrative items to seize was sufficiently particular notwithstanding provision allowing, as well, seizure of "other items that constitute evidence of the offenses" identified); *United States v. Young*, 745 F.2d 733, 759-60 (2d Cir. 1984) (warrant allowing seizure of listed items plus "other evidence of" the crimes specified was sufficiently particular);

*United States v. Jacobson*, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants.").

The Second Circuit has observed that, where a warrant authorizes the search of digital evidence, "the particularity requirement assumes even greater importance." *Ulbricht*, 858 F.3d at 99 (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013)). That observation reflects a concern that "[a] general search of electronic data"—that is, one conducted pursuant to an insufficiently particular warrant—"is an especially potent threat to privacy because hard drives and e-mail accounts may be 'akin to a residence in terms of the scope and quantity of private information they may contain.'" *Id.* (quoting *Galpin*, 720 F.3d at 446). Still, "[t]he Fourth Amendment does not require a perfect description of the data to be searched and seized." *Id.* at 100. And, just like other warrants, "[s]earch warrants concerning digital data may contain 'some ambiguity'" provided that "law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant.'" *Id.* (quoting *Galpin*, 720 F.3d at 446); *see also United States v. Tompkins*, 118 F.4th 280, 287 (2d Cir. 2024) ("We have also noted that the Fourth Amendment does not require that search warrants include a perfect description of the data to be searched and seized, including search warrants for digital data.").

Importantly—and demonstrating the distinction between particularity and breadth, *see Zemlyansky*, 945 F. Supp. 2d at 450—the Second Circuit has emphasized, specifically in the context of digital evidence, that "[it] is important to bear in mind that a search warrant does not necessarily lack particularity simply because it is broad," *Ulbricht*, 858 F.3d at 100. Indeed,

precisely because the search of digital evidence can be "akin to [a search of] a residence," and because "it is not always feasible to 'extract and segregate responsive data from non-responsive data'" when dealing with digital storage, searches for digital evidence "may sometimes need to be as broad as searches of residences pursuant to warrants." *Id.* at 99-100; *accord Tompkins*, 118 F.4th at 289 (citing *Ulbricht* for the same principle more recently). The Fourth Amendment has long authorized those analogous "traditional searches for paper records," even though they "have always entailed the exposure of records that are not the objects of the search to at least superficial examination in order to identify and seize those records that are." *Ulbricht*, 858 F.3d at 100. It similarly permits comparably broad searches for digital evidence, even though "government efforts to locate particular files" through such searches may, "[b]y necessity . . . require examining a great many other files to exclude the possibility that the sought-after-data are concealed there." *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc), *overruled in part on other grounds as recognized by Demaree v. Pederson*, 887 F.3d 870, 876 (9th Cir. 2018); *accord Galpin*, 720 F.3d at 447 (citing *Comprehensive Drug Testing* favorably in discussing the challenges that come with reviewing digital evidence, including the impossibility of "ascertain[ing] the content of a file without opening it" and the reality that "files containing evidence of a crime may be intermingled with millions of innocuous files"). Accounting for these realities inherent in reviewing digital evidence, the Second Circuit has made clear that the breadth of a warrant for digital evidence, even where it results in consequential review of non-responsive materials, does not "turn[] a search warrant into a prohibited general warrant." *Ulbricht*, 858 F.3d at 100. What matters for purposes of particularity is that the warrant—whether for "traditional" or digital evidence—"enables the executing officer to ascertain and identify with reasonable certainty

those items that the magistrate judge has authorized him or her to seize." *Groh v. Ramirez*, 540 U.S. 551, 557-58 (2004); *United States v. Rosa*, 626 F.3d 56, 58 (2d Cir. 2010).

Applying those principles, courts in this Circuit, including this one, have—without exception—upheld warrants authorizing law enforcement to review *the entirety* of a cellphone or email account in order to identify and then seize the subset of data from that cellphone or email account responsive to the warrant, so long as the warrant is sufficiently particular. *See, e.g.*, *United States v. Patel*, No. 25 Cr. 173 (VM), 2026 WL 849850, at *7 (S.D.N.Y. Mar. 27, 2026); *Barrett*, 2025 WL 371084, at *22; *Nejad*, 436 F. Supp. 3d at 728; *United States v. Garlick*, No. 22 Cr. 540 (VEC), 2023 WL 2575664, at *11 (S.D.N.Y. Mar. 20, 2023) (collecting cases); *United States v. Arias-Casilla*, No. 21 Cr. 218 (AT), 2022 WL 2467781, at *6 (S.D.N.Y. July 6, 2022); *United States v. Ray*, 541 F. Supp. 3d 355, 397-402 (S.D.N.Y. 2021); *United States v. Rosario*, No. 19 Cr. 807 (LAP), 2021 WL 5647879, at *6 (S.D.N.Y. Dec. 1, 2021); *United States v. Gatto*, 313 F. Supp. 3d 551, 560 (S.D.N.Y. 2018); *see also In the Matter of a Warrant for All Content & Other Info. Associated with the Email Acct. xxxxxxx gmail.com Maintained at Premises Controlled By Google, Inc.* ("*In re Google Warrant*"), 33 F. Supp. 3d 386, 393 (S.D.N.Y. 2014), *as amended* (Aug. 7, 2014) ("[W]e view it as well-established that a search warrant can properly permit the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government."). As those decisions have recognized by way of analogy: "It has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized," and those principles "apply with equal force to searches of electronic data and devices." *Barrett*, 2025

WL 371084, at *22 (quoting *United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039, at *14 (S.D.N.Y. Oct. 10, 2014), *aff'd*, 858 F.3d 71)). Notably, in many of these decisions, courts rejected motions to suppress evidence from warrants that authorized a complete review of the relevant data (*i.e.*, the entirety of a phone or email account) without regard to its date, even though the categories of evidence that the law enforcement was authorized to *seize* were limited to records from within a specified date range. *See, e.g.*, *Garlick*, 2023 WL 2575664, at *10-*11; *Ray*, 541 F. Supp. 3d 355, 397-402; *see also Rosario*, 2021 WL 5647879, at *7. Other of these decisions rejected motions to suppress evidence from similar warrants where some—or even all—of the categories of evidence to be seized were not date-limited. *See, e.g.*, *Barrett*, 2025 WL 371084, at *17 (collecting cases and noting that a temporal limitation is "not an absolute necessity" but, rather, "one indicium of particularity"); *Arias-Casilla*, 2022 WL 2467781, at *6-*7 (noting that, although there is consensus that "a time frame is relevant [to the particularity inquiry,] there is no apparent consensus as to when one is required," and concluding, with respect to challenged warrant, that "[t]he absence of a temporal limitation alone does not render the Warrant overbroad"); *see also United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at *11 (S.D.N.Y. Jan. 6, 2010) ("The complexity and duration of the alleged criminal activities" may "render a time frame less significant than in a case that requires a search for a small set of discrete items related to one or only a few dates.").

Courts have invoked these same principles to deny suppression motions arising from circumstances in which law enforcement, while reviewing the entirety of cellphone or email account pursuant to a warrant, encounter evidence of additional criminal activity beyond the categories of evidence specified in the warrant. In some cases, that additional evidence consisted of records indicating that the defendant had committed crimes other than the ones specified in the warrant. *See,*

*e.g.*, *Barrett*, 2025 WL 371084, at *3 (law enforcement observed evidence of PPP loan fraud and prison contraband while conducting review of cellphone records for evidence of drug crimes). In others, the additional evidence was still evidence of the same crimes specified in the warrant but was outside the date limitation(s) included in the warrant—thus indicating the defendant had been involved in the specified crimes for longer than the Government originally understood. *See, e.g.*, *Rosario*, 2021 WL 5647879, at *2 (law enforcement observed, during review of cellphone, a series of text message chains that predated but continued to run through the time period specified in their original warrant); *see also, e.g.*, *United States v. Raniere*, No. 18 Cr. 204-1 (NGG), 2019 WL 1984026, at *2 (E.D.N.Y. May 3, 2019).[38]

---

[38] Cases about digital warrants often discuss whether law enforcement observed additional evidence in "plain view" on a device or in an account, referring to the rule permitting certain warrantless seizures that first arose in the context of physical evidence. *See generally, e.g.*, *Horton v. California*, 496 U.S. 128, 130-31, 133-37 (1990) (permitting warrantless seizure of firearms found during execution of robbery-related premises warrant that did not mention weapons). The plain-view doctrine generally permits the warrantless seizure of evidence where: "(1) the officer is lawfully in a position from which the officer views an object, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object." *United States v. Babilonia*, 854 F.3d 163, 180 (2d Cir. 2017) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)); *see also Galpin*, 720 F.3d at 451 (recognizing applicability of the plain view doctrine in the context of electronic evidence). *See, e.g.*, *Rosario*, 2021 WL 5647879, at *7 (referring to the additional evidence that law enforcement observed as "plain-view evidence"); *see also, e.g.*, *Barrett*, 2025 WL 371084, at *22.

The use of the phrase "plain view" to describe "*reviewing* . . . evidence," *e.g.*, *Rosario*, 2021 WL 5647879, at *7, is not wholly apt. The plain view doctrine is concerned solely with the warrantless *seizure* of evidence, not the mere *observation* of evidence that law enforcement later reference in establishing probable cause for a future warrant. As then-Justice Rehnquist explained, "It is important to distinguish 'plain view' as used . . . to justify seizure of an object, from an officer's mere observation of an item left in plain view," because mere "observation . . . generally involves no Fourth Amendment search," but "[t]he information obtained as a result of observation . . . may be the basis for probable cause [in a future warrant application]." *Brown*, 460 U.S. at 738 n.4 (Rehnquist, J., plurality opinion); *see also* Orin Kerr, THE DIGITAL FOURTH AMENDMENT 90 (2024) ("In existing Fourth Amendment law, there are no limits on the government sharing information about what they see in plain view while executing a warrant."). That latter scenario—

4. *Manner of Search*

"[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. United States*, 441 U.S. 238, 257 (1979). For searches authorizing the seizure of ESI, "the Fourth Amendment does not require a search warrant to specify computer search methodology." *United States v. Bowen*, 689 F. Supp. 2d 675, 681 (S.D.N.Y. 2010).

The Second Circuit similarly "[has] not required specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants, and [the Circuit] do[es] not impose any rigid requirements in that regard at this juncture." *Galpin*, 720 F.3d at 451. And, consistent with *Galpin*, courts in this District have repeatedly declined to "impose *ex ante* restrictions pertaining to the later execution of [a] warrant," *In re Google Warrant*, 33 F. Supp. 3d at 397, and have declined to find searches conducted without such protocols to be impermissible, *United States v. Romain*, No. 13 Cr. 924 (RWS), 2014 WL 6765831, at *9 (S.D.N.Y. Dec. 1, 2014). Numerous courts in this District have recognized that, "while the warrant must state with particularity the materials to be seized from a computer, the warrant need not specify *how* the

---

"an officer's mere observation of an item" that becomes "the basis for probable cause" in a future warrant application—is what the *Rosario* and *Barrett* decisions meant by "plain view." In the events giving rise to both decisions, law enforcement did not immediately *seize* additional evidence it observed while reviewing the entirety of a cellphone or email account for specific categories of evidence but, rather, went to a magistrate judge, described the evidence that they had observed, and obtained an additional warrant *authorizing* its seizure (and the seizure of additional similar evidence). *See, e.g.*, *Barrett*, 2025 WL 371084, at *3-*4; *Rosario*, 2021 WL 5647879, at *2; *accord Brown*, 460 U.S. at 738 n.4 (Rehnquist, J., plurality opinion).

As discussed more fully below, that is what happened here. The point of the cases about digital evidence observed in "plain view" is that suppression is unjustified where agents executing a warrant authorizing review of an entire device or account for certain evidence see additional evidence, report that evidence to a magistrate judge, and obtain an expanded warrant covering that evidence.

computers will be searched." *United States v. Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *37 (S.D.N.Y. Apr. 4, 2007) (emphasis in original); *see id.* (observing that "[t]his is the view of the vast majority of courts to have considered the question" and collecting cases).

The latitude afforded to law enforcement in their execution of a warrant for digital evidence reflects the challenges inherent in reviewing that sort of data. *See United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149, at *4 (S.D.N.Y. Nov. 29, 2016) (citing *United States v. Ganias*, 824 F.3d 199, 211-21 (2d Cir. 2016), as "acknowledg[ing] that meaningful digital segregation may well be impossible"). The Second Circuit described some of these challenges in *Ulbricht* in rejecting the notion that law enforcement should be required to limit their review using keyword searches:

> [I]t will often be impossible to identify in advance the words or phrases that will separate relevant files or documents before the search takes place, because officers cannot readily anticipate how a suspect will store information related to the charged crimes. Files and documents can easily be given misleading or coded names, and words that might be expected to occur in pertinent documents can be encrypted; even very simple codes can defeat a pre-planned word search.

858 F.3d at 102; *accord Riley*, 906 F.2d at 845 ("[F]ew people keep documents of their criminal transactions in a folder marked 'drug records.'").

5. *The Suppression Remedy and Good Faith*

The "drastic remedy of the suppression of all evidence seized is not justified unless those executing the warrant acted in flagrant disregard of the warrant's terms." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988). Law enforcement "'flagrantly disregard' the terms of a warrant . . . only when (1) they effect a 'widespread seizure of items that were not within the scope of the warrant,' and (2) do not act in good faith." *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000).

To establish the first prong of this two-part test, "the search conducted by government agents must *actually resemble* a general search." *Id.* (emphasis in original). In considering whether the degree of over-seizure required to manifest "flagrant disregard" is present, courts across the country have recognized that executing agents must be given significant leeway to determine what is and is not in scope of a warrant, so long as the seized material has a "reasonable" connection to the charged offense. *See, e.g., United States v. Young*, 916 F.3d 368, 377 (4th Cir. 2019); *Thiel v. Korte*, 954 F.3d 1125, 1128 (8th Cir. 2020) ("We point out, moreover, that '[i]tems not mentioned in a warrant may be seized so long as they are reasonably related to the crime for which the warrant issued.'"); *see also United States v. Graziano*, 558 F. Supp. 2d 304, 317 (E.D.N.Y. 2008) (recognizing need to for "leeway in searching computers for incriminating evidence"); *United States v. Scarfo*, 180 F. Supp. 2d 572, 578 (D.N.J. 2001) ("Where proof of wrongdoing depends upon documents or computer passphrases whose precise nature cannot be known in advance, law enforcement officers must be afforded the leeway to wade through a potential morass of information in the target location to find the particular evidence which is properly specified in the warrant.")

Particularly with ESI, material that would not on its own be responsive can be seized if it gives context to other material that is directly within the scope of the warrant. *United States v. Swinton*, 251 F. Supp. 3d 544, 551 (W.D.N.Y. 2017), *aff'd*, 797 F. App'x 589 (2d Cir. 2019). Moreover, "[a]lthough not every item that falls within the language of the warrant will prove probative in a future criminal prosecution, the evidentiary significance of each and every item may not be instantly apparent during the course of a search." *United States v. Kimble*, 855 F.3d 604, 612 (4th Cir. 2017). Thus, "items seized pursuant to a validly issued warrant are not required, on

their face, to necessarily constitute evidence of an offense identified in the relevant warrant—rather, they only potentially have to be evidence of such offense." *Id.*

With respect to the second prong, under the "good faith exception, the exclusionary rule and its remedy of suppression do not apply where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. The law encourages law enforcement to obtain warrants and to rely upon them. Suppression of evidence obtained in reliance upon a facially valid warrant would "[p]enaliz[e] the officer for the magistrate's error," and thus not "logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 921.

In analyzing the applicability of the good faith exception, the pivotal question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23. If the reviewing court finds that the officers' reliance on the warrant was objectively reasonable, suppression is not warranted. *See, e.g.*, *United States v. Singh*, 390 F.3d 168, 183 (2d Cir. 2004). Moreover, to trigger the exclusionary rule, law enforcement's conduct must "be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Exclusion should be a "last resort" rather than a "first impulse." *United States v. Rosa*, 626 F.3d at 64. The exclusionary rule should be used only where law enforcement "'exhibit[s] deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights.'" *United States v. Raymonda*, 780 F.3d 105, 117-18 (2d Cir. 2015) (quoting *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013)).

As a result, "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon*, 468 U.S. at 922; *see also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (noting that the "issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause"). Consistent with those principles, the good faith exception is *in*applicable where a search is conducted pursuant to a warrant only in four narrow circumstances:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992).

6. Franks *Hearings*

A search warrant affidavit is presumed reliable. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008). "The task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the [issuing judge] a 'substantial basis' for making the requisite probable cause determination." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 238). "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003). Not every statement in a warrant affidavit must be true. *See United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000). To invoke the *Franks* doctrine, the defendant must demonstrate that there were intentional misstatements or

omissions in the search warrant affidavit and that those misstatements or omissions were material. *See Awadallah*, 349 F.3d at 64. The defendant must establish both components—*i.e.*, intent and materiality—by a preponderance of the evidence. *See Klump*, 536 F.3d at 119.

"The *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). To secure a *Franks* hearing, a defendant must make a "'*substantial preliminary showing*' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Franks*, 438 U.S. at 155, 170) (emphasis added). The burden to obtain a *Franks* hearing is thus a heavy one, and such hearings are rare. *See, e.g.*, *United States v. Sandalo*, 70 F.4th 77, 86 (2d Cir. 2023) ("[T]he substantial preliminary showing standard imposes a 'high' burden on [the defendant]." (quoting *Rivera*, 928 F.2d at 604)); *United States v. Skyfield*, No. 23 Cr. 569 (LJL), 2023 WL 8879291, at *8 (S.D.N.Y. Dec. 22, 2023) (defendant's burden is "'a heavy one that requires more than a mere conclusory showing'" (quoting *Sandalo*, 70 F.4th at 86)); *United States v. Melendez*, No. 16 Cr. 33 (LTS), 2016 WL 4098556, at *7 (S.D.N.Y. July 28, 2016) ("The burden to obtain [a *Franks*] hearing is a heavy one, and such hearings are exceedingly rare."); *United States v. Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A defendant seeking to have the Court hold a *Franks* hearing bears a substantial burden.").

In reviewing a challenge to a warrant, alleged "[o]missions are not subject to the same high level of scrutiny as misstatements." *United States v. Rivera*, 750 F. Supp. 614, 617 (S.D.N.Y. 1990). Because "all storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant." *Vilar*, 2007 WL 1075041, at *27;

*see also Awadallah*, 349 F.3d at 67. "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Mandell*, 710 F. Supp. 2d 368, 373 (S.D.N.Y. 2010). Thus, "as a practical matter the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." *Id.* at 374. This is because "allegations of omission potentially open officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id.*

To permit the inference that an affiant acted with reckless disregard for the truth, the omitted information must be "clearly critical" to assessing the legality of the search. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996). The movant must make a substantial preliminary showing that a reasonable person would have known that the magistrate judge would have wanted to know the kind of information that was omitted. *See United States v. Perez*, 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003). "Courts have repeatedly been warned not to interpret the affidavit in a hypertechnical, rather than a commonsense, manner." *Canfield*, 212 F.3d at 719.

A search warrant affiant "does not necessarily act with reckless disregard for the truth simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be clearly critical." *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013). "Rather, the reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Id.* (quoting *Awadallah*, 349 F.3d at 68). "[T]he mere intent to exclude information is

insufficient . . . [since] every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly." *Awadallah*, 349 F.3d at 67-68.

"To prove reckless disregard for the truth, the defendant[] [must] prove that the affiant in fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154; *see also Falso*, 544 F.3d at 126 ("Allegations of negligence or innocent mistake are insufficient.").

"To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *United States v. Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718. In other words, "[t]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Id.*

That approach to materiality comports with the Second Circuit's guidance that "[t]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant." *United States v. Peeples*, 962 F.3d 677, 688 (2d Cir. 2020). Thus, when considering an affidavit including some tainted evidence, "[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant" or file a criminal complaint. *Id.* at 688-89. If so, suppression is unwarranted. *Id.*

**B. Discussion**

1. *The Defendant Lacks Standing*

As a threshold matter, the defendant has not established standing to challenge any of the warrants at issue in his suppression motion because he has not submitted an affidavit from someone

with personal knowledge establishing a privacy interest in the devices or online accounts searched. The defendant's decision is possibly a tactical one: Because of the incriminating nature of the information recovered, submission of an affidavit would effectively restrict his ability to pursue a theory at trial contrary to that contained in his affidavit. *See, e.g., United States v. Montoya-Eschevarria*, 892 F. Supp. 104, 106 n.2 (S.D.N.Y. 1995) (noting, in finding that a defendant failed to establish standing to attack a Title III wiretap interception because he did not submit an affidavit averring that his voice was intercepted, that "[d]efendant's reluctance to testify to the presence of his voice on the surveillance tapes is understandable [because] prior inconsistent suppression hearing testimony may be used to impeach the defendant during trial").

While the Government expects to argue at trial that certain of the searched devices and online accounts belong to the defendant, that does not suffice to give him standing. A defendant does not have standing to challenge a search "merely because he anticipate[s] that the Government will link the objects recovered in that search" to him "at trial." *Watson*, 404 F.3d at 166-67 (citing *United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993)). Courts routinely reject efforts by defendants to establish standing in this fashion. *See*, *e.g.*, *United States v. Filippi*, No. 12 Cr. 604 (RA) 2013 WL 208919, at *6 (S.D.N.Y. Jan. 16, 2013) (holding that "efforts made by the Government to link [the defendant] to [a] phone" are insufficient to establish the defendant's standing to challenge a warrant permitting the tracking of that phone); *Montoya-Eschevarria*, 892 F. Supp. at 106 (holding that "defendant's unsworn assertion of the Government's representations does not meet this burden" of establishing standing).

Absent the defendant's submission of an affidavit attesting to his privacy interest in the devices or online accounts that are the subjects of the warrants he challenges, the defendant's motion to suppress should be denied for lack of standing alone.

2. *The July 2024 Email Warrant and the September 2024 Phone Warrant Were Properly Issued and Executed*

With one exception, the defendant does not outright challenge any of the warrants obtained in this case for overbreadth or a lack of particularity. (*See* Dkt. 43 at 18-34).[39] Rather, the defendant's suppression motion turns almost entirely on his argument that law enforcement violated the Fourth Amendment when, in reviewing the Subject Account and the Subject Device pursuant to the July 2024 Email Warrant and the September 2024 Phone Warrant (collectively, the "2024 Warrants"), they observed materials predating January 1, 2023, and then described those materials in the application for the September 2025 Warrant. (*See id.*). In other words, the defendant's suppression argument is not aimed at the 2024 Warrants themselves but, rather, at their execution.

That argument rests on an incorrect premise that the 2024 Warrants "only permitted the Government to review communications related to the Subject Offenses dated *on or after* January 1, 2023." (Dkt. 43 at 18 (emphasis added)). Not so. The defendant's argument conflates search with seizure. While it is correct that the 2024 Warrants permitted law enforcement to *seize* categories of evidence confined to that date range (*see* Dkt. 51-1 at 33-34, Dkt. 51-2 at 201-03), the warrants authorized law enforcement to "conduct a *complete review*"—*i.e.,* search—"*all* the electronically

[39] In an argument that he advances in the alternative to his other suppression arguments, the defendant claims that the September 2024 Phone Warrant was overbroad insofar as it did not impose date limitations with respect to some of the categories of evidence that it authorized law enforcement to seize from the Subject Device. (*See* Dkt. 43 at 20-21). This argument is addressed below.

stored information" from the Subject Account and the Subject Device in order to identify that evidence. (*See* Dkt. 51-1 at 35; Dkt. 51-2 at 204 (emphasis added)).[40]

That "recognized procedure" does not violate the Fourth Amendment. *Garlick*, 2023 WL 2575664, at *11. And, as a result, courts within this Circuit have universally upheld warrants authorizing law enforcement to review the entirety of a cellphone or email account in order to identify—and then seize—a subset of data from that cellphone or email account responsive to the warrant. *See, e.g.*, *Patel*, 2026 WL 849850, at *7; *Barrett*, 2025 WL 371084, at *22; *Nejad*, 436 F. Supp. 3d at 728; *Garlick*, 2023 WL 2575664, at *11 (collecting cases); *Arias-Casilla*, 2022 WL 2467781, at *6; *Ray*, 541 F. Supp. 3d at 397-402; *Rosario*, 2021 WL 5647879, at *6; *Gatto*, 313 F. Supp. 3d at 560; *see also In re Google Warrant*, 33 F. Supp. 3d at 393. Indeed, the procedure contemplated in the 2024 Warrants—*i.e.*, reviewing the full contents of the relevant phone or ESI—was not only fully disclosed to the issuing judges in each warrant, but also is expressly permitted by Rule 41(e)(2)(B), which provides that agents should seize or copy the "electronic storage media" to be searched such that review of that media can occur at a later date. *See* Fed. R. Crim. P. 41(e)(2)(B); *see also Ganias*, 824 F.3d. at 213 ("[I]n assessing the reasonableness, for Fourth Amendment purposes, of the search and seizure of digital evidence, we must be attuned to the technological features unique to digital media as a whole and to those relevant in a particular case—features that simply do not exist in the context of paper files.").

---

[40] As discussed below, the September 2024 Phone Warrant did not include date limitations with respect to some of the categories of evidence that it authorized law enforcement to seize. (*See* Dkt. 51-2 at 201-03). That warrant therefore *necessarily* must have contemplated law enforcement agents reviewing at least some records from the Subject Device, without regard to their date.

As this abundant precedent makes clear, the 2024 Warrants permissibly authorized law enforcement to conduct a "complete review" of the Subject Account and the Subject Device to identify materials responsive to those warrants. Law enforcement thus cannot be said to have violated the Fourth Amendment when they, in the course of that review, observed additional evidence of criminal activity—and certainly not when they then disclosed that additional evidence to a magistrate judge and obtained an additional warrant authorizing its seizure.

Courts have routinely denied suppression motions in such circumstances. *See, e.g.*, *Barrett*, 2025 WL 371084, at *22; *Rosario*, 2021 WL 5647879, at *4-*8; *Raniere*, 2019 WL 1984026, at *2 (concluding that evidence of child pornography falling outside of initial search warrant's date range was in plain view and approving the obtaining of a subsequent warrant authorizing a broader search); *see also Ray*, 541 F. Supp. 3d at 399 (denying motion to suppress and rejecting defendant's argument that a set of warrants concerning email accounts were constitutionally infirm because they "allow[ed] for a 'cursory inspection of all emails,' rather than a targeted review of only the specific communications referenced in the warrants and supported by probable cause"). And those courts have routinely reached those decisions without requiring evidentiary hearings like the one the defendant requests (*see* Dkt. 43 at 32). *See, e.g.*, *Barrett*, 2025 WL 371084, at *22 (rejecting "request for a hearing to determine if the materials seized were truly in 'plain view' of officers conducting the searches" because court had "sufficient information from the warrants and underlying affidavits to resolve [the] suppression motion"); *Rosario*, 2021 WL 5647879, at *4-*8; *Raniere*, 2019 WL 1984026, at *1-*2; *see also Ray*, 541 F. Supp. 3d at 395-96 (denying hearing request and rejecting argument that a hearing was "necessary because the search of the devices went beyond what would be conducted had the agents limited themselves to a key word search

and because numerous materials unresponsive to the warrant were searched and seized by the government, including privileged documents").

Here, the *Barrett* decision—a decision that the defendant repeatedly cites (unpersuasively) with respect to his severance motion but omits entirely from his suppression motion—is on point. In *Barrett*, law enforcement had obtained warrants authorizing them to search the contents of two of Barrett's cellphones and a number of his digital accounts (including email accounts) for evidence of crimes concerning misbranded performance-enhancing drugs. 2025 WL 371084, at *3. In the course of conducting their review pursuant to those warrants, law enforcement "observed in plain view" evidence of additional offenses—namely, evidence indicating that Barrett had participated in the PPP loan fraud scheme with which he was later charged, as well as a scheme involving prison contraband. *Id.* The government therefore sought and obtained, in part based on the additional evidence that law enforcement had observed in conducting their reviews pursuant to the previously obtained warrants, an "expanded" warrant authorizing them to search the phones and digital accounts for evidence of those additional crimes. *Id.* at *3-*4.

Barrett raised many of the same arguments the defendant raises here in moving to suppress the additional evidence that law enforcement had observed before obtaining the "expanded" warrant, as well as all evidence seized pursuant to the expanded warrant itself. The court correctly denied that motion and declined to hold a hearing on the issues Barrett had raised. As the court explained, the original warrants for Barrett's cellphones and accounts—like the warrants at issue here—authorized law enforcement to conduct a complete review of the data from that media in order to identify evidence of the crimes as to which the government had established probable cause. *See id.* at *22. The agents in *Barrett* therefore did not "exceed[] the scope of their authority

pursuant to those warrants" when they, in "reviewing the entirety of the [ESI] for material specified in the search warrant[s], uncovered evidence of other crimes that was in plain view." *Id.* In reaching that conclusion, the *Barrett* court acknowledged the privacy interests implicated by warrants authorizing the complete review of "electronic devices" containing "voluminous troves of personal information" but explained that the agents' review nevertheless did not violate the Fourth Amendment. *See id.* (explaining that, in reviewing ESI, "some degree of intrusion will be 'inevitable' because 'it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized'" (quoting *Ganias*, 824 F.3d at 211)).

*Barrett*'s reasoning applies with equal force here. As the court in *Barrett* recognized (just as many others have before it), simply because a warrant restricts what law enforcement may permissibly seize does not mean that it necessarily restricts, in the same way, what law enforcement may search. And warrants in this Circuit, particularly where they concern digital evidence, may permissibly authorize the complete review (*i.e.*, search) of an electronic device or email account in order to seize a smaller subset of data. The 2024 Warrants permissibly did so here. And, as a result, the defendant cannot obtain the extraordinary remedy of suppression based on an argument that law enforcement violated those warrants' terms in reviewing, in the course of their authorized *searches*, some communications outside the scope of what the warrants authorized them to *seize*.

As to the method by which those searches were executed, the 2024 Warrants were consistent with the law of this Circuit in not requiring law enforcement to use any particular tools or protocols in their review of data from the Subject Account and the Subject Device, including the use of the

"date-filtering features" for which the defendant advocates (*see* Dkt. 43 at 22). Rather than impose any such requirement, the 2024 Warrants empowered law enforcement to use "various techniques" to locate responsive data, and set forth a non-exhaustive list of examples, including "surveying file directories and the individual files they contain," "opening or cursorily reading the first few 'pages' of such files in order to determine their precise contents"; and "performing key word searches through *all* electronic storage areas." (Dkt. 51-1 at 35; *see also* Dkt. 51-1 at 203-04). It is therefore of no moment, as the defendant suggests, that law enforcement did not utilize the particular tools and protocols that the defendant claims law enforcement should have used in conducting the searches authorized by the 2024 Warrants. (*See, e.g.*, Dkt. 43 at 5-6 ("restrict[ing] the viewable material by date"); 22 (using "date-filtering features and "machine learning enabled software" on specific "document review programs"); 27 ("filter[ing] out-of-scope communications" . . . using what the defendant characterizes as "a standard function of forensic-review platforms"; and 32 (using a "review protocol" and check[ing] communication dates before reading")).

As explained above, the Second Circuit has been clear that "specific search protocols or minimization undertakings" are *not* "predicates for upholding digital search warrants." *Galpin*, 720 F.3d at 451. And decisions in this Circuit have faithfully followed that rule, repeatedly declining to "impose *ex ante* restrictions pertaining to the later execution of [a] warrant." *In re Google Warrant*, 33 F. Supp. 3d at 397; *see also Vilar*, 2007 WL 1075041, at *37; *see also United States v. Woods*, No. 17 Cr. 103, 2019 WL 7630758, at *3 (W.D.N.Y. Aug. 30, 2019) (rejecting defendant's argument that warrants for evidence from social media accounts "were invalid because they lacked a protocol to be used in conducting the search of electronically stored data" as "totally without legal merit"), *report and recommendation adopted*, 2019 WL 5781859 (W.D.N.Y. Nov.

6, 2019). This leeway is pragmatic. It accounts for the challenges attendant to reviewing digital evidence, which the Second Circuit does not require courts to ignore. *See Ulbricht*, 858 F.3d at 102 ("Files and documents can easily be given misleading or coded names, and words that might be expected to occur in pertinent documents can be encrypted; even very simple codes can defeat a pre-planned word search.").

The *Rosario* decision is instructive. In that case, law enforcement obtained a search warrant to review ESI from the defendant's cellphone for evidence of drug and firearms crimes from a limited date range. *Rosario*, 2021 WL 5647879, at *1. Like the 2024 Warrants, the initial warrant in *Rosario* authorized law enforcement to "conduct a complete review of all the ESI from the Subject Devices to locate all data responsive to the warrant." *Id.* And, like in the instant case (and akin to what happened in *Barrett*), while reviewing Rosario's phone pursuant to that warrant, law enforcement saw text messages predating the date range included in the warrant. *Id.* at *2. The government then relied on the out-of-range text messages to obtain a second warrant authorizing law enforcement to further review Rosario's phone and seize evidence of the same drug and firearms crimes specified in the original warrant, without any temporal limitation. *Id.*

In seeking to suppress the text messages from outside the initial warrant's date range, Rosario contended that the government had searched his phone "indiscriminately and without using the simple tools available to [it]," *id.* at *4-*8—a contention that closely mirrors the defendant's argument here (*see, e.g.*, Dkt. 43 at 22-23 (decrying the Government's alleged failure to use purported "date-filtering features" and "machine learning enabled software")). Indeed, just as the defendant does here, Rosario specifically argued that the government had run afoul of the original warrant it obtained by not date-filtering the digital records that the warrant authorized it to review—

even though, like the 2024 Warrants, the original warrant in *Rosario* contained no such requirement. *Compare Rosario*, ECF No. 85 at 23, 28 (S.D.N.Y. March 19, 2021) (asserting that document review platform enabled "filtering . . . text messages, by date" that, per the defendant, the government could have accomplished with "five mouse clicks" and that such a step was required "to comply with the court order [*i.e.*, the warrant]"), *with* Dkt. 43 at 5-6 (asserting that "electronic platforms" would have "allowe[d] government agents to restrict the viewable material by date . . . [w]ith just a few clicks").

Judge Preska rejected that argument and denied Rosario's suppression motion, reasoning that the government was not required to use any particular protocol, including date-filtering, in carrying out the review authorized by the challenged warrant. *Rosario*, 2021 WL 5647879, at *7. Judge Preska further explained that, to the extent the challenged warrant had resulted in the government reviewing materials outside the date range contemplated in the warrant, that review had not violated the Fourth Amendment because "in almost any warranted search . . . it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Id.* (quoting *Gatto*, 313 F. Supp. 3d at 561).

Similarly, in *Ray*, the court expressly rejected the defendant's argument that, where the government obtains the entire contents of an email account from that account's service provider, the government should be required to "particularize[]" its search "by using terms *or specific time frames*." 541 F. Supp. 3d at 399 (emphasis added); *see also Woods*, 2019 WL 7630758, at *3 (rejecting defendant's argument that warrants for evidence from social media accounts "were invalid because they lacked a protocol to be used in conducting the search of electronically stored data" as "totally without legal merit"); *see also Raniere*, 2019 WL 1984026 (denying suppression motion premised on agents' review of materials created in 2005, despite warrant limiting seizure

of evidence to date range beginning in 2015, and reasoning that "FBI agents were not required to stop reviewing a folder once they saw that it was dated 2005" because they "were permitted to 'engage in a cursory review of files [in the folder dated 2005], by opening them, to determine whether they contained evidence that was within the scope of the warrant'" (brackets in original)).

Permitting warrants that do not contain such restrictive protocols—including specification of a date-filtering methodology—makes sense, especially "[g]iven the ease with which an individual may change the file dates on his or her computer," *United States v. Loera*, 59 F. Supp. 3d 1089, 1153 (D.N.M. 2014), *aff'd*, 923 F.3d 907 (10th Cir. 2019), and *aff'd*, 923 F.3d 907 (10th Cir. 2019), and given the lack of reliable or consistent dates even on some data obtained from service providers such as Google. As one scholar has recently explained, "[t]he problem" with restricting execution of digital warrants is that "you can't know ahead of time where evidence is located or what steps may be needed to find it. Because digital evidence can be anywhere, you can never say that evidence categorically will not be in a particular place on a storage device. File labels can be changed or faked. Documents in one format can be saved as another. Even a large file might be spread among many places, leaving fragments here and there. There's always a chance that responsive evidence can be found somewhere . . . . In light of this reality, limiting where or how on a device agents can search wrongly interferes with the government's ability to find responsive evidence." Kerr, THE DIGITAL FOURTH AMENDMENT at 95-97 (2024); *accord, e.g.*, *Graziano*, 558 F. Supp. 2d at 315 (limiting means of executing digital warrants would "give criminals the ability to evade law enforcement scrutiny simply by utilizing coded terms in their files or documents" or other creative methods of obscuring data). That is why it is "[n]ot surprising[]" that, "in the context of computer searches," such restrictions are "routinely held not

to be required." *In re Google Warrant*, 33 F. Supp. 3d at 399-400 (collecting cases); *see also, e.g.*, *United States v. Otero*, 563 F.3d 1127, 1135 (10th Cir. 2009) (finding that a "search methodology" that "did not include a date restriction" and with which the executing agent "view[ed] non-relevant information" was a good-faith reflection of "the fact that given the numerous ways information is stored on a computer, openly and surreptitiously, a search can be as much an art as a science"); *Teledyne Instruments, Inc. v. Cairns*, No. 12 Cv. 854 (ORL), 2013 WL 5781274, at *5 (M.D. Fla. Oct. 25, 2013) (describing the various ambiguities of electronic data that supposedly identifies the "date" of a document, including that "merely placing the mouse over a file name in Windows Explorer can update a file's last accessed date," "[s]oftware can also affect system metadata date and time stamps in different ways," and that two different dates can "[e]ach more than likely reflect the correct date on which the 'file' was created, depending on which sense of the word 'file' is used").

As this ample precedent and commentary demonstrate, there simply is no basis—certainly not in this Circuit—to conclude that, in reviewing the Subject Account and the Subject Device pursuant to the 2024 Warrants, law enforcement was required to use any particular protocol or tool, where the warrants did not call for one.

The defendant nevertheless invites this Court to reach that conclusion based on two decisions, both of which concerned warrants wholly unlike the ones at issue in this case and one of which is a report and recommendation issued by a magistrate judge in the District of Minnesota, the relevant portions of which *were never adopted*. (*See* Dkt. 43 at 19-27 (citing *United States v. Delima*, No. 22 Cr. 0111, 2023 WL 7404054 (D. Vt. Nov. 9, 2023) and *United States v. Armstrong*, No. 23 Cr. 324, 2024 WL 2894273 (D. Minn. Mar. 12, 2024), *report and recommendation adopted*

*sub nom. United States v. Sam*, 2024 WL 2354593 (D. Minn. May 23, 2024)). Both decisions are readily distinguished.

In *Delima*, law enforcement obtained a warrant to search a cellphone seized from the defendant incident to his arrest for drug and firearms charges. 2023 WL 7404054, at *3. The "temporal scope of the data subject to [that original warrant] was June 1, 2022, to July 6, 2022." *Id.* While reviewing the phone's contents pursuant to the original warrant, an agent observed a photograph depicting a number of firearms that been uploaded to the cellphone on July 25, 2019—*i.e.*, outside the date range provided in the original warrant. *Id.* at *4. The agent then pointed to the firearms photograph in applying for an expanded warrant. *Id.* at *4-*5. The defendant later moved to suppress the firearms photograph, and the court granted his motion, concluding that the agent had erred in obtaining (and then reviewing) a "full extraction" of the cellphone rather than limiting his review to the phone's data from the time period specified in the original warrant. *Id.* at *21-*22.

As an initial matter, *Delima*'s reasoning appears to run afoul of the Second Circuit's guidance that "minimization undertakings" are *not* "predicates for upholding digital search warrants." *Galpin*, 720 F.3d at 451. More fundamentally, the *Delima* court's decision flowed logically from the language of the warrant at issue there—which provided for an entirely different procedure than the warrants obtained in this case. Unlike the 2024 Warrants, the original *Delima* warrant *did not authorize* a complete review of the contents of Delima's cellphone in order to identify responsive records. In fact, the *Delima* warrant was remarkably slim. It described Delima's phone as the "property to be searched" and then listed just three categories of evidence, all of which were limited to the brief time period of June 1, 2022, to July 6, 2022. *See United*

*States v. Delima*, No. 22 Cr. 0111, Dkt. 39-11 at 3 (D. Vt. Aug. 3, 2023). And, although the agent in *Delima* had noted in his application for the warrant that his review "might expose many parts of the device[] to human inspection in order to determine whether it is evidence described by the warrant," the *Delima* warrant itself did not sanction a complete review of ESI in order to identify responsive data. *Delima*, ECF No. 39-11 at 12; *see also id.* at 3. For that reason, the *Delima* court concluded that the warrant had "unequivocally limited the data *to be searched*"—*i.e.*, not just the data to be *seized*—to the time period specified in the warrant. 2023 WL 7404054, at *22 (emphasis added). The warrants at issue here, by contrast, specifically authorized the "recognized procedure" of reviewing the entirety of the subject ESI for information responsive to the warrant. *Garlick*, 2023 WL 2575664, at *11.[41]

*Armstrong* is even further afield. *Armstrong* is an out-of-Circuit report and recommendation in a firearms case concerning fourteen motions filed by two defendants, Donald Duane Armstrong and Franklin Warren Sam, Jr. *See generally Armstrong*, 2024 WL 2894273. In that report and recommendation, the magistrate judge recommended that the assigned district court judge grant a motion filed by Armstrong (not by Sam) to suppress certain evidence obtained from Armstrong's personal cellphone. 2024 WL 2894273, at *24-*30. Notably, that recommendation was never

[41] Other issues abounded in *Delima*—none of which is present here. For one, the *Delima* court concluded that the government had unreasonably delayed in obtaining a number of warrants in that case, including the warrant pursuant to which the firearms photograph was found. *See, e.g.*, 2023 WL 7404054, at *11-*19, *22. And the court cited that unreasonable delay as supporting its conclusion that the good faith exception did not shield the agent's actions in reviewing Delima's phone. *Id.* at *22. This case does not present a similar concern.

adopted by the district court—a fact that the defendant, perhaps inadvertently, omits in simply characterizing *Armstrong* as having been "*adopted sub nom.*" (Dkt. 43 at 19).[42]

In any event, *Armstrong* is inapposite here, both in its facts and its application of the law. In *Armstrong*, in a fact pattern akin to *Delima*'s, law enforcement obtained a warrant to search Armstrong's cellphone records from a limited time period. 2024 WL 2894273, at *18 n.14. Agents then obtained, in contravention of that warrant, the *full* contents of Armstrong's cellphone and proceeded to review those records without filtering them by date. *Id.* at *26-*28. In the course of that *unauthorized* review, law enforcement observed evidence of additional criminal activity and relied on that additional evidence in obtaining an expanded warrant. *See id.*

This case presents different facts, primarily because it involves a different kind of warrant. As all parties in *Armstrong* agreed, the original warrant obtained with respect to Armstrong's cellphone did not authorize law enforcement to conduct a complete review of that device's contents to identify responsive materials within that data—as the challenged warrants here did. *Armstrong*, 2024 WL 2894273, at *18 n.14 (describing challenged warrant as requesting only "to *search* [ESI from the cellphone] from February 1st 2023 through June 14th 2023" (emphasis added)); *see Armstrong*, ECF No. 74 at 5 (government brief characterizing agent's warrant application as having "requested a specific date range *wherein he wanted to search* for evidence of Armstrong's crimes" (emphasis added)); *see also Armstrong*, ECF No. 68 at 3 (defense brief describing

[42] Armstrong pleaded guilty following issuance of the report and recommendation which, in addition to recommending granting Armstrong's suppression motion concerning the review of his cellphone, recommended denying his motions to dismiss the indictment and suppress certain of his post-arrest statements, *see* 2024 WL 2894273, at *24-*30. *Armstrong*, No. 23 Cr. 324, Dkt. 90 (Apr. 16, 2024). The report and recommendation was then adopted, but only insofar as it pertained to Armstrong's co-defendant, Sam.

challenged warrant as authorizing law enforcement to "*search* text messages and other media from February 1, 2023 to June 14, 2023" (emphasis added)).[43] Rather, like in *Delima*, the original warrant at issue in *Armstrong* restricted the scope of law enforcement's *search* to a subset of the data from Armstrong's cellphone spanning a limited time period. It is therefore no surprise that the *Armstrong* court concluded (like the *Delima* court did) that the government had exceeded the bounds of that warrant when it reviewed data outside of that limited time period.[44] By contrast, and as explained above, the warrants at issue here contemplated—and authorized—a different review process by which law enforcement was permitted to collect and review the entirety of the Subject Account and the Subject Device for evidence responsive to the warrants. Of course,

---

[43] To the extent that the original warrant in *Armstrong* contemplated the same procedure authorized here—and the parties (and, by extension, the court) simply misapprehended that procedure—*Armstrong* appears at odds with several Eighth Circuit decisions notably missing from the *Armstrong* report and recommendation's analysis. *See, e.g.*, *United States v. Ivey*, 91 F.4th 915, 918 (8th Cir. 2024) ("The possibility that Ivey's phone also contained information unrelated to the criminal investigation did not transform the warrant into an impermissible general warrant."); *Lindell v. United States*, 82 F.4th 614, 620 (8th Cir. 2023) ("While the phone very likely also contains a plethora of information unrelated to the government's investigation, such as business related correspondence and transactions; photographs; passwords; apps; potential attorney-client communications; and private communications with friends, family, and business associates, this fact does not transform the warrant into a general warrant."). And, to the extent that *Armstrong* can be read to suggest that, in executing a warrant authorizing a complete review of ESI in order to identify responsive data, law enforcement are required to date-filter the universe of ESI they obtain or otherwise employ specific protocols and minimization requirements, *Armstrong* stands at odds with binding Second Circuit precedent—precedent which, of course, does not similarly bind courts in the District of Minnesota.

[44] Further distancing this case from *Armstrong*, there was a significant issue with respect to the original warrant for Armstrong's phone that is not present here. Namely, in *Armstrong*, all parties agreed—and the Government expressly conceded—that the original warrant for Armstrong's phone was both insufficiently particular and overbroad because it broadly requested "the courts [sic] permission to extract data from Armstrong's cellular device to obtain further evidence of controlled substance trafficking and illegal possession/sales of firearms." *Armstrong*, 2024 WL 2894273, at *24. The warrants here do not suffer from the same defects (nor does the defendant claim they do).

the warrants directed that, in carrying out that review process, law enforcement agents would use "reasonable efforts" to search only for files responsive to the warrants. (Dkt. 51-1 at 35; Dkt. 51-2 at 204). But the warrants prudently—consistent with the law in this Circuit and for all of the reasons above—did not provide that the only way to reasonably conduct the contemplated reviews was through the use of tools like date-filtering.[45] To the contrary, as made plain by the warrants themselves, such "reasonable efforts" could include, depending on the circumstances, a host of "various techniques," among them "a cursory inspection of all emails within the Subject Account" and "other methods as well, particularly including keyword searches," (Dkt. 51-1 at 25) and, among other things, "conducting a file-by-file review" of all "the ESI contained" on the Subject Device (Dkt. 51-2 at ¶¶ 91-92).

Against that backdrop, the defendant has fallen far short of demonstrating that law enforcement, in their use of those methods, acted in "flagrant disregard" of the warrants' terms based on the mere fact that law enforcement observed in plain view a comparatively small subset of documents beyond the date range provided in the warrants—and then, rather than seizing those documents, disclosed what had happened to a magistrate judge and obtained a new, expanded warrant *authorizing* their seizure (*i.e.*, the August 2025 Warrant). *See Matias*, 836 F.2d at 747; *see also* Kerr, THE DIGITAL FOURTH AMENDMENT at 223 n.18 (describing suppression for "flagrant disregard" of warrant in its execution as "an extreme remedy developed by lower courts when the search as a whole is clearly a fishing expedition for evidence not named in the warrant").

---

[45] This is indisputably true of the September 2024 Phone Warrant, which, again, contemplated the seizure of several categories of evidence without regard to date.

Further to that point, and as noted above, law enforcement obtained a total of 658,186 documents from Google in response to the July 2024 Email Warrant concerning the Subject Account, and only 8,792 of those documents (*i.e.*, fewer than 1.4%) have been identified as responsive to date—a figure hardly suggestive of the type of "general search" or "rummaging," *Coolidge*, 403 U.S. at 467, that warrants wholesale suppression.[46] *See Garlick*, 2023 WL 2575664, at *12 (denying suppression motion premised on allegedly improper execution of Google warrant where government marked only "about 2 percent of the records produced in response to the Google Warrant responsive, suggesting that it did not engage in the type of general search that would require wholesale suppression"); *see also United States v. An*, 733 F. Supp. 3d 77, 105 (E.D.N.Y. 2024) (rejecting suppression where government seized out-of-date materials because it did not engage in "general search").

The defendant is even further from demonstrating that law enforcement acted in "flagrant disregard" of the September 2024 Phone Warrant in examining records on the Subject Device from before January 1, 2023. As noted, the September 2024 Phone Warrant indisputably authorized the Government to *seize* some kinds of evidence—that is, not just review it (as the July 2024 Phone Warrant did)—*without regard to the date of that evidence*. (*See* Dkt. 43 at 20-21; *see also, e.g.*, Dkt. 51-2 at 201-03 (permitting seizure of evidence pertaining to the defendant's consciousness of

[46] The Government later obtained, pursuant to the August 2025 Warrant, an additional 112,219 documents from the Subject Account, only 3,041 of which have been identified as responsive to date.

guilt and motive, without regard to its date, but limiting the seizure of other categories of evidence to evidence from on or before January 1, 2023).[47]

[47] The defendant nonetheless contends that the September 2024 Phone Warrant was overbroad insofar as it did not impose date limitations with respect to some categories of evidence. (*See* Dkt. 43 at 20-21). The Court need not address this argument because, as explained herein, the 2024 Warrants (including the September 2024 Phone Warrant) permissibly authorized law enforcement to conduct a complete review of the Subject Account and the Subject Device.

In any event, the defendant's overbreadth argument based on the lack of date limitations as to all categories of evidence is meritless. As explained above, "[t]he absence of a temporal limitation alone does not render [a] Warrant overbroad." *Arias-Casilla*, 2022 WL 2467781, at *6-*7; *see also Barrett*, 2025 WL 371084, at *17 (temporal limitation "not an absolute necessity" but, rather, "one indicium of particularity"). That is especially true in cases such as this one, where the crimes under investigation—even based just on what the Government's investigation had uncovered at the time it sought the September 2024 Phone Warrant—arose from more complex criminal conduct with significant documentary evidence, occurring over a long period of time. *See United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at *11 (S.D.N.Y. Jan. 6, 2010); *United States v. Dupree*, 781 F. Supp. 2d 115, 149 (E.D.N.Y. 2011) ("Where, as here, complex financial crimes are alleged, a warrant properly provides more flexibility to the searching agents."); *United States v. Yusuf*, 461 F.3d 374, 395 (3d Cir. 2006) ("[T]he government is to be given more flexibility regarding the items to be searched when the criminal activity deals with complex financial transactions.").

Underscoring the reasonableness of the seizure authorized by the September 2024 Phone Warrant (even with its non-date-limited categories of evidence), in issuing the warrant, Judge Kuo distinguished between the categories of evidence that could (or should) be time-limited, and those that should not. She did not lack a "substantial basis" for the way that she balanced those considerations. *See Rosario*, 2021 WL 5647879, at *5-*6. For instance, the warrant appropriately accounted for the reality that the defendant's personal cellphone was likely to contain certain evidence of the crimes under investigation—at that time, crimes pertaining to the Security Company scheme—that would predate the defendant's work in City government (and, indeed, that would not lend itself to a temporal limitation at all). Evidence of motive, including the defendant's "financial circumstances" (Dkt. 51-2 at 202), and consciousness-of-guilt evidence, such as evidence indicating that the defendant or his co-conspirators "deviated from their conduct in other relevant circumstances" (*id.*), is not likely to begin developing on a particular, identifiable date—and is more than likely to have predated the defendant's work for the City.

At a minimum, even if Judge Kuo had authorized an overbroad warrant (which she did not), law enforcement cannot be said to have acted in bad faith in reviewing records from the Subject Device predating January 1, 2023, when it was conducting that review pursuant to a warrant expressly authorizing law enforcement both to look for and to seize certain evidence on the Subject Device, without regard to its date—particularly not when courts in this Circuit have not clarified

In sum, the 2024 Warrants properly authorized law enforcement to review the entirety of the Subject Account and the Subject Device for the categories of evidence specified in the warrants. And law enforcement did not err in executing those warrants simply because they did not use the techniques and protocols that the defendant suggests they should have used.

3. *Even if Law Enforcement's Execution of the 2024 Warrants Was Deficient, Blanket Suppression is Unwarranted*

As described above, the 2024 Warrants authorized complete review of the Subject Account and the Subject Device, and law enforcement's conduct in carrying out that review was proper. Even if there had been some error in those warrants' authorization or execution, though, blanket suppression would be entirely improper.

Neither prong of the "flagrant disregard" test is met here. First, there was no widespread seizure of items outside the scope of the 2024 Warrants. Indeed, the defendant has not pointed to the *seizure* (rather than the mere observation) of *any* item outside the scope of the 2024 Warrants. All of the communications that the defendant claims were improperly viewed pursuant to those warrants—*i.e.*, the communications predating January 1, 2023—were not seized pursuant to the 2024 Warrants. Rather, upon observing those communications in the course of their authorized review of the Subject Account and the Subject Device, law enforcement—in lieu of seizing the communications—sought a new warrant permitting their seizure (*i.e.*, the August 2025 Warrant). *See Brown*, 460 U.S. at 738 n.4 (drawing distinction discussed above between a scenario in which evidence is seized without warrant pursuant to the "plain view" doctrine and scenario in which

---

when, if at all, temporal limitations are required. *See Rosario*, 2021 WL 5647879, at *5-*6 ("Because no consensus exists in this Circuit as to when temporal limitations are required, this Court cannot say that a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.").

evidence is merely observed and relied upon in a future warrant application). That understanding finds support in the application for that August 2025 Warrant itself, in which the Government disclosed exactly what law enforcement had done and seen. *See Barrett*, 2025 WL 371084, at *23 (no bad faith); *Rosario,* 2021 WL 5647879, at *7 (same).[48] There, Affiant-2 described the pre-2023 communications not as records "seized" pursuant to the 2024 Warrants but, rather, as records that law enforcement "viewed in plain view" while conducting their reviews of data from the Subject Account and the Subject Device. (*See* Dkt. 51-3 at 25).

Alternatively, even if law enforcement could be said to have "seized" the pre-2023 communications during their review pursuant to the 2024 Warrants, the plain-view doctrine would have authorized those communications' seizure. That doctrine permits the "seizure of illegal *or evidentiary* items" without a warrant (or beyond the scope of an existing warrant) that are "visible to [an agent] whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity."

[48] This case is thus inapposite from *Pinto-Thomaz*, a case cited by the defendant, in which Judge Rakoff found that the Government had exceeded the limits of the relevant search warrant, but nevertheless declined to impose blanket suppression. (Dkt. 43 at 27-28 (citing *United States v. Pinto-Thomaz*, 357 F. Supp. 3d 324 (S.D.N.Y. 2019)). In *Pinto-Thomaz*, while reviewing an electronic search warrant return, law enforcement seized several items that fell outside of the relevant timeframe set forth in the search warrant. 357 F. Supp. 3d at 330. The Government produced those items *as part of its subset of seized evidence*, and the defendant moved to suppress, arguing that the Government had exceeded the search warrant's limitations. By contrast, here, the Government effected no seizure upon viewing criminal communications falling outside of the 2024 Warrants' timeframe. Rather, the Government properly obtained the broader August 2025 Warrant, which supported the seizure of the pre-January 1, 2023 communications that law enforcement had observed (as well as other evidence of the expanded subject offenses described in the affidavit). *Cf. Brown*, 460 U.S. at 738 n.4 (Rehnquist, J., plurality opinion) (discussing distinction between seizing evidence in plain view and using such evidence as grounds for a subsequent warrant). Many other cases that the defendant cites are inapplicable for the same reason. (*See* Dkt. 43 at 26-27 (citing, *e.g.*, *United States v. Debbi*, 244 F. Supp. 2d 235 (S.D.N.Y. 2003)).

*United States v. Gamble*, 388 F.3d 74, 76 (2d Cir. 2004) (emphasis added); *see also Galpin*, 720 F.3d at 451 (applying plain-view doctrine to digital evidence). Here, the 2024 Warrants' authorization to collect and review the entirety of the Subject Account and Subject Device was the "prior Fourth Amendment justification" for the executing agents' "access to" the pre-2023 communications. *See Babilonia*, 854 F.3d at 180 (restating this threshold requirement as the executing agent must be "lawfully in a position from which [she] views an object" and with "a lawful right of access to the object"). And the executing officers "ha[d] probable cause to suspect that" the pre-2023 communications "[were] connected with criminal activity." *Gamble*, 338 F.3d at 76. The defendant complains that one of the agents "could describe" the pre-2023 communications "as evidence of a crime only by invoking his 'training and experience' and facts learned elsewhere in the investigation." (Dkt. 43 at 21). But that is exactly how probable cause works. *See Gates*, 462 U.S. at 231-32 (describing how "evidence thus collected" by "law enforcement officers . . . formulat[ing] certain common-sense conclusions about human behavior" "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement"). For that reason, judges value what the defendant urges the Court to disregard, and consider an executing agent's general experience and his knowledge of "facts learned elsewhere in the investigation" (Dkt. 43 at 21) as reasons to find evidence was lawfully seized in plain view. *See, e.g.*, *Raniere*, 2019 WL 1984026, at *4 (E.D.N.Y. May 3, 2019) (finding that "materials created in 2005" were lawfully seized in plain view as "evidence . . . of crimes that occurred in 2015 or later" and that, "[g]iven what the agents knew at the time they opened" the documents on account of their participation in the related investigation, "a person of 'reasonable caution' would have believed [they] constituted evidence of a crime"). And, when the

defendant argues that "nothing about" the pre-2023 communications was "facially incriminating" because the documents concerned "nonprofit administration and political campaigning" and a "banking transaction," (Dkt. 43 at 21), he ignores that probable cause "turn[s] on the assessment of probabilities in particular factual contexts," *Gates*, 462 U.S. at 232, and depends on "the facts available to the officer" involved. *Brown*, 460 U.S. at 742 (plurality opinion). Nonprofit administration, political campaigning, and banking transactions might be banal in many contexts. But in the "particular factual context" of *this investigation*, and in the context of "the facts available to the officer[s]" participating in it, "these messages provide context for later messages" between subjects whose role in the commission of interrelated crimes is described in the warrants' affidavits. *United States v. Hills*, No. 16 Cr. 329, 2018 WL 1621088, at *6 (N.D. Ohio Apr. 4, 2018). Accordingly, even if the pre-2023 communications were deemed to have been "seized" during the execution of the 2024 Warrants, that seizure would be lawful under the plain-view doctrine.

More fundamentally, and without regard to which warrant the pre-2023 communications were seized under, wholesale suppression of the sort the defendant seeks requires "widespread seizure of items that were not within the scope of the warrant." *Shi Yan Liu*, 239 F.3d at 140. As described above, the total universe of records from the Subject Account identified as responsive was modest (roughly 1.4%). Even if one were to assume for the sake of argument that *all* of those records were identified pursuant to the 2024 Warrants (which they were not), such a "modest collection" still would not manifest the "flagrant disregard" that warrants blanket suppression. *United States v. Mendlowitz*, No. 17 CR. 248 (VSB), 2019 WL 1017533, at *13 (S.D.N.Y. Mar. 2, 2019); *see also See Garlick*, 2023 WL 2575664, at *12; *United States v.*

*Triumph Capital Grp., Inc.*, 211 F.R.D. 31, 62 (D. Conn. 2022) (concluding that the government did not flagrantly disregard a search warrant's terms in part because it seized "only a comparatively small amount" of the defendant's data).

Second, the 2024 Warrants were executed in good faith. As described above, the Government's execution was reasonable and consistent with both the warrants and governing caselaw. As to any notion that law enforcement's decision not to use date-filtering technology somehow evinces bad faith—despite the warrants imposing no such requirement and authorizing complete review of the relevant ESI—the law in this Circuit plainly does not impose such a requirement, much less establish a consensus that it does. Because "no consensus exists in this Circuit" as to whether such tools are required (indeed, all governing precedent is to the contrary), it cannot be said that "a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *Cf. Rosario*, 2021 WL 5647879, at *5-*6 ("Because no consensus exists in this Circuit as to when temporal limitations are required, this Court cannot say that a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.").

To further assess the good faith with which law enforcement acted here, the Court need look no further than what law enforcement did. After observing evidence of criminal activity potentially falling outside the 2024 Warrants' authorization, the Government disclosed what materials law enforcement had seen and how they had seen those materials to a magistrate judge and obtained the August 2025 Warrant (a matter discussed at length below in this brief's discussion of that warrant). The fact that the defendant's criminal conduct was so rampant as to predate the initial timeframe designated by the 2024 Warrants (and then, as later sections discuss, continue to surpass each revised

estimation of how far back that conduct extended) does not undermine the Government's good-faith efforts to reasonably execute the searches that the 2024 Warrants authorized.

#### 4. *The August 2025 Warrant Was Properly Issued and Relied Upon in Good Faith*

The defendant's motion to suppress evidence obtained from the August 2025 Warrant turns entirely on his arguments regarding the communications that law enforcement saw when conducting their review of the Subject Account and the Subject Device pursuant to the 2024 Warrants. Accordingly, because the 2024 Warrants were properly authorized, executed, and relied upon in good faith, the defendant's motion to suppress all evidence obtained from the August 2025 Warrant based on his arguments to the contrary should be denied. Even if the Court were to conclude, though, that there had been some error either in the authorization or execution of the 2024 Warrants that necessitated consideration of the August 2025 Warrant's authorization (which there was not), the Court should uphold the August 2024 Warrant or, at minimum, decline to suppress records obtained pursuant to that warrant based on law enforcement's good-faith reliance on it.

In applying for the August 2025 Warrant, Affiant-2 disclosed to Judge Ricardo how law enforcement had obtained the 2024 Warrants; how they had "initiated a review of the data produced for the Subject Account and the data extracted from the [Subject Device]" pursuant to those warrants; and how, in the course of reviewing that data, observed "in plain view" certain records predating January 1, 2023. (*See* Dkt. 51-3 at 25-28 & n.12). Affiant-2 then described those communications. (*See id.*). Of note—and particularly reflective of the good-faith manner in which he was operating—Affiant-2's affidavit was upfront about the date ranges included in the 2024 Warrants. (*See* Dkt. 51-3 at 15-16 (describing prior warrants' date limitations and noting, "I am now seeking [a warrant] for an expanded time period")). (*See* Dkt. 51-3 at 5). Indeed, the affidavit appended the

application for the July 2024 Email Warrant, which included the warrant itself, date limitations and all.

Accordingly, even had there been some Fourth Amendment violation relating to law enforcement's review of the pre-2023 communications, Affiant-2's affidavit ensured that Judge Ricardo was "apprised of the relevant conduct" such that Judge Ricardo was "able to determine whether any predicate illegality precluded issuance of the warrant." *Ganias*, 824 F.3d at 223. And, having been apprised of those facts, Judge Ricardo nevertheless authorized the August 2025 Warrant. By consequence, it was "objectively reasonable" for law enforcement to rely on that warrant in carrying out an expanded review of the data from the Subject Account and the Subject Device as provided in the warrant. *Leon*, 468 U.S. at 922. Assessed in the context of the "pivotal question" for purposes of the good faith inquiry, it strains credulity to think that a "reasonably well trained officer" would—after having disclosed to a judge how he conducted an authorized review of ESI and, in the course of that review, encountered materials beyond the date range constraining what he was permitted to seize—think that an expanded warrant *then* authorized by that judge would give rise to an illegal search "despite the magistrate's authorization." *Id.* at 922 n.23.

The defendant's contrary assertion—that Affiant-2 "knowingly misled" Judge Ricardo in describing how law enforcement came to observe the pre-2023 communications described in the August 2025 Warrant application—is without merit. (*See* Dkt. 43 at 33). To make that claim, the defendant employs some tortured reasoning. He argues that Affiant-2 misled Judge Ricardo (or concealed material information from Judge Ricardo) when his affidavit said that law enforcement had seen the pre-2023 communications in "plain view." (*See id.*). According to the defendant, that

statement must necessarily have been a lie because, as he reads the 2024 Warrants, they did not authorize law enforcement to review records from before January 1, 2023,[49] and an agent cannot observe something in "plain view" while examining materials outside the scope of a warrant. (*See id.*). As best the Government can understand the defendant's argument flowing from those mistaken premises, he is claiming that, when Affiant-2 characterized the pre-2023 communications as having been observed "in plain view," he impermissibly suggested to Judge Ricardo that they had been observed in the course of the sort of strictly limited, date-filtered review that the defendant believes was required here. (*See id.* (submitting that the pre-2023 communications were not properly characterized as "in plain view" because "[t]he Government found them by searching data the 2024 Warrants placed off limits)).[50]

That argument makes no sense. Affiant-2 explained—right at the warrant application's outset—the 2024 Warrants' date limitations. He then clearly described the contested "plain view" communications and, in doing so, specifically noted the dates of those communications, all of which predated the date ranges in the 2024 Warrants that Affiant-2 had described. (*See* Dkt. 51-3 at 25-28 & n.12). It therefore would have been immediately apparent to Judge Ricardo that the contents of the Subject Account and the Subject Device had not been date-filtered and that law enforcement had encountered these pre-2023 communications despite the 2024 Warrants' date limitations. Eliminating any doubt as to that matter, Affiant-2's affidavit attached the July 2024 Email Warrant

---

[49] For all the reasons given above, this was not the case. And even the defendant acknowledges that at least the September 2024 Phone Warrant must necessarily have permitted law enforcement to review pre-2023 communications, as it authorized them to seize some categories of evidence without regard to date. (*See* Dkt. 43 at 20-21).

[50] Elsewhere in his briefing, the defendant similarly frames Affiant-2's use of the phrase "plain view" as "conced[ing] that its review exceeded the scope of the 2024 Warrants." (Dkt. 43-1 at 5). The Government makes no such concession.

itself. If Judge Ricardo had thought that the Government's access to and observation of pre-2023 communications violated that warrant's terms, the law presumes that he would not have authorized the warrant based on them. *See Rosa*, 11 F.3d at 326. But that was not the conclusion Judge Ricardo reached, and he authorized the warrant. As a "neutral and detached" magistrate, his probable cause finding is "entitled to substantial deference." *Id.*

*Second*, even if the Court were to conclude that the pre-2023 communications from the Subject Account and the Subject Device referenced in the August 2025 Warrant application were "tainted" by some Fourth Amendment violation and thus "excise" them from the warrant application, the application still would amply establish probable cause. *See Peeples*, 962 F.3d at 688-89. Even without those pre-2023 communications, the warrant application is replete with evidence establishing probable cause that the defendant engaged in the relevant fraud and bribery offenses and that evidence of those crimes was likely to be found on the Subject Account and the Subject Device for the modestly broader time period authorized by the August 2025 Warrant (or, with respect to its non-date-limited categories, more generally).

For example, in addition to incorporating all of the facts from the July 2024 Email Warrant application as to the Security Company scheme, the August 2025 Warrant application described evidence obtained from the Security Company Executive's cellphone—*i.e.*, not the Subject Account or the Subject Device—showing that his and the defendant's relationship extended back at least to mid-2021, when the defendant told the Security Company Executive that the defendant's purported non-profit entity was "gonna be fruitful for us all" and later sought a campaign donation from the Security Company Executive. (*See* Dkt. 51-3 at 27-28). Other messages from the Security Company Executive's cellphone showed that he considered the defendant his "business

partner" at least by February 1, 2022. (*See* Dkt. 51-3 at 27-28). Given the other facts alleged as to the Security Company scheme, those messages surely authorized further review of the defendant's cellphone and email account for additional evidence of that scheme across a broader time period. (*See* Dkt. 51-3 at 28-30).

Additionally, as the defendant all but acknowledges outright, *none* of the evidence described in the August 2025 Warrant Application pertaining to the so-called "Additional Bribery Subject Offenses"—*i.e.*, the bribery scheme involving [redacted]—derived from pre-2023 communications from the Subject Account or the Subject Device. (*See* Dkt. 43 at 29-20). The defendant instead argues for suppression on the basis that Judge Ricardo erred in finding that the August 2025 Warrant application established probable cause for those additional subject offenses. (Dkt. 43 at 29-30). But Affiant-2's affidavit set forth detailed allegations explaining how [redacted]. (*See* Dkt. 51-3 at 32-33).

The defendant's arguments to the contrary misconstrue the probable cause inquiry. Taking them in turn, first, the Security Company Executive's "veracity," "reliability," and "basis of knowledge," *Gates*, 462 U.S. at 230, are not undermined—certainly not to any meaningful degree—by what the affidavit disclosed as [redacted]

[redacted]. (Dkt. 51-3 at 33 n.16 [redacted]. *See Gerstein*, 420 at 121 (probable cause "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands."). Judge Ricardo at least did not think so—as evinced by the fact that Affiant-2 expressly laid out the tension between [redacted], and Judge Ricardo nevertheless issued the warrant. (*See* Dkt. 51-3 at 33 n.16).[51] Moreover, and further undercutting any suggestion of "unreliability," the Security Company Executive's many other statements to law enforcement were generally corroborated by documentary evidence, much of which was laid out in the warrant for Judge Ricardo to consider as well—including text messages specifically concerning [redacted]. (*See* Dkt. 51-3 at 15 n.6, 32).

Second, the Security Company Executive's lack of a "specific recollection of paying a bribe" to the defendant specifically in exchange for [redacted]

[51] [redacted]

not mean that Affiant-2's affidavit fell short of establishing probable cause to think the defendant had engaged in a bribery scheme [redacted]. (Dkt. 51-3 at 33). Though the Security Company Executive lacked such a "specific recollection," he did recall that, around this time, he had made "several payments" to the defendant with the "understanding" that, if he requested the defendant's assistance with matters "relating to [the defendant's] government employment," the defendant "would provide such assistance." Whether that evidence, if offered at a trial without more, might lend itself to a jury argument that the Government had failed to demonstrate the requisite *quid pro quo*, *see United States v. Reichberg*, 5 F.4th 233, 247 (2d Cir. 2021) (which the Government does not concede), is not the relevant inquiry. Particularly given the other significant evidence of the defendant's participation in bribery conduct with the Security Company Executive (still excluding pre-2023 communications from the Subject Account and the Subject Device), his recollection of having been paying the defendant for "assistance with matters relating to [the defendant's] government employment" when [redacted]—offered more than a "substantial basis" for concluding that the defendant's phone and email account might contain evidence of bribery offenses, including during the time period described in the warrant (*i.e.*, from January 1, 2022, to the present). *Gates*, 462 U.S. at 232.

In sum, there is no basis to suppress evidence obtained pursuant to the August 2025 Warrant.

5. *The Remaining Warrants Were Properly Issued and Relied Upon in Good Faith*

The defendant's remaining arguments—which are, in essence, all premised on his arguments as to the 2024 Warrants and the August 2025 Warrant—fail largely for the reasons given above.

For instance, the defendant claims that any evidence seized pursuant to the October 2025 Warrant must be suppressed because the application submitted in support of that warrant cited "seventeen exchanges of emails and text messages from 2022" consisting of communications between the defendant and the Funeral Home Director and another individual involved in the referral scheme described above. (*See* Dkt. 43 at 31). But those communications were permissibly seized pursuant to the August 2025 Warrant, which authorized—without regard to date—the seizure of, among other applicable categories of evidence, evidence of the defendant's and his co-conspirators' "[k]nowledge of any acts taken by HERBERT or other public officials in exchange for any payments, gifts, services, money or things of value to HERBERT or another public official and their associates." (Dkt. 51-3 at 67).

Beyond those emails and text messages, the defendant points to one paragraph of the October 2025 Warrant application—in its section addressing evidence of the PPP loan fraud scheme—concerning emails from the Subject Account showing that, [redacted]. (Dkt. 43 at 30 (referencing Dkt. 51-4 at 12-13)). According to the defendant, these emails were "out-of-scope communications," in part because they predated a date limitation included with respect to *some* of the categories of evidence in the August 2025 Warrant. (*See* Dkt. 43 at 30). But these emails were properly seized, as they fell within several of the August 2025 Warrant's *non*-date-limited categories of evidence, including, for example, the categories describing "[e]vidence concerning the location of other evidence,

including financial accounts"; "[i]nformation concerning the identities and locations of co-conspirators; and evidence of the defendant's "consciousness of guilt." (Dkt. 51-3 at 67-68).[52]

In any event, the October 2025 Warrant application set forth sufficient evidence to establish the defendant's participation in a PPP loan fraud scheme beyond these emails [redacted]. Indeed, most of the evidence of the PPP loan scheme described in the warrant application derived from sources *other* than the Subject Account and the Subject Device, all of which concerned *the defendant's* PPP loan. (*See, e.g.*, Dkt. 51-4 at 7-10 (describing, with respect to the PPP loan fraud scheme, the April 10, 2021 PPP loan application for the "Anthony Herbert" business and the documentation submitted in support thereof, including the fraudulent invoice and Schedule C (all of which were obtained from the bank administering the PPP loan program); bank records showing that the resulting PPP loan was deposited into the defendant's bank account; tax documents; and email subscription records). That evidence offered more than a "substantial basis" for the October 2025 Warrant's authorization. *Gates*, 462 U.S. at 232.

The defendant's arguments regarding the February 2026 Warrant are similarly unavailing. Again, the defendant rests his argument on what he characterizes as the Government's review of communications outside the date limitations included in the—at this juncture, four—warrants that the Government had obtained with respect to the Subject Account and the Subject Device, each of

---

[52] As explained above, in the October 2025 Warrant application, Affiant-2 described these emails as ones that law enforcement had observed "in plain view in the course of reviewing the contents of the [Subject Account]." Law enforcement did not violate the Fourth Amendment in observing those emails while reviewing the Subject Account pursuant to the August 2025 Warrant (which both contemplated a complete review of the account's contents *and* permitted the seizure of many categories of evidence without regard to its date (thus necessarily authorizing a review of all records without regard to date)).

which authorized a complete review of that media. (*See* Dkt. 43 at 31-32). This argument fails on multiple fronts.

Most foundationally, as noted above, nearly all of the evidence described in the application submitted in support of the February 2026 Warrant (which, as explained, largely concerned [redacted]) did not derive from the Subject Account or the Subject Device. And none of the emails from September 2019 through January 2021 (*i.e.*, the emails challenged by the defendant (*see* Dkt. 41 at 31-32)) were from those sources. Rather, all of those emails were obtained via grand jury subpoena from [redacted] (as is apparent from the face of the emails, which show they were sent from the [redacted] email account, not the Subject Account).[53] (*See, e.g.*, Dkt. 51-5 at 9-10 (describing [redacted]); Dkt. 51-5 at 10 (describing [redacted]); *id.* (describing [redacted]). As the defendant himself recognizes, the February 2026 Warrant's "probable cause showing rests on" these emails (Dkt. 41 at 31)—*i.e.*, ones obtained from [redacted] and not the Subject Account. As such, his challenge to the February 2026 Warrant must fail.

[53] In some instances, emails were forwarded from the Subject Account to the [redacted] email account, or vice versa, and therefore appear in both accounts. Such emails were first obtained from [redacted] (and relied upon in the affidavit), although they may have also been later seized from the Subject Account after the February 2026 Warrant was authorized.

Furthermore, by the time the February 2026 Warrant was secured, law enforcement agents had been authorized to *seize* (not just review) many categories of evidence without regard to its date. Therefore, even if the communications on which the defendant rests his challenge to the February 2026 Warrant had been obtained from the Subject Account or the Subject Device (though they were not), law enforcement still could not be said to have committed a Fourth Amendment violation when they reviewed those communications as law enforcement had been granted (several times over) authority to do so in order to determine whether those records were subject to seizure.

Finally, even if the challenged communications had been obtained from the Subject Account or the Subject Device, all of the communications that the defendant identifies with respect to his challenge to the February 2026 Warrant application would fall within the non-date-limited categories of evidence that law enforcement was authorized to seize at the time—given that those communications, among other things, constitute evidence of [redacted].

6. *No Hearing is Required*

For the reasons stated above, none of the issues raised in the defendant's motion warrants a hearing under *Franks* or any other authority.

First, the defendant cites no authority for the proposition that he is entitled to an evidentiary hearing other than a *Franks* hearing (a standard he has not met). And courts confronting suppression motions akin to the defendant's have routinely denied them without

conducting such a hearing. *See, e.g.*, *Barrett*, 2025 WL 371084, at *22 (no hearing); *Rosario*, 2021 WL 5647879, at *4-*8 (same); *Raniere*, 2019 WL 1984026, at *1-*2 (same); *see also Ray*, 541 F. Supp. 3d at 395-96.

As to *Franks*, the defendant has not nearly carried the "heavy" burden, *Sandalo*, 70 F.4th at 86, of demonstrating a "'substantial preliminary showing" that any of the warrant applications in this case included a "deliberate falsehood or statement made with reckless disregard for the truth" that was "necessary to the judge's finding of probable cause." *Falso*, 544 F.3d at 125. As explained above, his only argument as to a possible misstatement—that Affiant-2 somehow misrepresented the nature of his review in candidly disclosing to not one, not two, but three magistrate judges the process by which law enforcement observed certain materials in "plain view" (*See* Dkt. 43 at 33-34)—is nonsensical. And, as made clear by the substantial evidence detailed in support of every warrant application in this case (much of which the defendant does not take issue with and none of which is subject to suppression based on the defendant's argument), any such misstatement was immaterial. *See Canfield*, 212 F.3d at 718.

## **CONCLUSION**

For the foregoing reasons, the defendant's pretrial motions should be denied.

Dated: New York, New York
September 11, 2026

Respectfully submitted,

JAMES M. McDONALD
United States Attorney

By: s/________________________
Benjamin M. Burkett
Catherine Ghosh
Justin Horton
Assistant United States Attorneys
(212) 637-2455 / 1114 / 2276