UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ANTHONY HERBERT,

Defendant.

**SUPERSEDING INDICTMENT**

S1 26 Cr. 04 (VEC)

## Overview

1. In a series of schemes spanning over six years, ANTHONY HERBERT, the defendant, abused his roles as a public official and community liaison to enrich himself at the expense of his employers and the public, including by soliciting and accepting bribes and kickbacks and engaging in fraud.

2. In the most recent of those schemes, from at least in or about March 2024 through at least in or about September 2024, ANTHONY HERBERT, the defendant—while serving in the Office of the Mayor of New York City ("City Hall")—abused his authority as a public official by seeking and accepting thousands of dollars in cash payments from a particular individual (the "Security Company Executive") in exchange for HERBERT's advice and pressure of other City government officials to award the Security Company Executive's security guard company (the "Security Company") contracts with the City, including for providing services at New York City Housing Authority ("NYCHA") developments.

3. In a second scheme also carried out during his City Hall employment, from at least in or about September 2022 through at least in or about February 2023, ANTHONY HERBERT, the defendant, advised, pressured, and fraudulently induced other City officials to approve payments to a funeral director (the "Funeral Home Director") of a particular funeral home

(the "Funeral Home") under a financial assistance program for burial services for low-income families, in exchange for thousands of dollars in kickbacks from the proceeds of those reimbursement payments from the Funeral Home Director.

4. In a third scheme, from at least in or about August 2019 through at least in or about December 2022—both before and while he was a City official—ANTHONY HERBERT, the defendant, and the executive director (the "Non-Profit Director") of a particular non-profit entity (the "Non-Profit Entity") conspired to and did induce a power company for which HERBERT worked from in or about September 2019 through in or about April 2021 as a community relations specialist (referred to herein with its affiliated entities as the "Power Company") to grant certain funding to the Non-Profit Entity, based on fraudulent misrepresentations that HERBERT and the Non-Profit Director caused to be made to the Power Company. These misrepresentations included, for instance, concealing from the Power Company that HERBERT would and did receive, pursuant to a secret agreement with the Non-Profit Director, kickbacks from the funding awarded to the Non-Profit Entity, rather than the Non-Profit Entity spending the funding as represented to the Power Company. As a result of this agreement between HERBERT and the Non-Profit Director, between in or about August 2019 and in or about December 2022, HERBERT received over $120,000 in kickbacks from funding meant to be used to support community services, including food distribution events, holiday toy giveaways, and the distribution of personal protective equipment ("PPE") during the COVID-19 pandemic.

5. In a fourth scheme, from at least in or about February 2021 through at least in or about June 2021, ANTHONY HERBERT, the defendant, conspired with others to submit a fraudulent loan application—including a fake invoice for a purported cake-baking business in HERBERT's name—just days after the end of his employment with the Power Company.

HERBERT's fraudulent application induced a bank to issue HERBERT a $20,418 loan under the Paycheck Protection Program ("PPP"), a government program administered by the United States Small Business Administration ("SBA") that was intended to help businesses keep workers employed during the COVID-19 pandemic.

**Relevant Individuals**

6. At all times relevant to this Indictment, ANTHONY HERBERT, the defendant, resided in Brooklyn, New York. HERBERT has held various roles in community engagement, both as a private citizen and as a public official. For instance, from in or about August 2019 through in or about April 2021, HERBERT was employed by the Power Company as a community relations specialist at a power plant in Queens, New York. HERBERT's role involved, among other responsibilities, recommending entities and/or programs in the community with which the Power Company should partner on community outreach programs, such as food drives, holiday toy giveaways, and other community events. HERBERT later became a public official. From in or about February 2022 through in or about September 2025, HERBERT worked for the Office of the New York City Mayor's Community Affairs Unit ("Community Affairs") within City Hall. In that capacity, HERBERT first functioned as the Brooklyn Borough Director for Community Affairs from in or about February 2022 through in or about February 2023, and then as the Citywide Public Housing Liaison until in or about September 2025. In the latter role, HERBERT was responsible for engaging with residents and leadership of NYCHA on behalf of City Hall.

7. As a City employee, ANTHONY HERBERT, the defendant, was subject to the New York City Charter, which at all relevant times prohibited a "public servant," such as HERBERT, from "accept[ing] any valuable gift . . . from any person or firm which such public servant knows is or intends to become engaged in business dealings with the city," and from

"us[ing] or attempt[ing] to use his or her position as a public servant to obtain any financial gain." The City Charter further prohibited public servants, such as HERBERT, from "receiv[ing] compensation except from the city for performing any official duty or accept[ing] or receiv[ing] any gratuity from any person whose interests may be affected by the public servant's official action."

8. At all relevant times, the Security Company Executive controlled the Security Company, a private security company incorporated in Brooklyn, New York, which was nominally owned by another individual.

9. At all times relevant to this Indictment, the Funeral Home, located in Brooklyn, New York, was wholly owned by the Funeral Home Director.

10. At all times relevant to this Indictment, the Non-Profit Entity, which is a registered charitable organization in the state of New York, was controlled by the Non-Profit Director, who resided in New Jersey.

**HERBERT Solicited and Received Bribes from the Security Company Executive**

11. As described herein, from at least in or about March 2024 through in or about September 2024, ANTHONY HERBERT, the defendant, solicited bribes of at least $15,000—and accepted bribes of at least $11,000—from the Security Company Executive in exchange for HERBERT's agreement to advise and pressure, and actually advising and pressuring, others within City government to award the Security Company a lucrative City contract, including for providing security to NYCHA properties.

***HERBERT Solicited $15,000 in Bribes***

12. No later than in or about early May 2024, ANTHONY HERBERT, the defendant, began encouraging the Security Company Executive to apply for City security contracts as part of

a scheme to solicit bribes from the Security Company Executive in exchange for HERBERT's assistance in obtaining the contracts. For example, on or about May 2, 2024, HERBERT texted the Security Company Executive, "I need your company info and capability outline asap," and four days later, after the Security Company Executive did not respond, HERBERT texted the Security Company Executive again: "Yo[u] must not really be interested in these contracts!" The Security Company Executive promptly responded to HERBERT with the name of the Security Company, and then called HERBERT and the two spoke for approximately two minutes.

13. Two days later, on or about May 9, 2024, ANTHONY HERBERT, the defendant, communicated to the Security Company Executive how HERBERT's interest in advancing the Security Company Executive's financial interests were tied to the Security Company Executive providing HERBERT with financial assistance. That day, HERBERT asked the Security Company Executive (who was at that time, and all subsequent times relevant to this Indictment, communicating with HERBERT at the direction and under the supervision of law enforcement) via text message for additional information about the Security Company. HERBERT particularly requested from the Security Company Executive a letter on behalf of the Security Company to the City requesting "access to bid[] on contracts." On the same day, and as part of the same text message exchange, HERBERT asked the Security Company Executive for a "loan" of up to $15,000, which HERBERT claimed he would pay back on a monthly basis, though HERBERT never repaid any money received or referenced repayment in future communications. HERBERT followed up with the Security Company Executive several hours later, and again on or about May

11, 2024, asking if the Security Company Executive could provide HERBERT with the "loan" or if HERBERT should "figure something else out."

***HERBERT Ghostwrote a Letter to City Officials on behalf of the Security Company***

14. On or about May 16, 2024, ANTHONY HERBERT, the defendant, emailed the Security Company Executive a ghostwritten letter to City Hall officials so that the Security Company Executive could "peruse [it] for corrections," put it on the letterhead of the Security Company, and send it to City Hall officials. The letter was addressed to two senior City Hall officials ("Senior Official-1" and "Senior Official-2," together the "Senior Officials"), and stated in relevant part, "My name is [name of the Security Company Executive], and I am writing to request an opportunity to present my security company . . . to both of you." The letter introduced the Security Company as a "licensed and certified security company" that offers "a comprehensive range of security services," and further stated that the Security Company was "particularly interested in exploring the possibility of providing security services for NYC Shelters and NYCHA properties."

15. That afternoon, the Security Company Executive spoke by phone with ANTHONY HERBERT, the defendant. During the phone call, which was observed by law enforcement agents, HERBERT instructed the Security Company Executive, in substance, to finalize the ghostwritten letter and transmit it to City officials because, according to HERBERT, "timing is everything." HERBERT explained, in substance, that City officials were terminating their agreement with the company that was then providing security services to NYCHA, thereby presenting an opportunity for the Security Company to obtain new business by servicing NYCHA properties. Approximately one hour later, the Security Company emailed Senior Official-1, copying HERBERT, attaching a

letter on the Security Company's letterhead with text that was nearly identical to the letter HERBERT had circulated earlier that day.

16. That evening, ANTHONY HERBERT, the defendant, contacted both Senior Official-1 and Senior Official-2. With respect to Senior Official-1, HERBERT sent that individual a text message asking Senior Official-1 to "give me a call from your pvt cell." With respect to Senior Official-2, HERBERT sent a text message advising Senior Official-2 that "I had my guys send you that email regarding their security company." The next morning, HERBERT relayed via text message to Senior Official-2 that the Security Company "wanted guidance as to where to begin the process" of obtaining City contracts through programs for Minority- or Women-owned Business Enterprises ("MWBEs"), noting that the Security Company's "MWBE status is pending."

17. Over the next several days, ANTHONY HERBERT, the defendant, frequently communicated with the Security Company Executive. The communications centered on HERBERT's request for money in exchange for HERBERT agreeing to help the Security Company obtain a City contract. For example, on or about May 18, 2024, HERBERT texted the Security Company Executive to ask if there was "[a]ny followup to that request" HERBERT had made for a payment of up to $15,000. The Security Company Executive replied, "Working on it." Four days later, on or about May 22, 2024, HERBERT discussed with the Security Company Executive during a recorded phone call how HERBERT was "planning to follow up with" one of the Senior Officials "in the morning" because the two had "a meeting."[1] The Security Company Executive responded, in relevant part, by referencing the money that HERBERT had requested,

---

[1] All recordings described herein were made at the direction and under the supervision of law enforcement.

stating: "some money came through, so uh I probably meet up with you one day next week if you're free and I'll get that to you." Before their conversation concluded, HERBERT reiterated his desire to obtain money from the Security Company Executive, noting that he was "just trying to stay afloat," and explaining that payment from the Security Company Executive "would be very helpful [and] put me in a better position . . . ."

***HERBERT Accepted a $5,000 Cash Bribe Payment from the Security Company Executive***

18. On or about May 29, 2024, ANTHONY HERBERT, the defendant, and the Security Company Executive agreed to meet later that day outside HERBERT's home in Brooklyn. In advance of the meeting, HERBERT texted the Security Company Executive that HERBERT had "[s]poke[n] to [Senior Official-1] last night as well at the Mayors [sic] townhall, tell u whe[n] I see u." That afternoon, HERBERT and the Security Company Executive met as planned.

19. During the meeting, which the Security Company Executive recorded, the Security Company Executive explained to ANTHONY HERBERT, the defendant, how the Security Company Executive "always can help you [HERBERT] out with anything you need," in exchange for HERBERT's assistance. HERBERT proceeded to describe the steps HERBERT was taking to help the Security Company Executive obtain a contract, recounting his discussions with other City officials, as follows:

> They said they just gotta get you, you gotta go in the system. And, and I, and I, and I whispered, I said, yo, we—this is the kind of guy that's gonna be helpful with election time. That's just the bottom line. You know, he's gonna be very helpful to me in the projects. I can say some shit like that. And whatnot. They were like, aight, this is hot.

20. Later during the meeting, ANTHONY HERBERT, the defendant, explained how HERBERT was "putting the pressure on" the then-Mayor of New York City (the "Mayor") to

increase security at NYCHA developments, which HERBERT claimed would create more contract opportunities for the Security Company. HERBERT stated, in relevant part:

> They took, they took, they took the companies out of NYCHA. Yeah. Because they had a seven, $7 million deficit. So now the mayor, I'm putting the pressure on him through, through NYCHA. I'm saying, yo, we gotta put that money back. The seniors are fucking complaining. We gotta get some security over there. So he's gonna put it back. He's gonna make that announcement and he's gonna win. He's gonna win those votes. He's gonna make that announcement. And once he does that, there's gotta be a contract in place. He's got—that's why I'm trying, that's why I'm rushing you to get your shit—. . . I told you send that letter to [Senior Official-1] and, and what's his name? They control that shit. And [the Mayor] is gonna tell them what to do.

Consistent with this statement by HERBERT, just eight days earlier, on or about May 21, 2024, HERBERT sent a text message to the Mayor—without disclosing his solicitation and receipt of payments from the Security Company Executive—advising that "[a]t that senior center some Resident Leaders were invited who is up in arms about public safety being pulled from NYCHA, just a heads up."

21. Near the conclusion of the May 29, 2024 meeting, the Security Company Executive handed ANTHONY HERBERT, the defendant, $5,000 in cash and told HERBERT, in relevant part, "I see you serious. . . . You working it, then I can, I can make it work. Alright. You know what I'm saying? I could definitely get you more money. I see you seriously working . . . ." The next day, on or about May 30, 2024, HERBERT deposited $4,500 in cash into his bank account.

***HERBERT Accepted a Second Bribe Payment in the Amount of $2,500 from the Security Company Executive***

22. On or about June 10, 2024, the Security Company Executive complained during a recorded phone call with ANTHONY HERBERT, the defendant, that Senior Official-2 was inadequately assisting the Security Company. In response to that complaint, HERBERT agreed to contact Senior Official-2 to "see what's up." The Security Company Executive then described

having recently earned additional money. The Security Company Executive noted how availability of these funds would allow the Security Company Executive to pay HERBERT. HERBERT replied, "Shit dog, that could be helpful . . . You are on point, kid." The Security Company Executive suggested the two meet in person and stated that the Security Company Executive's goal was to "see if we can close this end" and "get this solidified." HERBERT replied, "Don't worry about it, I'll make the connection."

23. ANTHONY HERBERT, the defendant, and the Security Company Executive continued their discussion via text message the next day, on or about June 11, 2024. After HERBERT confirmed for the Security Company Executive that HERBERT would be speaking with Senior Official-2 the next day, the Security Company Executive thanked HERBERT and emphasized how the Security Company Executive was "really banking on this." HERBERT promised he was "working it" but also expressed, via text message, a need for caution to avoid his own role coming to light, warning the Security Company Executive, "I just have to becareful how I do it so it doesnt raise eyebrows."

24. The next morning, on or about June 12, 2024, ANTHONY HERBERT, the defendant, reported to the Security Company Executive that HERBERT had followed through on his promise, texting the Security Company Executive, "You are on the radar." Later that morning, HERBERT and the Security Company Executive spoke by phone. During their discussion, which was recorded, HERBERT recounted the advice HERBERT said he gave to Senior Official-2: "I put the word in. I told him it's important to the mayor that we take care of our MWBEs, if you understand what I'm saying, and go from there."

25. Approximately 15 minutes after this phone call, ANTHONY HERBERT, the defendant, texted the Security Company Executive to request the payment that the Security

Company Executive had referenced two days earlier. HERBERT wrote: "I meant to ask if u still can help out." During a recorded conversation later that day, the Security Company Executive confirmed to HERBERT that the Security Company Executive would send HERBERT an electronic payment of $2,500, explaining: "I see the progress happening. And I do know you're making the connections, and I see the connections . . . . And next week I'll be able to throw a little more, you know. As the progress goes, I'm progressing with you, you feel what I'm saying." HERBERT responded, "Got it, got it." The Security Company Executive then electronically transferred $2,500 to HERBERT.

26. During this time period, and consistent with his promises to the Security Company Executive, ANTHONY HERBERT, the defendant, sent text messages to the Mayor advising of a need for the City to retain private security at NYCHA properties. Specifically, on or about June 21, 2024, HERBERT texted the Mayor, again without disclosing his solicitation and receipt of payments from the Security Company Executive: "Fyi...the only major issue in Public housing is the $7 million dollar cut to security, seniors are up in arms, if you can replace security, you will be back at batting 90% with them." HERBERT then texted the Mayor, "HUD [U.S. Department of Housing and Urban Development] flexed . . ." and sent a link to a June 20, 2024 press release titled "HUD Awards $10 Million to Public Housing Agencies to Protect Residents."

***HERBERT Accepted a Third Bribe Payment in the Amount of $3,500 Cash from the Security Company Executive***

27. On or about July 3, 2024, the Security Company Executive met at City Hall with Senior Official-2 and one other senior City official with authority over contracting ("Senior Official-3"). Shortly before the meeting, ANTHONY HERBERT, the defendant, and the Security Company Executive met and walked together to City Hall. During these interactions, which the Security Company Executive recorded, HERBERT accepted from the Security Company

Executive an envelope containing $3,500 in cash, and HERBERT advised the Security Company Executive how they would conceal HERBERT's role in advancing the Security Company's interests. HERBERT explained that HERBERT himself would not be attending the meeting with Senior Official-2 and Senior Official-3 because, if HERBERT were to attend, "[i]t would look like I'm fucking soliciting, soliciting uh fucking government contracts." HERBERT further coached the Security Company Executive not to imply in the meeting that the Security Company should receive a City contract for any corrupt reasons, stating: "you don't have to say nothing about helping out the mayor or nothing like that. Don't say nothing like that."

28. When ANTHONY HERBERT, the defendant, and the Security Company Executive arrived at City Hall, the two waited together for the Security Company Executive to be called into the meeting. While waiting, the Security Company Executive expressed his gratitude to HERBERT for setting up the meeting. HERBERT replied by recounting how HERBERT had told the Mayor to increase private security services at NYCHA. HERBERT explained: "This is what we do, bro. This is what we do. I mean it's, ain't nobody gonna do it for us. That was one of the reasons why I told him [*i.e.*, the Mayor] he had to put the security back in NYCHA so that more, so like, you could, you could, uh, fuckin submit for that."

29. At approximately 11:00 a.m., the Security Company Executive was called into the meeting with Senior Official-2 and Senior Official-3. The meeting proceeded—without ANTHONY HERBERT, the defendant, in attendance—for approximately seven minutes.

30. Shortly after the meeting, the Security Company Executive met again with ANTHONY HERBERT, the defendant, as the Security Company Executive continued to record their interactions. The Security Company Executive remarked that the meeting seemed like a "rush job." The Security Company Executive further stated, "I want this to work out" so that the Security

Company Executive could "help out whatever I need to help out with you." In response, HERBERT reiterated, in substance, that he would advise and pressure others to award a contract to the Security Company, informing the Security Company Executive that HERBERT was "going [to] keep pushing it through," and that, in any event, the meeting the Security Company Executive had with Senior Official-2 and Senior Official-3 was "just a formality." HERBERT told the Security Company Executive, "I'm on it," and "don't sweat that, I'll take care of it." The Security Company Executive then told HERBERT, "you gonna make some money. If I make money, then *you*—I got you." HERBERT responded, in relevant part, "Alright."

31. Later the same day, the Security Company Executive and ANTHONY HERBERT, the defendant, spoke by phone. During their conversations, which was recorded, the Security Company Executive referenced the cash exchange from earlier that day and asked HERBERT to "check out what I gave you." The Security Company Executive explained that the Security Company Executive may have mistakenly "put an extra thousand" in the envelope he had handed to HERBERT. After HERBERT relayed that he had received "35," the Security Company Executive confirmed the payment included an extra "thousand" that the Security Company Executive had intended to use "at the casino." The Security Company Executive told HERBERT not to "worry about it" and to keep the extra thousand dollars. HERBERT responded, "so I can hold onto this? . . .You the man bro. Thank you." Approximately three hours later, HERBERT deposited $3,000 cash into his bank account.

***HERBERT Continued to Advise and Pressure Other Officials to Contract with the Security Company***

32. After the City Hall meeting, throughout July and August 2024, ANTHONY HERBERT, the defendant, continued to advise and pressure other officials for the benefit of the Security Company Executive. During this time, HERBERT frequently contacted the Security

Company Executive to request updates on the status of efforts by the Security Company to obtain City contracts, and HERBERT similarly contacted Senior Official-2 and Senior Official-3 to assist the Security Company.

33. In exchange for this assistance to the Security Company Executive, ANTHONY HERBERT, the defendant, solicited additional payments. For example, on or about August 9, 2024, HERBERT commented to the Security Company Executive during a recorded call that HERBERT was "trying to stay afloat" financially. The Security Company Executive promised to help HERBERT "stay afloat" while imploring HERBERT to "Help me help you!" HERBERT responded, in substance, with recognition that the Security Company Executive's financial "help" was exchanged for HERBERT advising and pressuring other City officials to award the Security Company contracts, stating: "what do you think I'm doing, doc? But you know, it's a process, that's the whole thing, it's a process."

34. Later the same month, in or about August 2024, ANTHONY HERBERT, the defendant, once again ghostwrote a letter for the Security Company Executive to send to City officials—here, Senior Official-2 and Senior Official-3. As HERBERT explained to the Security Company Executive, HERBERT had identified an "opportunity to get [the Security Company] prequalified so that you can get assigned to a few [City] contracts . . . ." Later that morning, HERBERT emailed the Security Company Executive a draft letter addressed to Senior Official-2 that requested "the necessary information and paperwork required to start the process of applying for security contracts as an MWBE." During a recorded phone call later that day, HERBERT explained to the Security Company Executive that the letter should be sent to Senior Official-2 so that, upon the Security Company being prequalified, Senior Official-2 can "start throwing some stuff your way." Further to this plan, on or about August 22, 2024, HERBERT emailed Senior

Official-2, among others, and attached the letter HERBERT had drafted, which was now signed by the Security Company Executive's colleague and on the Security Company's letterhead.

35. Six days later, on or about August 28, 2024, ANTHONY HERBERT, the defendant, learned from the Security Company Executive that the Security Company Executive had not received any follow-up inquiries from City officials in response to the August 22, 2024 letter. During a recorded call, HERBERT stated that HERBERT would follow up with Senior Official-2 and would also report to the Mayor that Senior Official-3 was failing to do "due diligence." On or about September 4, 2024, law enforcement disrupted HERBERT's scheme. Accordingly, no City contracts were issued to the Security Company as a result of the scheme.

**HERBERT Accepted $5,000 in Kickbacks from the Funeral Home Director**

36. In or about 2022 and 2023, ANTHONY HERBERT, the defendant, exercised his authority as a City employee to advise and pressure other City officials, including through false and fraudulent representations, to approve City reimbursements to the Funeral Home Director, in exchange for kickbacks from the Funeral Home Director. The reimbursements were made pursuant to a burial assistance program administered by the New York City Human Resources Administration ("HRA") for low-income families.

37. On or about September 12, 2022, at the encouragement of ANTHONY HERBERT, the defendant, the Funeral Home Director emailed HERBERT an invoice of $19,500 for a funeral the Funeral Home Director planned to provide for a particular crime victim ("Victim-1"). The invoice did not reflect any credit for payments received via sources such as the family, GoFundMe (a fundraising website that allows individuals to raise money from others, and is sometimes used to raise funds to cover funeral expenses), or any other sources, such as New York State financial-assistance programs for funeral services for low-income families.

38. Over the coming months, from September 2022 through December 2022, ANTHONY HERBERT, the defendant, helped facilitate payment of funds for Victim-1's funeral from the City to the Funeral Home Director with the understanding that the Funeral Home Director would pay a kickback to HERBERT with the funds. For example, on or about September 15, 2022, HERBERT emailed a Community Affairs official ("Senior Official-4") and asked Senior Official-4 to "[p]lease process payment request to support funeral expenses for" Victim-1, attaching the invoice from the Funeral Home Director. HERBERT subsequently confirmed that HERBERT was requesting "just $13k" in reimbursement for the Funeral Home Director, and Senior Official-4 responded, "Copy. Will direct HRA to process for 13k."

39. While ANTHONY HERBERT, the defendant, continued his efforts to obtain City reimbursement for the Funeral Home Director for Victim-1's funeral, another individual ("Victim-2") was killed in mid-October 2022. The day after Victim-2's death, HERBERT provided the Funeral Home Director with contact information for Victim-2's family members. HERBERT purported to carry out this work, at least in part, as part of his City Hall duties and responsibilities.

40. ANTHONY HERBERT, the defendant, worked to ensure that the Funeral Home Director submitted a funeral reimbursement application for City funding for Victim-2's funeral, reminding the Funeral Home Director to submit an "invoice for the city." Following Victim-2's funeral, in late October 2022, the Funeral Home Director emailed HERBERT an invoice for the funeral, requesting a balance due of $7,845. The same day, HERBERT emailed the invoice to certain Community Affairs officials and noted that "[the Funeral Home Director] is getting alot [sic] of referral business once again with these violent acts"—without disclosing that HERBERT himself was the one referring the Funeral Home Director to victims' families, or the kickback arrangement HERBERT had with the Funeral Home Director—and that "[f]amilies truly respect

how he handles the arrangements of their loved ones." HERBERT continued: "I vouch for him . . . ."

41. On or about October 29, 2022, ANTHONY HERBERT, the defendant, requested via text message that the Funeral Home Director send HERBERT the "names" of the deceased which "we need the city to push thr [sic] checks for asap." Approximately 40 minutes later, the Funeral Home Director sent the names and claim numbers for Victim-1 and Victim-2 (as well as for a third individual, whom HERBERT indicated he would not push the City for because that individual "isn't on my case load so I don't want to raise any eyebrows").

42. The next month, in or about November 2022, ANTHONY HERBERT, the defendant, continued to correspond with City officials and with the Funeral Home Director to obtain relevant information and facilitate payment from the City to the Funeral Home Director for funerals for Victim-1 and Victim-2. For example, on or about November 22, 2022, HERBERT sent the Funeral Home Director a blank HRA form and told the Funeral Home Director it had to be filled out. On or about November 29, 2022, the Funeral Home Director emailed HERBERT two HRA burial allowance applications for funerals for Victim-1 and Victim-2 that the Funeral Home Director had filled out, which HERBERT forwarded to Community Affairs officials. Senior Official-4 then requested the final invoices, and on or about December 1, 2022, the Funeral Home Director sent HERBERT funeral bills which HERBERT passed on to the Community Affairs officials. The bill for the funeral for Victim-1 now reflected a $3,000 credit from a state funeral assistance program and a final "balance due" of $16,500, and the bill for the funeral for Victim-2 still reflected a balance due of $7,845.

43. ANTHONY HERBERT, the defendant, particularly played a role in addressing concerns by Community Affairs personnel that the invoices may be over-charging the City. On or

about December 12, 2023, Senior Official-4 asked if the family of Victim-1 had received funds from GoFundMe, because "[m]y understanding is that they received $6k in the GoFundMe." HERBERT falsely stated in response, "as per the Funeral home[], I am told there is no knowledge of a gofundme." HERBERT, however, was well aware that Victim-1's family had a GoFundMe page for Victim-1: on or about September 15, 2022, HERBERT acknowledged via text message to a family member of Victim-1 that "[t]here is over $6000 in the gofundme me." After HERBERT falsely told Senior Official-4 that there was no GoFundMe page for Victim-1, senior Community Affairs officials approved the invoices for Victim-1 and Victim-2 to be sent to HRA. The same day, on or about December 12, 2022, HERBERT texted the Funeral Home Director that "[t]hey finally sent in the request for those cases we discussed."

44. Approximately three weeks later, on or about January 4, 2023, the Funeral Home Director deposited two checks from HRA (both dated December 16, 2022): one check for $16,500 related to Victim-1, and one check for $7,845 related to Victim-2. Two-and-a-half weeks later, on or about January 21, 2023, ANTHONY HERBERT, the defendant, asked the Funeral Home Director if the Funeral Home Director had gotten the "funds from the city" because "they said it went out." The Funeral Home Director responded he had received the funds but that his bank account had been hacked and he was waiting for the bank to replace the funds. With reference to his prior kickback agreement with the Funeral Home Director, HERBERT responded, in part, "Damn Bro[.] I was counting on that hookup."

45. Six days later, on or about January 27, 2023, ANTHONY HERBERT, the defendant, deposited a $5,000 check from the Funeral Home Director (also dated January 27). The memo line of the check stated the payment was for "referrals."

**HERBERT Fraudulently Induced the Power Company to Award at Least $800,000 in Funding to the Non-Profit Entity and Secretly Received Over $120,000 in Kickbacks from the Funding**

46. While employed as a community relations specialist at the Power Company and extending into the period during which he worked for the City, ANTHONY HERBERT, the defendant, and the Non-Profit Director fraudulently induced the Power Company to issue approximately $827,000 in funding to the Non-Profit Entity while the Non-Profit Director, unbeknownst to the Power Company, paid kickbacks to HERBERT from the Power Company funding, rather than using all of the funding as represented.

47. The Power Company's Code of Conduct included a detailed "gifts policy" which stated, among other things, that "[g]ifts of cash [or] cash equivalents" from third parties, "[g]ifts requested or offered in exchange for personal gain or unfair business advantage," and "[g]ifts accepted or provided that influence or give the appearance of influencing business," were "[n]ever [a]cceptable." Additionally, the Power Company's conflict of interest policy, among other things, prohibited employees from "us[ing] their positions with [the Power Company] or knowledge gained therefrom for their personal benefit," and that specifically identified as examples of conflicts of interest "[r]eceiving remuneration for services with respect to individual transactions involving [the Power Company]," and "[r]eceiving personal gifts or loans from third parties dealing or competing with [the Power Company]." The conflict of interest policy also stated that "[r]eceipt of any gifts is disapproved excepts [*sic*] gifts of a value less than $50, which could not be refused without discourtesy. No Personal gift of money should ever be accepted."

48. Notwithstanding these prohibitions on conflicts of interest, ANTHONY HERBERT, the defendant, and the Non-Profit Director agreed to induce the Power Company to award funds to the Non-Profit Entity for purported community programming to be sponsored by the Power Company to enhance its community reputation, while planning, and executing their

plan, for the Non-Profit Director to use the Power Company's funds to pay kickbacks to HERBERT.

49. For example, within a few days of ANTHONY HERBERT, the defendant, beginning work at the Power Company, on or about September 11, 2019, the Non-Profit Director emailed HERBERT a proposal with a $60,000 budget for various enrichment programs (including, *e.g.*, health and women's empowerment workshops) that the Non-Profit Entity sought to provide at four NYCHA developments. Approximately one week later, on or about September 18, 2019, HERBERT texted the Non-Profit Director that "my budget was approved" and asked the Non-Profit Director to send an invoice to his Power Company email. That day, the Non-Profit Director sent HERBERT a $60,000 invoice for the enrichment programs and wrote, "I'm super excited about this opportunity to work with you." The next day, HERBERT submitted a check request to the Power Company for $60,000 to be paid to the Non-Profit Entity.

50. Over the coming weeks, ANTHONY HERBERT, the defendant, and the Non-Profit Director discussed the status of the funding request for the enrichment programs, as well as other events for which they were seeking additional funding. For example, on or about September 30, 2019, the Non-Profit Director asked if HERBERT had any updates on the funding, and HERBERT told the Non-Profit Director that "[t]hey are meeting on Wednesday with the Corporate office to clear the final stage." HERBERT then added, "Lol..***I need the [sponsorship] to happen***" (emphasis added). The Non-Profit Director replied, "[p]rayerfully it will happen," and "[i]t will certainly be a blessing ***for both of us***" (emphasis added). On or about October 21, 2019, HERBERT asked the Non-Profit Director to send him a "letter for the Turkey giveaway" (another Non-Profit Entity program for which the Non-Profit Director was seeking funding from the Power Company), and the Non-Profit Director emailed HERBERT a letter requesting "funding in the

amount of $20,000.00 - to provide 1500 turkeys and food baskets to residents living at [four particular NYCHA developments in Queens]."

51. On or about October 22, 2019, the Power Company made its first payment to the Non-Profit Entity in the amount of $60,000 via check for the funding that the Non-Profit Director and ANTHONY HERBERT, the defendant, sought in September 2019. HERBERT requested that the check be given to him so he could hand-deliver it to the Non-Profit Director. The next day, on or about October 23, 2019, HERBERT and the Non-Profit Director met in person. HERBERT gave the Non-Profit Director a check for $60,000, and the Non-Profit Director gave HERBERT two checks—one for $4,500 and another for $5,500. The checks were issued to an entity that HERBERT controlled, and their memo lines stated "consultant fee" and "consultant fee - training," respectively. The Non-Profit Director told HERBERT to wait to deposit the checks until after the Power Company's check to the Non-Profit Entity had "fully cleared."

52. The October 22, 2019 check from the Power Company to the Non-Profit Entity was soon followed by additional funding to the Non-Profit Entity that ANTHONY HERBERT, the defendant, helped secure: $20,000 on or about October 29, 2019, for a NYCHA turkey giveaway, and $25,000 on or about November 7, 2019, for a program in which the Non-Profit Entity planned to coordinate a bus trip to an amusement park for youth, for a total of $105,000 in funding to the Non-Profit Entity in 2019 (including the $60,000 in funding for various enrichment programs described above). The $10,000 that the Non-Profit Director gave HERBERT on October 22, 2019, was therefore approximately 10% of the total amount of funding that HERBERT helped the Non-Profit Entity secure from the Power Company in 2019.

53. Materials submitted by the Non-Profit Director to the Power Company via ANTHONY HERBERT, the defendant, in connection with the funding awarded by the Power

Company in 2019 did not disclose HERBERT having any paid role with the Non-Profit Entity or that any of the funds would be used to pay HERBERT rather than for the funding's intended purposes. For example, on or about December 17, 2019, the Non-Profit Director emailed HERBERT an "Enrichment Program Update[]" that thanked HERBERT and the Power Company "for providing the funding to sponsor [the Non-Profit Entity's] Enrichment Programs" at four NYCHA developments and provided a "program budget" showing how the $60,000 issued in October 2019 was being spent (as well as attaching certain program materials, such as resumes for workshop instructors). None of the disclosed expenses covered "consultant fees" or otherwise indicated that any such fee was being paid to HERBERT.

54. In the course of their scheme, ANTHONY HERBERT, the defendant, and the Non-Profit Director made additional misrepresentations to the Power Company, beyond concealing their misuse of the funding in connection with the kickbacks that the Non-Profit Director was paying to HERBERT. For example, in or about December 2019, HERBERT texted the Non-Profit Director regarding the upcoming amusement park trip, saying that they needed to cancel one of the five buses that had been rented for the trip, and then suggesting, "lets split that savings!!!" The Non-Profit Director agreed and canceled the fifth bus, resulting in savings of approximately $1,400. A few days later, HERBERT texted the Non-Profit Director that the Power Company was asking for her "final overview" on the three programs (*i.e.*, the enrichment programs, turkey giveaway, and amusement park bus trip) "to determine future funding," and then suggested, "Lets leave in the invoice with the 5 buses! Your thoughts?" That is, consistent with his prior suggestion that they "split that savings," HERBERT suggested sending the Power Company the original invoice showing the cost of five buses, even though the Non-Profit Entity was now using (and paying for) just four buses. This is what the Non-Profit Director did,

submitting a cover letter and supporting documentation to the Power Company via HERBERT on or about December 30, 2019, which described the event as involving "five buses" and included the outdated (and incorrect) invoice for five buses.

55. ANTHONY HERBERT, the defendant, continued to steer funds from the Power Company to the Non-Profit Entity based on his and the Non-Profit Director's misrepresentations. During 2020 and 2021, the Power Company provided the Non-Profit Entity with over $600,000 in funding for programs such as workshops, food and toy giveaways, and—once the COVID-19 pandemic began in early 2020—distribution of PPE. During the same period, the Non-Profit Director and the Non-Profit Entity paid HERBERT (or entities he controlled) over $100,000 in undisclosed kickbacks.

56. For example, on or about April 23, 2020, ANTHONY HERBERT, the defendant, requested that the Power Company award $50,000 in funding to the Non-Profit Entity for the purchasing of masks and other PPE for residents of NYCHA developments. When a Power Company supervisor asked whether the Non-Profit Entity was "legitimate," HERBERT responded, in part, that the Non-Profit Entity came "highly recommended" and that its "community partnership is extremely important for our purposes"—without disclosing his kickback agreement with the Non-Profit Director. Based on HERBERT's misrepresentations, including purported accountings of the Non-Profit Entity's use of Power Company funds that concealed the kickbacks that HERBERT planned to and did receive from the funding, the Power Company agreed to allocate $50,000 to the Non-Profit Entity for the PPE distribution program. The next morning, HERBERT texted the Non-Profit Director that "my direct mgr is being the bitch he is again, he wants an outline on how we plan to procure the mask and the overhead." The Non-Profit Director said this was "no problem" and told HERBERT that the Non-Profit Director would call HERBERT

shortly. HERBERT replied, "Ok package it sweet, u know!! ;-)." Later that day, the Non-Profit Director emailed HERBERT a "budget narrative" that included an estimated $50,000 budget consisting of $42,500 for 50,000 masks (further broken down by price per mask and number of boxes), $3,495 for PPE supplies, and $4,005 for transportation. The budget also noted that volunteers—*i.e.*, unpaid labor—would be used to deliver "all the supplies." On or about May 4, 2020, the Non-Profit Director texted HERBERT a photo of the Power Company's $50,000 check to the Non-Profit Entity, and four days later the Non-Profit Entity issued two kickback checks to HERBERT's entity for $5,500 and $4,500, respectively, as purported "consultant fee[s]."

57. Although ANTHONY HERBERT, the defendant, left his employment with the Power Company in or about April 2021 when he was running for public office, his scheme with the Non-Profit Director continued. For example, in or about August 2021, the Non-Profit Director submitted to the Power Company a food insecurity program proposal—nearly identical to a Non-Profit Entity food insecurity program proposal that HERBERT had submitted to the Power Company in or about January 2021—that set out a budget of "100 bags of grocery = $55.00 x 100 = $5,500 each location/week," for a total of $88,000 for four weeks at four locations, but made no mention of any consulting fees or other payments to HERBERT. On or about October 21, 2021, HERBERT sent the Non-Profit Director an email setting out his expected "Budget Consulting Commission" that listed approximately 20% purported "commissions"—in reality, kickbacks—for six programs HERBERT had initially caused the Power Company to fund and for which the Non-Profit Entity was continuing to receive Power Company funding, including the food insecurity program. HERBERT did not list any "commission" for the only two programs on his list that were not associated with the Non-Profit Entity, the names of which are redacted below:

| | Budget. | Commission |
|---|---|---|
| Food Insecurity. | $88,000. | $10,000 |
| [redacted] | $25,000 | |
| Women's Emp. | $25,000. | $5,000 |
| Youth Gang. | $25,000. | $5,000 |
| [redacted] | $25,000 | |
| Turkey Drive. | $25,000. | $5,000 |
| Toy Giveaway. | $25,000. | $5,000 |
| PPE. | $50,000. | $10,000 |

58. The Non-Profit Director agreed with these calculations regarding the kickbacks to be paid to ANTHONY HERBERT, the defendant. Several days after HERBERT sent the above accounting, he and the Non-Profit Director had an approximately 10-minute call. Approximately 20 minutes later, the Non-Profit Director texted HERBERT that the Non-Profit Director had "just checked & you're right it was 10k off the PPP" (mistakenly referring to the PPE mask funding as "PPP"). That is, consistent with HERBERT's prior email to the Non-Profit Director showing their kickback agreement, the Non-Profit Director agreed that HERBERT was owed a $10,000 "commission" from the PPE funding. Several hours later, HERBERT responded, "Lol, I told you."

59. A few days later, on or about October 29, 2021, the Non-Profit Entity received a wire transfer of $246,625 from the Power Company's Manhattan bank for the six programs described in the "commission" email from ANTHONY HERBERT, the defendant. On or about November 9 and 10, 2021, the Non-Profit Entity made three payments to HERBERT totaling $24,625 with the memos, "Partial payment for commission," "Partial payment for commission (2nd payment)," and "Final commision [sic] payment." The following month, HERBERT's entity received another $4,500 from the Non-Profit Entity as another alleged "consultant fee."

60. The scheme to defraud the Power Company continued even after ANTHONY HERBERT, the defendant, obtained his first role in City Hall in or about February 2022, with HERBERT touting his purported connections to City leadership in pressing the Power Company to award continued funding to the Non-Profit Entity. For example, in or about April 2022, after multiple text messages in which HERBERT pressured the Power Company to continue to award funding to the Non-Profit Entity, HERBERT thanked the Power Company for finally awarding the funding and noted, in part, that he would be "an ally in city hall now" and claimed he had the "ear" of City Hall leadership.

61. ANTHONY HERBERT, the defendant, received at least one payment from the Non-Profit Director for the Power Company contracts while HERBERT was employed at City Hall. On or about November 22, 2022, the Non-Profit Entity received additional funding from the Power Company for a turkey giveaway held on or about November 18, 2022, and a holiday toy giveaway to be held later that year, totaling approximately $60,000, collectively. The day before the funding was issued, on or about November 21, 2022, HERBERT asked the Non-Profit Director if the Non-Profit Entity planned to hold the turkey giveaway that year, and the Non-Profit Director informed HERBERT that the giveaway had already happened "this past Friday"—*i.e.*, November 18, 2022. In response, on or about November 25, 2022, HERBERT texted the Non-Profit Director the following message, setting forth his understanding of the kickbacks he was owed under their agreement:

> Hey [. . .] Not sure how I should feel given all I put in place and covered up to secure your access to [the Power Company] to not hear anything or even get a call from you. Maybe I am just a different person and always looking out for others and shouldn't expect folks to be like me or do as I do. Even a "small" token of appreciation when contracts are issued I thought would've been a good gesture. I'm in my feelings right now!

That is, HERBERT conveyed to the Non-Profit Director his understanding that, despite his no longer working at the Power Company and his new role with the City, he still expected that, "when contracts [were] issued" (*i.e.*, when the Power Company awarded funding to the Non-Profit Entity), he would receive a "token of appreciation" from the Non-Profit Director (*i.e.*, a kickback, as he had before), partly in exchange for all he had "put in place and covered up to secure . . . access" to the Power Company (*i.e.*, the funding he had helped the Non-Profit Entity secure while concealing, among other things, the true intended use of all the funding and the true reasons that he had advocated for the Power Company to award funding to the Non-Profit Entity). After various attempts beginning the next day to get in touch with HERBERT, the Non-Profit Director finally spoke with HERBERT by phone on or about December 8, 2022. Approximately 11 days later, on or about December 19, 2022, the Non-Profit Director sent HERBERT a $1,000 electronic payment described as a "consultant fee."

62. In similar efforts to help obtain funding from the Power Company for the Non-Profit Entity, in or about May 2024—by which point he had become the Citywide Public Housing Liaison at City Hall—ANTHONY HERBERT, the defendant, emailed the Non-Profit Director the text of a ghostwritten letter for the Non-Profit Director to send to the Power Company expressing "deep concern regarding the recent actions taken by [the Power Company] in pulling back the resources that were committed to support our community," and suggesting the letter list "Tony Herbert/NYCHA Citywide Liaison[,] Office of the Mayor" as a "Cc."

**<u>HERBERT Fraudulently Obtained a $20,000 Federal PPP Loan</u>**

63. The Paycheck Protection Program was a loan program administered by the SBA intended to help businesses keep their workforce employed during the COVID-19 pandemic. Applications for PPP loans were submitted directly to banks that participated in the program.

64. On or about April 10, 2021—just days after ANTHONY HERBERT, the defendant, ended his employment with the Power Company—a PPP loan application was filed in the name of HERBERT for a company that reportedly used the business name "Anthony Herbert," and which had purported gross income in 2020 of $98,010. Based on its reported income, the company was approved for a loan of $20,418. HERBERT's application indicated that the loan's purpose was "Payroll Costs (including proprietor expenses, equal to business expenses plus owner compensation)," and listed HERBERT as the 100% owner and sole employee of the eponymous company, which was purportedly established on or about October 1, 2017.

65. To substantiate that the "Anthony Herbert" business's purported revenue in 2020 was $98,010, the PPP loan application filed in the name of ANTHONY HERBERT, the defendant, enclosed a purported invoice numbered Invoice 2930, dated January 20, 2020, and issued on behalf of HERBERT's eponymous company to a particular customer for $810 (reflecting that it was paid in full in cash) for a "Three layer cake – 80's Themed - Orange, Blue, Black and White – Tie dye color" delivered to a particular hotel in Brooklyn, New York. This invoice, which suggested that the "Anthony Herbert" business sold cakes, was fraudulent. Among other things, the email address listed for HERBERT on the January 2020 invoice was created on or about April 9, 2021—over a year *after* the date the purported invoice was issued, and the day before HERBERT's PPP application was submitted.

66. The purported cake invoice included in the fraudulent PPP loan application for ANTHONY HERBERT, the defendant, was substantially identical to the invoice submitted with a fraudulent loan application for one of HERBERT's co-conspirators ("CC-1") in or about February 2021. CC-1's invoice was purportedly issued to a customer with the same surname as HERBERT's purported customer, and also purported to charge $810 for a "Three layer cake – 80's

Themed - Orange, Blue, Black and White – Tie dye color," delivered to the same Brooklyn hotel on the same date in January 2020 as HERBERT's purported cake invoice.

67. The fraudulent PPP loan application for ANTHONY HERBERT, the defendant, also included a falsified Internal Revenue Service ("IRS") Form 1040 Schedule C (used to report income from a sole proprietorship) for the year 2020 for the business "Anthony Herbert." The Schedule C indicated that HERBERT was the proprietor of that business, and that the type of business or profession was "consultant." The Schedule C reported $98,010 in gross receipts or sales, and the same amount as gross profit. The Schedule C also reported specific expenses for the business including $10,325 for supplies and $4,349 for travel, with purported net profit of $78,930. The Schedule C, however, was false: 2020 tax returns prepared for HERBERT by a tax preparer and signed by HERBERT did not include any Schedule C, and the IRS has no record of HERBERT ever having submitted the Schedule C that was submitted in support of HERBERT's PPP loan application.

68. The fraudulent PPP loan application submitted under the signature of ANTHONY HERBERT, the defendant, certified (among other things) that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law . . . ." That certification was false.

69. On or about April 13, 2021, ANTHONY HERBERT, the defendant, received $20,418 as proceeds of the PPP loan by an electronic deposit into a checking account that HERBERT held.

70. Within days of receiving his fraudulent PPP loan proceeds, ANTHONY HERBERT, the defendant, made two electronic payments totaling $5,000 to CC-1. And through

approximately June 2021, HERBERT routinely made approximately weekly transfers in the amount of $1,923.08 from the bank account that held his fraudulent loan proceeds to another account he held at that bank (the same account into which he deposited payments from the Security Company Executive, the Funeral Home Director, and the Non-Profit Director). CC-1 similarly made approximately weekly withdrawals from CC-1's fraudulent loan proceeds in the exact same amount. These weekly withdrawals were designed to appear like payroll payments, creating the illusion that HERBERT was complying with the PPP's conditions.

**HERBERT's False Financial Disclosures**

71. ANTHONY HERBERT, the defendant, took several steps beyond those described above to conceal his corrupt dealings with the Security Company Executive, Funeral Home Director, and Non-Profit Director, and his fraudulent PPP loan. For example, HERBERT did not disclose his payments from the Non-Profit Director, nor the proceeds of his fraudulent PPP loan, when answering questions during the City's background investigation for his public employment. HERBERT also omitted from financial disclosures he was required to file in 2022, 2023, and 2024 in connection with his City employment that he had received payments from the Security Company Executive, Funeral Home Director, and Non-Profit Director, and that he had an outstanding PPP loan.

72. ANTHONY HERBERT, the defendant, electronically filed his required financial disclosures for the years 2022, 2023, and 2024 on or about April 10, 2023, May 20, 2024, and May 6, 2025, respectively. In the disclosures, HERBERT falsely answered "no" to the following questions, among others:

- During [the relevant year], did you receive any gift or gifts valued at $50 or more from the same person or entity or affiliated entities that had business dealings with the City?

- During [the relevant year], did you receive any gift or gifts valued at $1,000 or more from the same person or entity or affiliated entities that did not have business dealings with the City?

- Did you owe any entity or person (other than a relative) $5,000 or more for 90 consecutive days during [the relevant year] or on the date you file this report?

- During [the relevant year], did you . . . receive gifts in the aggregate amount or value of $50.00 from any single source where the source is a person or firm doing business with, or intending to do business with, the City of New York.

In submitting these forms, ANTHONY HERBERT, the defendant, certified that "I have personally reviewed all information contained in this report and that it is true, accurate, and complete, to the best of my knowledge." Notwithstanding that certification, HERBERT did not report the $1,000 he received from the Non-Profit Director in December 2022, nor did he report the $5,000 he received from the Funeral Home Director in January 2023, nor did he report the $11,000 he received from the Security Company Executive in May, June, and July 2024. Similarly, HERBERT did not report the PPP loan described above, which remained outstanding (and had been so for more than 90 days) and was more than $5,000 that he "owe[d] any entity or person (other than a relative)" during each year he filed such disclosures.

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Bribery)

The Grand Jury charges:

73. The allegations contained in paragraphs 1 through 35 and 71 through 72 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

74. From at least in or about March 2024 through in or about September 2024, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, being an agent of a local government, to wit, the City of New York, which received, in the calendar year

2024, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and a series of transactions of the City of New York involving a thing of value of $5,000 and more, to wit, HERBERT agreed to and did solicit at least $15,000, and accepted at least $11,000, from the Security Company Executive in exchange for HERBERT agreeing to advise and pressure, and in fact advising and pressuring, other City Hall officials to cause the City to award the Security Company security contracts with the City.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

**COUNT TWO**
**(Honest Services Wire Fraud)**

The Grand Jury further charges:

75. The allegations contained in paragraphs 1 through 35 and 71 through 72 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

76. From at least in or about March 2024 through in or about September 2024, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and to deprive the public and the City of New York of their intangible right to the honest services of HERBERT, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HERBERT solicited and accepted cash payments from the Security Company Executive in exchange for HERBERT agreeing to advise and pressure, and in fact advising and pressuring, other City Hall officials to cause the City to award the Security

Company security contracts with the City, and HERBERT transmitted and caused to be transmitted electronic communications to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343, 1346, and 2.)

**COUNT THREE**
**(Extortion Under Color of Official Right)**

The Grand Jury further charges:

77. The allegations contained in paragraphs 1 through 35 and 71 through 72 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

78. From at least in or about March 2024 through in or about September 2024, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, knowingly committed and attempted to commit extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, HERBERT, under color of official right, obtained from the Security Company Executive cash payments, with the consent of the Security Company Executive, that were not due HERBERT or his office, in exchange for HERBERT agreeing to advise and pressure, and in fact advising and pressuring, other City Hall officials to cause the City to award the Security Company security contracts with the City.

(Title 18, United States Code, Section 1951.)

**COUNT FOUR**
**(Bribery)**

The Grand Jury further charges:

79. The allegations contained in paragraphs 1 through 10, 36 through 45, and 71 through 72 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

80. From at least in or about September 2022 through in or about February 2023, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, being an agent of a local government, to wit, the City of New York, which received, in each of the calendar years 2022 and 2023, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and a series of transactions of the City of New York involving a thing of value of $5,000 and more, to wit, HERBERT solicited and accepted at least $5,000 from the Funeral Home Director in exchange for HERBERT agreeing to advise and pressure, and in fact advising and pressuring, other City Hall officials to approve more than approximately $24,000 in reimbursements for the Funeral Home.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

**COUNT FIVE**
**(Federal Program Fraud)**

The Grand Jury further charges:

81. The allegations contained in paragraphs 1 through 10, 36 through 45, and 71 through 72 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

82. From at least in or about September 2022 through in or about February 2023, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, being an agent of a local government, to wit, the City of New York, which received, in each of the calendar years 2022 and 2023, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, obtained by fraud property worth at least $5,000 and under the care, custody, and control of the City of New York, to wit, HERBERT fraudulently induced the City to award funds to the Funeral Home, of which HERBERT obtained at least $5,000, including by falsely telling City officials there were no GoFundMe funds raised for Victim-1's funeral, when in fact HERBERT was aware that thousands of dollars had been raised through GoFundMe, and by concealing his referrals of Victim-1 and Victim-2 to the Funeral Home Director.

(Title 18, United States Code, Sections 666(a)(1)(A) and 2.)

**COUNT SIX**
**(Conspiracy to Commit Wire Fraud)**

The Grand Jury further charges:

83. The allegations contained in paragraphs 1 through 10 and 63 through 72 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

84. From at least in or about February 2021 through in or about June 2021, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

85. It was a part and an object of the conspiracy that ANTHONY HERBERT, the defendant, and others known and unknown, knowingly having devised and intending to devise a

scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, HERBERT agreed to and did engage in a scheme with, among others, CC-1 to obtain PPP loan funds by causing the electronic submission of a false and fraudulent loan application and receiving an electronic transfer of approximately $20,418 in loan funds as a result of such false and fraudulent application, and HERBERT transmitted and caused to be transmitted electronic communications to, from, and through the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Section 1349.)

**COUNT SEVEN**
**(Wire Fraud)**

The Grand Jury further charges:

86. The allegations contained in paragraphs 1 through 10 and 63 through 72 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

87. From at least in or about April 2021 through at least in or about June 2021, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, HERBERT engaged in a scheme to obtain PPP loan funds by causing the electronic submission of a false and fraudulent loan application and receiving an

electronic transfer of approximately $20,418 in loan funds as a result of such false and fraudulent application, and HERBERT transmitted and caused to be transmitted electronic communications to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT EIGHT
## (Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

88. The allegations contained in paragraphs 1 through 10, 46 through 62, and 71 through 72 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

89. From at least in or about September 2019 through in or about December 2022, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

90. It was a part and an object of the conspiracy that ANTHONY HERBERT, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, HERBERT agreed to and did engage in a scheme with the Non-Profit Director to fraudulently induce the Power Company to award funding to the Non-Profit Entity by falsely representing that the funding would

be used for legitimate purposes while concealing that a portion of the funding would, in fact, be kicked back to HERBERT pursuant to a secret agreement between HERBERT and the Non-Profit Director, and HERBERT sent and received, and caused others to send and receive, electronic transfers of funds and electronic communications to, from, and through the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Section 1349.)

**COUNT NINE**
**(Wire Fraud)**

The Grand Jury further charges:

91. The allegations contained in paragraphs 1 through 10, 46 through 62, and 71 through 72 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

92. From at least in or about September 2019 through in or about December 2022, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, HERBERT engaged in a scheme with the Non-Profit Director to fraudulently induce the Power Company to award funding to the Non-Profit Entity by falsely representing that the funding would be used for legitimate purposes while concealing that a portion of the funding would, in fact, be kicked back to HERBERT pursuant to a secret agreement between HERBERT and the Non-Profit Director, and HERBERT sent and received, and caused others to send and receive, electronic transfers of funds and

electronic communications to, from, and through the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATIONS

93. As a result of committing the offenses alleged in Counts One through Nine of this Indictment, ANTHONY HERBERT, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

### Substitute Assets Provision

94. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

[redacted]
FOREPERSON

Oct 14, 2026

James M. McDonald
JAMES M. McDONALD
United States Attorney